## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| _____ )<br><br>CITY OF PROVIDENCE and )<br>CITY OF CENTRAL FALLS, )<br>*Plaintiffs,* )<br>  )<br>v. )<br>  )<br>JEFFERSON B. SESSIONS III, in his )<br>official capacity as Attorney General of the )<br>United States, and the UNITED STATES )<br>DEPARTMENT OF JUSTICE, )<br>*Defendants.* )<br>_____ )<br>  ) | C.A. No.: 1:18-cv-00437-JJM-LDA<br><br>AMENDED COMPLAINT FOR<br>DECLARATORY AND INJUNCTIVE<br>RELIEF |

## <u>INTRODUCTION</u>

1.     In our system of government, local governments are the primary source for law enforcement policies to keep communities safe and promote trust between law enforcement agencies and the residents they serve. The Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program provides funding for states and units of local government to support a broad range of criminal justice related activities based on their own local needs and conditions. Congress has appropriated hundreds of millions of dollars in annual grant funds to that end. Contrary to this congressional intent, however, the United States Department of Justice ("DOJ") has now decided to coerce local governments into enforcing the federal government's civil immigration priorities by conditioning Byrne JAG funding on compliance with immigration-related conditions that have nothing to do with the program's purpose. Plaintiffs—the City of Providence ("Providence") and the City of Central Falls ("Central Falls") (collectively, the "Cities" or "Plaintiffs")—challenge these unconstitutional and illegal conditions, and seek declaratory and injunctive relief to protect their ability to pursue their own law enforcement prerogatives in the manner that best achieves the safety and security of their communities.

2.      The Byrne JAG program is designed to "give state and local governments more flexibility to spend money for programs that work for them rather than impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005). Byrne JAG funds have been used to support a diverse array of programs tailored to local law enforcement needs.

3.      On July 25, 2017, DOJ issued a press release announcing that it was imposing three immigration-related conditions on Fiscal Year ("FY") 2017 Byrne JAG funds. The conditions require states and local governments to (1) provide unfettered access to their correctional facilities for federal immigration enforcement agents (the "access condition"); (2) provide advance notice to federal immigration authorities before a suspected alien's scheduled release from custody (the "notice condition"); and (3) comply with federal statute (8 U.S.C. § 1373) prohibiting state and local governments from restricting their officials from communicating with federal immigration authorities regarding any individual's citizenship or immigration status (the "cooperation condition"). In conjunction therewith, for FY 2017, DOJ is requiring certification of compliance with Section 1373 and the notice and access conditions. (These three conditions and the certifications required are referred to collectively as "the FY 2017 immigration-related conditions").

4.      A year later, on June 28, 2018, DOJ issued a press release announcing "new conditions" on four (4) public safety FY 2018 grants in order to "enforce immigration laws." The FY 2018 conditions change the FY 2017 immigration-related conditions in form but not in substance and add additional immigration-related conditions. In order to accept Byrne JAG awards, the FY 2018 conditions include re-packaged versions of (1) the access condition; (2) the notice condition; and (3) the cooperation condition; as well as (4) a new prohibition on the public disclosure of any federal law enforcement information that might harbor or shield from detection

2

any illegal aliens pursuant to 8 U.S.C. § 1324 (the "gag-order condition"). In conjunction therewith, for FY 2018, DOJ is requiring certifications of compliance with these four conditions and with various federal law enforcement and immigration statutes—namely, 8 U.S.C. §§ 1226(a) and (c), 1231(a)(4), 1324(a), 1357(a)(1), 1366(1) and (3), 1373, and 1644—that DOJ purportedly considers to be *post hoc* statutory authority for these conditions. (These four conditions and the certifications required by DOJ in order for Plaintiffs to receive Byrne JAG funds are referred to collectively as "the FY 2018 immigration-related conditions.")

5.      DOJ's decision to impose these sweeping conditions on Byrne JAG grantees represents an unlawful, *ultra vires* attempt to force states and localities to forsake their own policy judgments and aid in federal civil immigration enforcement. Nothing in the Byrne JAG statute "grant[s] the Attorney General the authority to impose conditions that require states or local governments to assist in immigration enforcement, nor to deny funds to states or local governments for their failure to comply with those conditions." *City of Chicago v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018).

6.      DOJ has thus forced the Cities into an untenable position: accept unlawful and unconstitutional conditions that diminish their ability to design their law enforcement policies and protect their communities, or forfeit Byrne JAG funding, thus undermining the vital programs that such funding supports.

7.      Accordingly, the Cities file this action seeking a declaratory judgment that the immigration-related conditions DOJ seeks to impose on both FY 2017 and FY 2018 Byrne JAG funds (together simply referred to as "the immigration-related conditions") are unlawful, and a permanent injunction enjoining DOJ from imposing these conditions on any Bryne JAG applicant in order to receive the funds.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346. The Court is authorized to issue the relief sought here under the Administrative Procedures Act, 5 U.S.C. §§ 702, 705, 706, and the Declaratory Judgment Act, 28 U.S.C. § 2201, 2202.

9.      Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The Cities are located in this District, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur herein.

## PARTIES

10.     Plaintiff City of Providence, represented by and through its Solicitor, Jeffrey Dana, is a municipal corporation organized pursuant to Rhode Island state law. Providence is a political subdivision of the State of Rhode Island and derives its powers through the state constitution, state laws, and its home rule charter.

11.     Providence is the state capital of Rhode Island and the third largest city in New England. According to the 2014 American Community Survey data, Providence has a population of 179,154 and an urban population density of 9,736 people per square mile. The city experiences the majority (70%) of the state's violent crimes. Providence is home to a diverse community, with a population that is 38% Hispanic or Latino, 38% White, 16% Black, 6% Asian, and 6% Multi-Racial. Over 47% of Providence residents speak a language other than English, compared to just 21% of residents statewide. Providence is one of the poorest cities in the Northeast, with approximately 29% of its residents receiving income below the federal poverty level. Despite these financial challenges, the City's community-oriented police policies have helped reduce the incident of crime by over 20% between 2013 and 2015.

12.     Plaintiff City of Central Falls, represented by and through its Solicitor, Matthew Jerzyk, is a municipal corporation organized pursuant to Rhode Island state law. Central Falls is a political subdivision of the State of Rhode Island and derives its powers through the state constitution, state laws, and its home rule charter.

13.     Central Falls has the most low-income people, immigrants, and people of color, per capita, in the state. Encompassing only 1.27 square miles, Central Falls has approximately 19,376 residents, of whom 38% are foreign-born, according to the 2010 U.S. Census.[1]  A super-majority of the population, 74.4%, is people of color, with an estimated two-thirds of the population of Hispanic or Latino origin (2016). Central Falls has the lowest median income among state municipalities (which approximates roughly half of the state median income). According to the 2016 RI Kids Count Factbook, 41% of Central Falls' children live in poverty and 19% in extreme poverty, more than twice the state rates. Despite these financial challenges, Central Falls has witnessed a reduction in crime of over 17% in the last five years as a result of community-oriented policing policies.

14.     The Cities are aggrieved by Defendants' actions and have standing to bring this action.

15.     Defendant United States Department of Justice ("DOJ") is an agency and executive department of the United States government and has responsibility for implementing the Byrne JAG program, which is administered by DOJ through its Office of Justice Programs.

16.     Defendant Jefferson B. Sessions III was the Attorney General of the United States and the federal official in charge of the DOJ until he tendered his resignation on November 7,

---

[1]     *See* United States Census Bureau, Quick Facts, Central Falls, Rhode Island, https://tinyurl.com/ycso7ddq (last visited November 9, 2018).

5

2018. Matthew G. Whitaker is serving as acting Attorney General.[2] The Attorney General is sued in his official capacity.

## FACTUAL ALLEGATIONS

### I.      The Byrne JAG Program

17.      The Byrne JAG program has its origins in the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, Title I, 82 Stat. 197, which created the first block grants for states and localities to use for law enforcement and criminal justice programs.[3] Recognizing that "crime is essentially a local problem that must be dealt with by State and local governments," 82 Stat. at 197, Congress designed the grant to provide a reliable funding stream that states and localities could use in accordance with state and local law enforcement policies.[4]

18.      To ensure federal deference to local priorities, the 1968 Act prohibited federal agencies and executive branch officials from using law enforcement grants to "exercise any direction, supervision, or control over any police force or any other law enforcement agency of any State or any political subdivision thereof." *Id.* § 518(a), 82 Stat. at 208. Although Congress has repeatedly modified the structure and terms of the law enforcement grants authorized under Title I of the 1968 Act, the prohibition originally set forth in § 518 of the 1968 Act remains in effect with virtually no modification, and is now codified in the same chapter of the U.S. Code as Byrne JAG. *See* 34 U.S.C. § 10228(a). The full text of Section 10228(a) provides: "Nothing in

---

[2]      Rule 25(d) of the Federal Rules of Civil Procedure provides for automatic substitution of public officers.

[3]      *See* Justice System Improvement Act of 1979, Pub. L. No. 96-157, 93 Stat. 1167, 1179 (amending Title I of the 1968 Act and reauthorizing law enforcement block grants to states and local governments); Justice Assistance Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837, 2077-85 (same); Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, pt. E, 102 Stat. 4181, 4329 (amending Title I of the 1968 Act and creating a formula law-enforcement grant); Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, § 1111, 119 Stat. 2960, 3094 (2006) (amending Title I of the 1968 Act and creating the modern Byrne JAG program).

[4]      *See, e.g.*, S. Rep. No. 90-1097, at 2 (1968) (stating that Congress sought to encourage States and localities to adopt programs "based upon their evaluation of State and local problems of law enforcement"); *see also Ely v. Velde*, 451 F.2d 1130, 1136 (4th Cir. 1971) (reviewing the legislative history of the 1968 Act and concluding that "[t]he dominant concern of Congress apparently was to guard against any tendency towards federalization of local police and law enforcement agencies").

this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." *Id.*

19.     Congress codified the modern Byrne JAG program in 2006.[5] 34 U.S.C. §§ 10151-58. Like its predecessors, Byrne JAG aims to "give state and local governments more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005). To that end, the Byrne JAG statute gives recipients substantial discretion to use funds for eight broad statutory purposes—namely: (1) law enforcement, (2) prosecution and courts, (3) crime prevention and education, (4) corrections and community corrections, (5) drug treatment, (6) planning, evaluation, and technology improvement, (7) crime victim and witness programs, and (8) mental health programs, including behavioral programs and crisis intervention. 34 U.S.C. § 10152(a)(1).

20.     DOJ is required by law to issue grants in "accordance with the formula" set forth in the Byrne JAG statute. *Id.* That formula determines the distribution of Byrne JAG funds to state and local governments based on their population and relative levels of violent crime and is explicitly enumerated in 34 U.S.C. § 10156.

21.     Of the money allocated to each state, sixty percent of the funding "shall be for direct grants to States," *id.* § 10156(b)(1), and forty percent "shall be for grants" directly to localities, *id.* 34 § 10156(b)(2), (d). Each state is required to allocate a portion of its award to

---

[5]     The program is named after a former New York City police officer who was killed in the line of duty while protecting a Guyanese immigrant who was acting as a cooperating witness. *See About Officer Byrne*, https://goo.gl/pLm8JM (last visited November 9, 2018), *see also Arjune Enters Plea of Guilty in Arrest Case,* NEW YORK TIMES (1989), *available at* https://tinyurl.com/ycx5bhzs (last visited November 9, 2018). Congress appropriated for the program—which consolidated the existing Byrne formula program with another law enforcement block grant program—in an appropriations act passed on December 8, 2004. *See* P.L. 108-447, 118 Stat. 2809, 2863 (Dec. 8, 2004). Thus, although the program was not codified until 2006, some states began receiving awards under the program in FY 2005.

localities within the state. *See id.*, § 10156(c)(2). Thus, some localities are both direct grant recipients and subgrantees of the states. The Cities are direct grant recipients only.[6]

22.     Unlike *discretionary* grant programs, which agencies award on a competitive basis, "formula grants…are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula." *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989). Thus, if a grantee satisfies the statutory requirements, it is entitled to receive what the formula dictates.

23.     Under the Byrne JAG statute, state and local governments are entitled to their share of the formula allocation as long as they use the funds to further one or more of the eight broadly defined goals, *see* 34 U.S.C. § 10152(a)(1)(A)-(H), and their applications contain a series of statutorily prescribed certifications and attestations, *see id.* § 10153(a).

24.     States and localities are required to submit an application to receive Byrne JAG funds each fiscal year. *See id.* § 10153(a). The application must include the following items, among others: a certification that program funds will not be used to supplant state or local funds, *id.* § 10153(a)(1); an assurance that the application was made available for comment by the public, and by neighborhood or community-based organizations, *id.* § 10153(a)(3); an assurance that the applicant will "maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," *id.* § 10153(a)(4); and a certification that programs to be funded meet the requirements of the Byrne JAG statute, that all the information in the application is correct, that there has been appropriate coordination with affected agencies, and that "the applicant will comply with all provisions of this part and all other applicable Federal laws," *id.* § 10153(a)(5).

---

[6]     In the past, the City of Central Falls has been a direct grant recipient and subgrantee of Byrne JAG funds. Since 2014, however, it has been only a direct recipient.

25.     The Byrne JAG statute does not authorize DOJ to impose any conditions on Byrne JAG funding.

## II.     The Cities' Use of Byrne JAG Funding

26.     For nearly fifty years, the states and local governments have used grant funds received under Byrne JAG and its predecessor grant programs to support a broad array of critical law enforcement programs tailored to local needs.

### A.     City of Providence

27.     Providence has used Byrne JAG funding for a variety of purposes, including overtime compensation for targeted patrols in areas known for criminal activity, training of police department personnel, and the development of a gang intervention unit and database (now known as an Intelligence Assessment Database) in order to monitor and curb the criminal activity of numerous highly organized and violent gangs operating in Providence.  Providence has received Byrne JAG awards every year since at least FY 2005.

28.     Upon information and belief, Providence has never had any conflicts with the federal government in obtaining Byrne JAG funds.

29.     On June 26, 2018, the DOJ awarded Providence with Byrne JAG funding for FY 2017 in the amount of $212,112. *See* FY 2017 Providence Award Letter, attached as **Exhibit A**.

30.     For the FY 2017 grant cycle, Providence plans to use its Byrne JAG funding to support a number of criminal justice priorities. In particular, Providence plans to use FY 2017 Byrne JAG funding to:

- cover overtime expenses incurred by the investigative and patrol divisions of the Providence Police Department in order to conduct targeted patrols in known "hotspot" areas;

- contract with a part-time bilingual police liaison in order to assist with providing crisis intervention, serve as an interpreter, and interview potential clients and recommend appropriate program assignments; and

- cover the cost of placing a "public notice ad" in the locality's prominent news publication.

31. Providence's deadline to accept the FY 2017 Byrne JAG award was August 10, 2018, but that time has been extended pursuant to a Stipulation and Order filed by the parties in this matter (*see* ECF No. 8) and entered as a text order by this Court on August 10, 2018.

32. While this case was pending, on October 1, 2018, the DOJ awarded Providence with Byrne JAG funding for FY 2018 in the amount of $211,879. *See* FY 2018 Providence Award Letter, attached as **Exhibit B**.

33. For the FY 2018 grant cycle, Providence plans to use its Byrne JAG funding to support a number of criminal justice priorities. In particular, Providence plans to use FY 2018 Byrne JAG funding to:

- outfit an additional 80 police officers with, and train them in the use of, body worn cameras for the purposes of providing critical evidence in criminal prosecutions, improving officer safety, strengthening police-community relationships, and decreasing incidents of police misconduct through enhanced accountability; and

- continue to utilize a part-time bilingual police liaison in order to assist with providing crisis intervention, serve as an interpreter, and interview potential clients and recommend appropriate program assignments.

34.    Providence's deadline to accept the FY 2018 Byrne JAG award was November 15, 2018, but that time has been extended pursuant to a Stipulation and Order entered by the Court in this matter on October 16, 2018. *See* ECF No. 12.

### B.    *City of Central Falls*

35.    Central Falls has used Byrne JAG funding for a variety of purposes, including the following: internet access and tablets for detectives; upgrades to police department servers, video cameras, security doors, radio system, and computer technology systems; and weapons and digital recording systems.

36.    Central Falls has received Byrne JAG awards every year since at least FY 2005.

37.    Upon information and belief, Central Falls has never had any conflicts with the federal government in obtaining Byrne JAG funds.

38.    Byrne JAG funds have been especially important to Central Falls as funding for its police department was cut dramatically following the city's declaration of bankruptcy in August 2011 and emergence from bankruptcy in late 2012.

39.    On June 26, 2018 the DOJ awarded Central Falls with Byrne JAG funding for FY 2017 in the amount of $28,677. *See* FY 2017 Central Falls Award Letter, attached as **Exhibit C** (referred to collectively with the FY 2017 Providence Award Letter as "the FY 2017 Award Letters).

40.    For the FY 2017 grant cycle, Central Falls plans to use its Byrne JAG funding to support a number of criminal justice priorities. In particular, the City of Central Falls plans to use FY 2017 Byrne JAG funding to:

- purchase necessary hardware and software that will allow police personnel to log onto the existing police network with heightened security by utilizing fingerprint readers and device access with dual authentication; and

- purchase hardware and software to increase the viability of the Central Falls Police Department's remote access location—the Emergency Operations Center—to assist in the maintenance and backup of data in real time and provide the police department with the ability to have an uninterrupted alternate offsite location in the event of equipment failure or an emergency event.

41.    Central Falls' deadline to accept the FY 2017 Byrne JAG award was August 10, 2018, but that time has been extended pursuant to a Stipulation and Order filed by the parties in this matter (*see* ECF No. 8) and entered as a text order by this Court on August 10, 2018.

42.    While this case was pending, on October 1, 2018, the DOJ awarded Central Falls with Byrne JAG funding for FY 2018 in the amount of $29,286. *See* FY 2018 Central Falls Award Letter, attached as **Exhibit D** (referred to collectively with the FY 2018 Providence Award Letter as "the FY 2018 Award Letters).

43.    For the FY 2018 grant cycle, Central Falls plans to use its Byrne JAG funding to support a number of criminal justice priorities. In particular, the City of Central Falls plans to use FY 2018 Byrne JAG funding to:

- purchase new software systems to connect multiple virtualized servers between the police station and the secured off-site backup location for the Emergency Operations Center; and

- purchase software for terminals located in the police station to enhance the day-to-day functions and duties for employees in the patrol division, detective division, and police administrative division.

44.     Central Falls' deadline to accept the FY 2018 Byrne JAG award was November 15, 2018, but that time has been extended pursuant to a Stipulation and Order entered by the Court in this matter on October 19, 2018. *See* ECF No. 14.

## III.     The Cities' Local Laws and Policies

45.     Immigrants are an integral part of the Cities' workforces, business sectors, schools and college populations, and civic associations; the success of local immigrants is vital to the Cities' success. To ensure that immigrant communities continue to thrive, the Cities' have adopted policies that seek to foster trust between the immigrant population and city officials and agents—especially the police department—and to encourage people of all backgrounds to take full advantage of the Cities' resources and opportunities. The rationale behind these policies is that if immigrants, including undocumented immigrants, do not fear adverse consequences to themselves or to their families from interacting with city officials, they are more likely to report crimes, enroll their children in public schools, request health services like vaccines, and contribute more fully to the Cities' health and prosperity.

46.     The Cities' have determined that public safety is best promoted without their involvement in the enforcement of federal immigration law. To the contrary, the Cities' have long recognized that a resident's immigration status has no bearing on his or her contributions to the community or on his or her likelihood to commit crimes, and that when people with foreign backgrounds are afraid to cooperate with the police, public safety is compromised.

47.    Providence, in order to bridge the divide between the community and the police, has, among other things, enacted the Providence Community Police Relations Act, which prohibits police from inquiring about an individual's immigration status or complying with requests by other agencies to support or assist in operations conducted solely for the purpose of enforcing federal civil immigration law.[7] By executive order of the Mayor, Providence issues identification cards to all City residents, regardless of immigration status.[8] Providence has established a Muslim-American Advisory Board to better serve the Muslim-American community in Providence and to provide advice on policy decisions that effect that community. The City Council has, by resolution, expressed concern with the federal Secure Communities program, an initiative that asks local law enforcement agencies to share information with U.S. Immigration and Customs Enforcement ("ICE") about arrestees.[9] In Providence's experience, these policies have promoted the city's safety by facilitating greater cooperation with the immigrant community at large.

48.    Central Falls, in order to bridge the divide between the community and the police, has implemented a community policing department in recent years. In addition, in collaboration with law enforcement experts and community leaders, Central Falls' police department implemented a general order on immigration detainers stating that "when an individual is arrested … on a criminal offense, and is determined during standard prisoner processing to have an ICE detainer request, he or she is not to be held beyond the time when they are eligible for release from custody, to include, yet not limited to, transportation to an outside jail or detention facility."[10]  The police department issued another general order on immigration matters

---

[7]      *See* Providence Code of Ordinances § 18 ½.4 (eff. Jan. 1, 2018).
[8]      *See* Providence Executive Order 2017-3 (Nov. 2, 2017).
[9]      *See* Providence City Council Resolution No. 170 (Mar. 11, 2011).
[10]     *See* Central Falls Police Department, General Order 14-08 (July 24, 2018).

prohibiting the detention of any individual at the request of ICE without evidence of a court-issued warrant.[11] Central Falls police officers do not stop or question individuals on account of their immigration status, do not in any way act as immigration enforcement agents, and maintain the confidentiality of information about victims and witnesses to crimes. The Central Falls City Council has expressed an official position opposing immigration policies which are not sensitive to the needs of local governments and communities.[12] In Central Falls' experience, these policies have promoted the city's safety by facilitating greater cooperation with the immigrant community at large.

## IV.    DOJ's FY 2017 Immigration-Related Byrne JAG Conditions

49.    On January 25, 2017, President Trump issued Executive Order 13768. Section 9(a) of the order threatened to deny federal grant funding to all so-called "sanctuary jurisdictions." That section was permanently enjoined by a federal district court because it violated numerous provisions of the United States Constitution.[13]

50.    DOJ subsequently sought to achieve a similar goal by imposing immigration-related conditions on Byrne JAG funds.

51.    On July 25, 2017, DOJ announced that it would impose immigration-related conditions on Byrne JAG grantees and provided a one-page "Backgrounder" and a press release, neither of which explained how or why DOJ decided to impose these immigration-related conditions, how the conditions would advance the interests of the Byrne JAG program, or what alternatives DOJ had considered.[14]

---

[11]    *See* Central Falls Police Department, General Order 100.01 (May 23, 2016).
[12]    *See* Central Falls City Council Resolution 17-08 (Feb. 13, 2017).
[13]    *Cty. of Santa Clara v. Trump*, 267 F. Supp. 3d 1201 (N.D. Cal. 2017) (permanent injunction).
[14]    *See* Press Release, Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Programs (July 25, 2017), *available at* https://goo.gl/VH5wGU (last visited November 9, 2018); Backgrounder on Grant Requirements (July 25, 2017), *available at*

52.     On August 24, 2017, one day before applications for FY 2017 Byrne JAG funds were due, DOJ published a sample final award document containing the notice, access, and cooperation conditions and stated that identical conditions would be imposed on all FY 2017 Byrne JAG funding recipients.

53.     The access condition requires all state and local grantees and state subgrantees to permit federal agents to access any correctional facility in order to question suspected aliens in state or local custody about their right to be, or remain, in the United States. The FY 2017 Award Letters impose the access condition by requiring the enactment of a state or local statute, rule, regulation, policy, or practice designed to ensure federal agents' access to state or local (or government-contracted) correctional facilities. *See* FY 2017 Award Letters (Exhibits A and C), at 22-23.

54.     The notice condition requires all state and local grantees and state subgrantees to provide the U.S. Department of Homeland Security ("DHS"), upon written request and as early as practicable, advance notice of a particular alien's scheduled release date and time from state or local custody. The FY 2017 Award Letters impose the notice condition by requiring the enactment of a state or local statute, rule, regulation, policy, or practice designed to ensure such notice is provided. *See* FY 2017 Award Letters (Exhibits A and C), at 22-23.

55.     The cooperation condition requires all state and local grantees and state subgrantees to comply with federal statute prohibiting restrictions on their officials' communication with federal immigration authorities "regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a).[15] The FY 2017 Award Letters

---

https://goo.gl/ZLgXMC (last visited November 9, 2018); Byrne JAG FY 2017 State Solicitation, *available at* https://www.bja.gov/funding/JAGstate17.pdf (last visited November 9, 2018).

[15]      *See also* 8 U.S.C. § 1373(b) ("Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of

impose the cooperation condition by requiring compliance with 8 U.S.C. 1373. *See* FY 2017 Award Letters (Exhibits A and C), at 20-21.

56.      In conjunction with these conditions, DOJ also requires three certifications in order to accept FY 2017 Byrne JAG awards. The first, which must be signed by the state or local government's chief legal officer—in this case, the Cities' solicitors—certifies compliance with Section 1373 (and, for states, that the chief legal officer understands that subgrantees must also comply with Section 1373). The second, which must be signed by the state or local government's chief executive—in this case, the Cities' mayors—attests to compliance with Section 1373 and the other grant conditions. The third requires the state or local government agent who signs the grant award to certify compliance with all other grant conditions. Each certification carries the risk of personal criminal prosecution, civil penalties, and administrative remedies. *See* FY 2017 Award Letters (Exhibits A and C), at 6, 19-20, 24.

57.      The FY 2017 immigration-related conditions elicited a wave of legal challenges from numerous jurisdictions across the country, and several courts already have struck them down. Indeed, to date all federal courts that have considered these requirements have found them unlawful. *See City and Cty. Of San Francisco v. Sessions*, No. 17-cv-04642-WHO, 2018 WL 4859528 (N.D. Cal. Oct. 5, 2018); *City of Chicago v. Sessions*, 888 F.3d 272, 276 (7th Cir. 2018) (invalidating FY 2017 notice and access requirements); *see also City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 321 (E.D. Pa. 2018) (striking down all FY 2017 immigration-related conditions); *City of Chicago v. Sessions*, 321 F. Supp. 855, 874 (N.D. Ill. 2018) (striking down all FY 2017 immigration-related conditions).

---

the following with respect to information regarding the immigration status, lawful or unlawful, of any individual: (1) Sending information to, or requesting or receiving such information from, the Immigration and Naturalization Service. (2) Maintaining such information. (3) Exchanging such information with any other Federal, State, or local government entity.").

58.     Before commencing this action, the Cities had been the beneficiaries of two nationwide preliminary injunctions prohibiting DOJ from imposing the FY 2017 immigration-related conditions on any Byrne JAG applicant, as ordered by federal courts in the Northern District of Illinois and the Northern District of California.[16] The Seventh and Ninth Circuit Courts of Appeals, in reviewing the district courts' decisions, upheld their conclusions that the FY 2017 immigration-related conditions were unlawful; however, both circuit courts vacated the nationwide injunction, limiting the injunction to the jurisdictions at issue in those cases.[17]

59.     One of the two nationwide injunctions lifted on June 26, 2018 and the other on August 1, 2018,[18] giving the Cities less than ten (10) days to decide whether to accept the FY 2017 Byrne JAG awards with the new immigration-related conditions.

60.     The Cities filed a complaint in this action challenging the FY 2017 immigration-related conditions on August 9, 2018, one day before their FY 2017 Byrne JAG award acceptances were due.

## V.      DOJ's FY 2018 Immigration-Related Byrne JAG Conditions

61.     With its efforts to condition FY 2017 Byrne JAG grant funds having been held unlawful by courts across the county, the DOJ prepared changes to the immigration-related conditions. On June 28, 2018, DOJ issued a press release announcing new immigration compliance requirements for FY 2018 grant recipients; then, on July 20, 2018, DOJ released the

---

[16]     *See City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017); *Cty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1219 (N.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub nom. City & Cty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).

[17]     *See City of Chicago v. Sessions*, 17-2991 (7th Cir. June 26, 2018), Order, Doc. No. 134 (granting partial stay of injunction as to geographic areas beyond the City of Chicago); *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. Aug. 1, 2018) (affirming grant of summary judgment in favor of plaintiffs and injunction as to state of California, but vacating nationwide injunction).

[18]     *See supra* footnote 17.

FY 2018 Byrne JAG award solicitation ("FY 2018 Local Solicitation"), which contained more detail on the new conditions and certifications required for FY 2018.[19]

62.     On October 1, 2018, less than two months after the complaint in this action was filed, DOJ issued FY 2018 grant award letters to the Cities ("FY 2018 Award Letters") that included revamped versions of the same notice, access, and cooperation conditions—which although different in form are virtually indistinguishable in substance—as well as the new gag-order condition. *See* FY 2018 Award Letters (Exhibits B and D).

63.     The FY 2018 immigration-related conditions attempt to provide *post hoc* statutory authority for the notice and access conditions, despite DOJ's inability to do so over the previous year of litigation challenging the FY 2017 immigration-related conditions. DOJ also continues to require compliance with Section 1373 as a basis for the cooperation condition, despite the fact that requiring state and local governments to certify compliance with that statute has been held unlawful by multiple courts.

64.     The access condition still requires all state and local grantees and state subgrantees to permit federal agents to access any correctional facility in order to question suspected aliens in state or local custody about their right to be, or remain, in the United States. The FY 2018 Award Letters impose the access condition by prohibiting state and local governments from "impeding" federal agents' access to these facilities on the purported basis that this would "interfere" with their authority to interrogate those suspected of being in the country illegally pursuant to 8 U.S.C. § 1357(a)(1) (and 8 C.F.R. § 287.5). *See* FY 2018 Award Letters (Exhibits B and D), at 20.

---

[19]     Press Release, Department of Justice Announces New Immigration Compliance Requirements for FY 2018 Grants (June 28, 2018), *available at* https://tinyurl.com/y7dsrsc8 (last visited November 9, 2018); *see also* Byrne JAG FY 2018 State Solicitation, *available at* https://www.bja.gov/funding/JAGLocal18.pdf (last visited November 9, 2018)

65.     The notice condition still requires all state and local grantees and state subgrantees to provide DHS, upon written request and as early as practicable, advance notice of a particular alien's scheduled release date and time from state or local custody. The FY 2018 Award Letters impose the notice condition on the purported basis that by "failing" to provide such notice state and local governments would be "interfering" with the enforcement of various federal immigration statutes—namely, 8 U.S.C. §§ 1226 and 1231 (which grant federal agents certain powers concerning the arrest, detention, and removal of aliens), and 8 U.S.C. § 1366 (which requires the Attorney General to report the number of individuals without lawful status incarcerated in federal and state prisons for having committed felonies and all efforts to ensure their prompt removal).[20] *See* FY 2018 Award Letters (Exhibits B and D), at 21.

66.     The cooperation condition still requires all state and local grantees and state subgrantees to comply with federal statute prohibiting restrictions on their officials' communication with federal immigration authorities regarding any individual's citizenship or immigration status. The FY 2018 Award Letters impose the cooperation condition by requiring compliance with 8 U.S.C. § 1373 *and* 8 U.S.C. § 1644—another federal statute prohibiting restrictions on sharing information about an individual's immigration status with federal authorities.[21] *See* FY 2018 Award Letters (Exhibits B and D), at 16-18.

67.     Additionally, for FY 2018, the cooperation condition includes a questionnaire and/or legal opinion component, requiring that each state and local government grantee and state

---

[20]     The FY 2018 Award Letters provide that this condition does not encompass DHS requests to continue to detain an individual for up to 48 hours *after* the scheduled release. *See* FY 2018 Award Letters (Exhibits B and D), at 21-22.

[21]     *See* 8 U.S.C. § 1644 ("Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.").

subgrantee, either when applying for FY 2018 Byrne JAG funds or in order to accept an award of

FY 2018 funds,[22] must answer the following questions:

- Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?

- Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meet the description in [the] question [above]?

FY 2018 Local Solicitation, at 27-18 (the "questionnaire component"). If the answer to either question is yes, the grantee must provide a copy of each law or policy, describe each practice, and explain how the law, policy, or practice complies with Section 1373. *Id.* States must also collect this information from all of their subgrantees. *Id.; see* FY 2018 Award Letters (Exhibits B and D), at 22, 26.

68.     The new gag-order condition, imposed in FY 2018 and as provided in the FY 2018 Award Letters, ambiguously requires state and local governments not to publicly disclose any federal law enforcement information in an attempt to conceal, harbor, or shield from detection, in violation of 8 U.S.C. § 1324, any alien who unlawfully has entered or remains in the United States, whether or not such disclosure would constitute or form a predicate for a violation of that section. *See* FY 2018 Award Letters (Exhibits B and D), at 19.

69.     It is unclear, to say the least, as to what jurisdictions must do in order to be in compliance with the gag-order condition. The award letters state that disclosure of information may be a violation of the gag-order condition *without regard to* whether such disclosure would constitute or could form a predicate for a violation of 8 U.S.C. § 1324—the statute DOJ relies

---

[22]     Although DOJ requires this and all other immigration-related conditions for FY 2018 Byrne JAG funds to be certified at the time of the grant application, the Office of Justice Programs will not deny an application for FY 2018 for failure to submit these by the application deadline; instead, grantees will not be able to access the awards until they submit these certifications and assurances. FY 2018 Local Solicitation at 1, 27-28, 40-41.

upon for imposing this condition. *See id.* Nor has DOJ provided any guidance on what conduct that does not violate Section 1324 would nonetheless constitute a violation of the gag-order condition. It appears DOJ itself is confused by this condition, as the FY 2018 Award Letters differ in their recitation of this condition, shifting tact, from the FY 2018 Local Solicitation—which stated that the award conditions would require grantees to agree not to violate, or aid or abet any violation of, Section 1324(a), without mention of a prohibition on public disclosure of federal law enforcement information (i.e., gag-order). FY 2018 Local Solicitation, at 36.

70.    In conjunction with these conditions, either when applying for FY 2018 Byrne JAG funds or in order to accept an award of FY 2018 funds, the DOJ requires three certifications. The state or local government's chief legal officer must attest to compliance with Sections 1373 and 1644, as well as with 8 U.S.C. §§ 1226(a) and (c), 1231(a)(4), 1357(a), and 1366(1) and (3). The state or local government's chief executive separately must certify compliance with those statutes, as well as with other grant conditions. And the state or local government agent who signs the grant award must certify compliance with all award conditions, including all statutes referenced in the chief legal officer's certification. Each certification carries the risk of personal criminal prosecution, civil penalties, and administrative remedies.[23]

71.    Otherwise put, each FY 2018 Byrne JAG grant recipient must certify that it does not or will not:

- Violate 8 U.S.C. §§ 1373 and 1644, two federal statutes prohibiting restrictions on sharing information about an individual's immigration status with federal authorities;

---

[23]    The most up-to-date certification forms for the FY 2017 and FY 2018 Byrne JAG awards, which frequently are revised—one of which was updated as recently as October 25, 2018—are available on DOJ's Office of Justice Program's website, at https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm (last visited November 9, 2018).

- Publicly disclose federal law enforcement information in an attempt to conceal, harbor, or shield from certain individuals from detection, whether or not in violation of 8 U.S.C. § 1324(a), which prohibits the knowing or reckless concealment or harboring of aliens;

- Impede federal authorities in their arrest or removal of aliens as authorized by 8 U.S.C. §§ 1226(a) and (c) and 8 U.S.C. § 1231(a)(4);

- Impede federal immigration agents in their interrogation of individuals as authorized by 8 U.S.C. § 1357(a)(a) (and 8 C.F.R. § 287.5); and

- Impede congressional reporting by the Attorney General, pursuant to 8 U.S.C. §§ 1366(1) and (3), of the number of individuals without lawful status incarcerated in federal or state prisons for having committed felonies and all efforts to ensure their prompt removal.

72.     DOJ's position now seems to be that 8 U.S.C. §§ 1226, 1231, 1324, 1357, and 1366 are "applicable laws" within the meaning of the Byrne JAG statute. Moreover, it is using several of these immigration statutes as a vehicle to provide *post hoc* statutory authority for the notice and access conditions—conditions that every court to date has held DOJ lacks the statutory authority to impose.

73.     By their own terms, these various federal statutes that DOJ attempts to connect to the FY 2018 Byrne JAG program do not provide authority for imposing immigration-related conditions on state and local governments. Sections 1226, 1231, 1357, and 1366 apply solely to the federal government—indeed, solely to the Attorney General himself—and do not impose any obligations whatsoever on state and local governments. Section 1324, which sets forth criminal

23

penalties on "any person" who knowingly or recklessly harbors or conceals an alien, relies on a definition of person, 8 U.S.C. § 1101(b)(3), that does not encompass state or local governments.

## VI.    The Immigration-Related Conditions Are Unlawful

74.    All of the immigration-related conditions are unlawful for a number of reasons.

75.    First, DOJ has no statutory authorization to impose the conditions. An "agency literally has no power to act…unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Here, nothing in the statute's text, structure, purpose, or history suggests that Congress granted DOJ authority to prescribe generally applicable substantive conditions like the immigration-related conditions at issue here. *See City of Chicago*, 888 F.3d at 285-87; *City of Philadelphia*, 309 F.Supp.3d at 321-22.

76.    The fact that Congress designed Byrne JAG as a formula grant provides further confirmation that DOJ lacks discretion to impose these substantive conditions. Formula grants leave no discretion to the administering agency: if a grantee satisfies the statutory requirements, it is entitled to the grant amount that the formula dictates. *See, e.g., City of Los Angeles*, 865 F.2d at 1088.[24] Accordingly, DOJ's imposition of the new conditions is *ultra vires* for purposes of the Administrative Procedure Act.

77.    Second, because Congress did not authorize DOJ to impose conditions on Byrne JAG, DOJ's actions here violate the Separation of Powers between Congress and the Executive. The Executive Branch may not arrogate to itself the powers that the Constitution reserves to Congress, as it has attempted to do here. The Executive has no authority to amend or cancel an appropriation that Congress has duly enacted. Nor can executive officials choose to spend less than the full amount of funding that Congress has authorized under a statute.

---

[24]    *See also* Paul G. Dembling & Malcolm S. Mason, *Essentials of Grant Law Practice* § 5.03, 33-35 (1991).

78.     Third, the immigration-related conditions violate 34 U.S.C. § 10228(a), which is codified in the same chapter of the U.S. Code as the Byrne JAG statute and provides that "[n]othing in this title or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or political subdivision thereof." This language has been carried forward in every law enforcement grant since the Omnibus Crime Control and Safe Streets Act of 1968—a predecessor to the Byrne JAG program and the first federal block grant program for State and local law enforcement.[25] The legislative history of Section 10228 makes clear that Congress intended to incorporate anti-commandeering principles into the grant context to prevent executive officials from using a grant like Byrne JAG to interfere with state and local law enforcement policy.[26] All of the immigration-related conditions violate § 10228(a) because they compel grant recipients to act as enforcement arms of federal immigration authorities.

79.     Additionally, DOJ's requirement that states and local governments certify compliance with the various additional immigration-related statutes in FY 2018 particularly runs afoul of Section 10228(a)'s prohibition on law enforcement commandeering because the statutes at issue do not even regulate actions by state or local governments. *Compare* 8 U.S.C. § 1373 (prohibiting federal, state, and local government agencies from restricting information-sharing about immigration or citizenship status with federal immigration authorities) *with* 8 U.S.C. §

---

[25]     *See* Omnibus Crime Control and Safe Street Act of 1968, Pub. L. No. 90-351, § 518(a), 82 Stat. 197, 208 (1968); *see generally* John K. Hudzik, *Federal Aid to Criminal Justice: Rhetoric, Results, Lessons* 1-68 (1984) (describing the origins of the Safe Streets Act).

[26]     *See, e.g.*, *Amendments to Title I (LEAA) of the Omnibus Crime Control and Safe Streets Act: Hearing Before the Subcomm. on Criminal Laws and Procedures of the S. Comm. of the Judiciary*, 94th Cong. 407-08 (1975) (statement of Richard W. Velde, Administrator of the LEAA) ("It is disturbing that it should even be suggested that LEAA ought to undertake to redirect the efforts of state and local law enforcement agencies . . . . The Congress has continuously emphasized that law enforcement is, and must remain, essentially a state and local responsibility. Section 518(a) of the Safe Streets Act is the embodiment of this appropriate philosophy.").

1644 (prohibiting state and local government agencies from being restricted in information-sharing about an individual's immigration status with federal immigration authorities); 8 U.S.C. §§ 1226(a) and (c) and 1231(a)(4) (granting certain powers to the Attorney General with respect to the arrest, detention, and removal of aliens); 8 U.S.C. § 1324(a) (prohibiting any person from the knowing or reckless concealment or harboring of aliens); 8 U.S.C. § 1357(a)(1) (authorizing federal immigration officers to interrogate any alien or person believed to be an alien); *and* 8 U.S.C. § 1366(1) and (3) (requiring the Attorney General to report to Congress on the number of individuals without lawful status incarcerated in federal and state prisons for having committed felonies and all efforts to ensure their prompt removal). DOJ's attempt to bootstrap compliance with the notice and access conditions into these statutes similarly violates Section 10228(a)'s anti-commandeering principle.

80.     Fourth, the cooperation condition is invalid because Sections 1373 and 1644 are unconstitutional. *See S. Dakota v. Dole*, 483 U.S. 203, 210-211 (1987) (federal government cannot impose unconstitutional conditions). In *Murphy v. NCAA*, 138 S.Ct. 1461, 1478 (2018), the Supreme Court held that Congress runs afoul of the anti-commandeering principles of the Tenth Amendment when it "unequivocally dictates what a state legislature may and may not do."

81.     Section 1373 violates this rule because it directly prohibits states and local governments from enacting laws, rules, policies, or procedures that "prohibit or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Nationalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). *See, e.g., City of Philadelphia*, 309 F.Supp.3d. at 329-31 (citing *Murphy* and holding that 8 U.S.C. § 1373 violates the Tenth Amendment).

82.     Just as Section 1373 violates the Tenth Amendment by seeking to unequivocally dictate what states and local governments may and may not do, so too does the newly-added Section 1644 condition, which, similarly to Section 1373, prohibits restrictions on "sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States." 8 U.S.C § 1644. The Tenth Amendment prohibits the federal government from requiring states and localities to govern according to Congress's instructions and from commanding localities to administer or enforce a federal regulatory program. This anti-commandeering principal applies to situations in which Congress compels a state to enact or prohibits a state from enacting legislation. *Murphy*, 138 S. Ct. at 1478.

83.     Fifth, the immigration-related conditions violate the Spending Clause of the U.S. Constitution, U.S. Const. art. I § 8, cl. 1, because the conditions are ambiguous as to what state and local governments must do to be in compliance and are not germane to the local criminal justice purposes of the Byrne JAG program. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *S. Dakota v. Dole*, 483 U.S. at 207.

84.     Finally, the conditions are arbitrary and capricious because DOJ imposed them without any explanation, reasoning, or opportunity for exchange with state or local governments regarding the likely impact of the conditions on state and local efforts to promote public safety.

## VII.    The Cities Are Harmed by DOJ's Imposition of the Immigration-Related Conditions on Byrne JAG Funding

85.     The immigration-related conditions imposed by DOJ upon grantees of the FY 2017 and FY 2018 Byrne JAG funding threaten the Cities with serious, immediate, and irreparable harm.

86.     In our federal system, states and localities have primary responsibility for the design of law-enforcement policies to keep their residents safe. *See, e.g., United States v. Morrison*, 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power…reposed in the States[] than the suppression of violent crime and vindication of its victims.").

87.     Recognizing that states and local governments possess the primary authority for maintaining public safety, Congress designed the Byrne JAG program to maximize the discretion of the states and their localities to decide how to best use these funds to advance their law enforcement priorities and make their communities safer. The immigration-related conditions constrain the very choices that Congress sought to safeguard.

88.     DOJ's actions place the Cities in an untenable position. If the Cities do not acquiesce to the conditions, they collectively will forfeit hundreds of thousands of dollars in law enforcement funding, potentially compromising the critical law enforcement and criminal justice programs those funds support.

89.     If they accept these conditions, the Cities will be forced to relinquish local control over law enforcement officials and law enforcement policies, including policy choices to allow localities to adopt law enforcement and criminal justice policies based on local needs. Localities that lawfully limited voluntary cooperation with federal immigration officials will now be compelled to adopt policies that undermine their relationships of trust with their immigrant communities, to the detriment of effective crime reporting and overall public safety. Immigrants also may be deterred from seeking primary care and preventative health care services, undermining the public health efforts of states and localities. The trust between immigrants and state and local officials, "once destroyed by the mandated cooperation and communication with

the federal immigration authorities, [cannot] easily be restored." *City of Chicago*, 888 F.3d at 291.

90.     Certifying compliance with Section 1373 is particularly perilous for the Cities given Defendants' expansive and ever-changing interpretations of that statute's meaning and application. DOJ has advanced increasingly broad interpretations of what it means to comply with Section 1373. For example, DOJ has suggested that Section 1373 prevents jurisdictions from enacting policies that define the time and manner in which their employees exchange immigration-status information with federal officials.[27] DOJ also has suggested that Section 1373 requires jurisdictions to not only provide advance notification of an alien's scheduled release from state or local custody, but also to facilitate transfers from state and local jails to federal immigration authorities.[28] DOJ has further suggested that Section 1373 requires jurisdictions to not only share the immigration and citizenship status of individuals, but that it also requires jurisdictions to share an alien's home and work address and his scheduled release date from incarceration.[29] On top of all of this, DOJ has taken the position that jurisdictions have an affirmative obligation to communicate DOJ's interpretation of Section 1373 to their

---

[27]     *See, e.g.*, Letter from Alan Hanson, Acting Assistant Attorney General, to Elizabeth Glazer, Director, New York City Mayor's Office of Criminal Justice (Oct. 11, 2017), *available at* https://www.justice.gov/opa/press-release/file/1003041/download (last visited November 9, 2018); Letter from Alan Hanson, Acting Assistant Attorney General, to the Hon. Jim Kenney, Mayor, City of Philadelphia (Oct. 11, 2017), *available at* https://www.justice.gov/opa/press-release/file/1003046/download (last visited November 9, 2018).

[28]     *See* Def.'s Proposed Findings of Fact 8-11, *City of Philadelphia v. Sessions*, No. 17-cv-3894 (E.D. Pa. May 17, 2018), ECF No. 200; Pl.'s Mot. For Prelim. Inj. and Mem. Of Law in Support 24-26, *United States v. California*, No. 18-cv-0490 (E.D. Cal. Mar. 6, 2018), ECF No. 2-1 (suggesting California law violates § 1373 by restricting the transfer of aliens in state custody to federal custody).

[29]     *See, e.g.*, Pl's Mot. for Prelim. Inj. and Mem. Of Law in Support 27-28, *United States v. California*, 18-cv-00490 (E.D. Cal. Mar. 6, 2018), ECF No. 2-1 (asserting that the phrase "information regarding the citizenship or immigration statute … of any individual" in § 1373 "does not merely denote the alien's technical immigration status"); Letter from Alan Hanson, Acting Assistant Attorney General, to Elizabeth Glazer, New York City's Mayor's Office of Criminal Justice, at 2 (Oct. 11, 2017), *available at* http://www.justice.gov/opa/press-release/file/1003041/download (last visited November 9, 2018) ("In order to comply with 8 U.S.C. § 1373, the Department has determined that New York would need to certify that it interprets and applies Section 9-131(b) and (d) to not restrict New York officers from sharing information regarding the date and time of an alien's release from custody."). But at least one federal court has ruled that Section 1373 does not govern release dates or home or work addresses. Order re: United States of America's Mot. for Prelim. Inj., *United States v. California*, 18-cv-00490 (E.D. Cal. July 5, 2018), ECF No. 193.

employees.[30] Thus, DOJ requires the Cities not only to certify compliance with the black-letter of Section 1373 but also with DOJ's ever-shifting interpretation of the scope of that statute.

91.     Certifying compliance with the myriad additional statutes cited by Defendants in the FY 2018 Grant Awards is similarly perilous for the Cities, as Defendants are reinterpreting the meaning and application of those statutes as well, which by their terms and past application do not impose obligations on state and local governments.

## CAUSES OF ACTION

### COUNT I
### Separation of Powers
### (FY 2017 Conditions)

92.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

93.     The Constitution vests the spending power in Congress, not the Executive Branch. U.S. Const. art. I § 8, cl. 1.

94.     Absent a statutory provision or express delegation, only Congress has the authority to attach conditions to federal funds.

95.     The Executive "does not have unilateral authority to refuse to spend … funds" that Congress already appropriated "for a particular project or program." *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); *see also Train v. City of New York*, 420 U.S. 35, 44 (1975).

---

[30]     *See, e.g.*, Letter from Alan Hanson, Acting Assistant Attorney General, to Elizabeth Glazer, New York City's Mayor's Office of Criminal Justice, at 2 (Oct. 11, 2017), *available at* http://www.justice.gov/opa/press-release/file/1003041/download (last visited November 9, 2018) ("In order to comply with 8 U.S.C. § 1373, the Department has determined that … New York would need to certify that it has communicated this interpretation to its officers and employees."); Letter from Alan Hanson, Acting Assistant Attorney General, to the Hon. Jim Kenney, Mayor, City of Philadelphia, at 2 (Oct. 11, 2017), *available at* http://www.justice.gov/opa/press-release/file/1003046/download (last visited November 9, 2018) ("In order to comply with 8 U.S.C. § 1373, the Department has determined that Philadelphia would need to certify that it interprets and applies this Executive Order to not restrict Philadelphia's officers from sharing information regarding immigration status with federal immigration officers. The Department has also determined that Philadelphia would need to certify that it has communicated this interpretation to its officers and employees.").

96.     The Executive's imposition of the FY 2017 immigration-related conditions on the Byrne JAG program amounts to a refusal to spend funds that Congress already appropriated, in violation of the Executive's constitutional duty to administer the law.

97.     Congress did not authorize the FY 2017 immigration-related conditions. Rather, these conditions were imposed by DOJ. Therefore, the FY 2017 immigration-related conditions amount to an improper usurpation of Congress' spending power by the Executive.

98.     The Byrne JAG statute does not condition participation in the Byrne JAG program on compliance with the FY 2017 immigration-related conditions. *See* 34 U.S.C. § 10151 *et seq.* Nor does it grant DOJ the authority to impose the FY 2017 immigration-related conditions.

99.     DOJ does not have authority under 34 U.S.C. § 10102(a)(6) to impose the access, notice, or cooperation conditions.

100.    DOJ does not have the authority to determine that 8 U.S.C. § 1373 is an "applicable federal law" for purposes of 34 U.S.C. § 10153(a)(5)(D).

101.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Attorney General's imposition of the FY 2017 immigration-related conditions violates the constitutional principle of separation of powers and impermissibly arrogates power to the Executive that is reserved to Congress. Plaintiffs also are entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

**COUNT II**
***Ultra Vires* Conduct**
**(FY 2017 Conditions)**

102.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

103.    Under the Administrative Procedure Act ("APA"), a court must set "aside agency action" that is, *inter alia*, "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "otherwise not in accordance with law," 5 U.S.C. § 706(2). DOJ's imposition of the FY 2017 immigration-related conditions on the Byrne JAG program is such an agency action.

104.    DOJ may only exercise authority conferred by statute. *See City of Arlington*, 569 U.S. 297.

105.    The Byrne JAG statute does not authorize the Attorney General to impose the FY 2017 immigration-related conditions on the receipt of Byrne JAG funds, or to deny funds to states or local governments that fail to comply with those conditions. *See City of Chicago*, 88 F.3d 283. Indeed, such authority is at odds with the text, structure, and purpose of the Byrne JAG statute.

106.    The DOJ's imposition of the FY 2017 immigration-related conditions contradicts the Byrne JAG program's formula grant structure. *See* 34 U.S.C. § 10156(d)(2)(A). It also contradicts Congress's intent to give states and local governments the "flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-223, at 89 (2005).

107.    DOJ lacks statutory authority to condition Byrne JAG funds on compliance with Section 1373. The Byrne JAG statute's requirement that grantees comply with "all applicable Federal laws" does not encompass Section 1373. Rather, the phrase "all applicable Federal laws" refers to the laws that regulate the conduct of federal grant recipients *as grant recipients* and not to every section of the U.S. Code that could possibly apply to a state or local government. Section 1373 does not regulate grantees as grantees nor does it mention federal grants or funds.

32

108.    The FY 2017 immigration-related conditions are invalid under 34 U.S.C. § 10228(a), which prohibits executive branch officials from using law-enforcement grants to exert "any direction, supervision, or control" over any state or local police force or criminal justice agency.

109.    Congress has repeatedly considered and rejected legislation that would withhold grant funding as a penalty for noncooperation with federal immigration law.[31] Courts should look skeptically on executive action where Congress declined to enact legislation that would have granted the same or substantially similar authority to the executive branch. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000).

110.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Attorney General lacks authority to impose the FY 2017 immigration-related conditions on Byrne JAG funds and, in doing so, has acted contrary to law in violation of the APA. Plaintiffs also are entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

### COUNT III
### Arbitrary and Capricious Agency Action
### (FY 2017 Conditions)

111.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

112.    Under the APA, a court must set "aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. §

---

[31]     *See, e.g.,* Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. § 4 (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. § 4 (2016); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. (2016); Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. § 2 (2015); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. § 3 (2015); Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 3(a) (2015); Stop Sanctuary Cities Act, S. 1814 114th Cong. § 2 (2015); Financial Services and General Government Appropriations Act, FY 2017, H.R. 5485, 114th Cong., § 1217 (2016); *see also* H.R. 3355, 103d Cong. § 5119 (Nov. 19, 1993) (Senate version of Violent Crime Control and Law Enforcement Act, which would have authorized DOJ to withhold grant funding if the jurisdiction did not cooperate with the Immigration and Naturalization Service).

706(2)(A)—for example, because the agency has failed to consider relevant evidence or "articulate a satisfactory explanation for its action." *State Farm*, 463 U.S. at 43.

113.    Even if DOJ had a constitutional or statutory basis to impose the FY 2017 immigration-related conditions, which it does not, DOJ's decision to impose the conditions on recipients of Byrne JAG funds is arbitrary and capricious.

114.    An agency's departure from prior practice can serve as a basis for finding an agency's interpretation to be arbitrary and capricious if the change in policy constitutes an "unexplained inconsistency." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

115.    DOJ departed from more than a decade of past practice when it imposed the FY 2017 immigration-related conditions, yet provided almost no explanation for its decision. *See Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2126 (2016) ("the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy"). DOJ has never before sought to impose notice and access conditions on grantees, nor has it ever "sought to enforce [Section 1373] against a state or local government."[32]

116.    DOJ has never previously determined that Section 1373 is an "applicable Federal law" for the purposes of the Byrne JAG program.

117.    Despite DOJ's shift in policy, it has provided virtually no explanation for its actions. It released no reports, studies, or analysis in connection with its July 25, 2017 announcement of the FY 2017 immigration-related grant conditions, nor has it attempted to justify its aggressive and shifting interpretations of Section 1373.

---

[32]     Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and a Poor Substitute for Real Reform*, 20 Lewis & Clark L. Rev. 165, 170 (2016).

118.     In addition, DOJ "relied on factors which Congress has not intended to consider," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), by, for example, evaluating grant applicants on the basis of their compliance with the immigration-related conditions rather than on their compliance with expressly enumerated statutory application requirements. *See* 34 U.S.C. § 10153(a)(1)-(6).

119.     DOJ also "entirely failed to consider an important aspect of the problem" by failing to recognize how Section 1373 interferes with local policies that promote public health and safety. *See Philadelphia*, 280 F. Supp. 3d at 625.

120.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the FY 2017 immigration-related conditions on Byrne JAG funds violate the APA. Plaintiffs also are entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

## COUNT IV
## Tenth Amendment: Commandeering
## (FY 2017 Conditions)

121.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

122.     The Tenth Amendment prohibits the federal government from "requir[ing] States and localities "to govern according to Congress' instructions," *New York v. United States*, 505 U.S. 144, 162 (1992), or "command[ing] the States' officers…to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997).

123.     Section 1373 violates the Tenth Amendment because it "unequivocally dictates what a state legislature may and may not do." *Murphy*, 138 S.Ct. at 1476. *See City of Philadelphia*, 309 F.Supp.3d. at 330-31.

124.   When Congress enacted Section 1373, it sought to ensure that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies" could be used to enforce federal law. S. Rep. No. 104-249, at 19-20 (1996). In doing so, it sought to "require [state and local officers] to provide information that belongs to the State and is available to them only in their official capacity,"—in other words, to engage in unconstitutional commandeering.

125.   Further, Section 1373 prohibits state and local governments from engaging in a core aspect of governing: controlling the actions of their agents. Compliance with Section 1373 results in the federal government commandeering states and local governments by directing how state and municipal agents should act and handle data under local control to advance a federal program. In fact, DOJ instructed that states and local governments may need to provide affirmative instructions to their agents to comply.[33] Section 1373 requires local officers to follow federal directives and usurps the local policymaking process.

126.   Because Section 1373 violates the Tenth Amendment, DOJ cannot require jurisdictions to comply with that statute as a condition of receiving Byrne JAG funds. *See South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987).

127.   Likewise, the notice and access conditions impermissibly commandeer states and local governments and cannot be validly imposed on Byrne JAG funding recipients. The notice condition seeks to fundamentally reorganize not just how local officers spend their time, but also the way state and local governments balance their Fourth Amendment obligations against their interest in effective law enforcement. The access condition requires a fundamental restructuring

---

[33]      *See* Mem. From Michael E. Horowitz, Inspector Gen., U.S. Dep't of Justice, to Karol V. Mason, Assistant Attorney General, Office of Justice Programs, U.S. Dep't of Justice, Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients (May 31, 2016), *available at* https://tinyurl.com/y9rpwge4 (last visited November 9, 2018).

of police procedures and functions to accommodate on-demand access to detainees by federal agents.

128.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the FY 2017 immigration-related conditions violate the Tenth Amendment. Plaintiffs also are entitled to a permanent injunction preventing the Attorney General from putting that condition into effect.

## COUNT V
## Violation of the Spending Clause
## (FY 2017 Conditions)

129.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

130.    In order to satisfy the requirements of the Spending Clause of the Constitution, U.S. Const. art. I § 8, cl. 1, the conditions for receipt must be stated clearly and the funding conditions must be reasonably related to the federal interest in the project or program that the federal government is funding.

131.    Even if Congress had delegated its authority to impose conditions on Byrne JAG funding, which it did not, all of the FY 2017 immigration-related conditions violate the Spending Clause because they are not reasonably related to the federal interest in the Byrne JAG program. *See S. Dakota v. Dole*, 483 U.S. at 207.

132.    The FY 2017 immigration-related conditions relate to *civil* immigration enforcement and do not reasonably relate to the Byrne JAG program, which is intended to provide funding to states and local governments for *criminal* justice purposes. The conditions actively undermine Congress's goals of disbursing funds across the country, targeting funds to combat violent crime, and respecting local judgment in settling law enforcement strategy.

133.    Furthermore, the FY 2017 immigration-related conditions violate the Spending Clause because of their ambiguity, leaving states and local governments unable to ascertain what is expected of them. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

134.    Additionally, the Spending Clause prohibits the federal government from imposing spending conditions to "induce the States to engage in activities that would themselves be unconstitutional." *S. Dakota v. Dole*, 483 U.S. at 210. The FY 2017 immigration-related conditions impermissibly induce Byrne JAG recipients to engage in unconstitutional activity, such as detaining individuals without probable cause in violation of the Fourth Amendment.

135.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the FY 2017 immigration-related conditions violate the Spending Clause. Plaintiffs also are entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

### COUNT VI
### Separation of Powers
### (FY 2018 Conditions)

136.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

137.    The FY 2018 immigration-related conditions on the Byrne JAG program amount to a refusal to spend money appropriated by Congress, in violation of the Executive's constitutional duty to administer the law.

138.    Congress did not authorize FY 2018 immigration-related conditions. Rather, these conditions were imposed by DOJ. Therefore, the FY 2018 immigration-related conditions amount to an improper usurpation of Congress' spending power by the Executive.

139.    The Byrne JAG statute does not condition participation in the Byrne JAG program on compliance with the FY 2018 immigration-related conditions. *See* 34 U.S.C.

38

§ 10151 *et seq.* Nor does it grant DOJ the authority to impose these immigration-related conditions.

140.    DOJ does not have authority under 34 U.S.C. § 10102(a)(6) to impose any of the FY 2018 immigration-related conditions.

141.    DOJ does not have the authority to determine that 8 U.S.C. §§ 1226, 1231, 1324, 1357, 1366, 1373 and 1644 are "applicable federal laws" for purposes of 34 U.S.C. § 10153(a)(5)(D).

142.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Attorney General's imposition of the FY 2018 immigration-related conditions on the FY Byrne JAG funds violates the constitutional principle of separation of powers and impermissibly arrogates power to the Executive that is reserved to Congress. Plaintiffs also are entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

**COUNT VII**
***Ultra Vires* Conduct**
**(FY 2018 Conditions)**

143.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

144.    The Byrne JAG statute does not authorize the Attorney General to impose the FY 2018 immigration-related conditions on the receipt of Byrne JAG funds, or to deny funds to states or local governments that fail to comply with those conditions. *See City of Chicago*, 88 F.3d 283. Indeed, such authority is at odds with the text, structure, and purpose of the Byrne JAG statute.

145.    The DOJ's imposition of the FY 2018 immigration-related conditions contradicts the Byrne JAG program's formula grant structure. *See* 34 U.S.C. § 10156(d)(2)(A). It also

contradicts Congress's intent to give states and local governments the "flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-223, at 89 (2005).

146.    DOJ lacks statutory authority to condition Byrne JAG funds on compliance with 8 U.S.C. §§ 1226, 1231, 1324, 1357, 1366, 1373, and 1644. The Byrne JAG statute's requirement that grantees comply with "all applicable Federal laws" does not encompass these immigration-related statutes. Rather, the phrase "all applicable Federal laws" refers to the laws that regulate the conduct of federal grant recipients *as grant recipients* and not to every section of the U.S. Code that could possibly apply to a state or local government. None of these statutes regulate grantees as grantees nor do they mention federal grants or funds.

147.    The FY 2018 immigration-related conditions are invalid under 34 U.S.C. § 10228(a), which prohibits executive branch officials from using law-enforcement grants to exert "any direction, supervision, or control" over any state or local police force or criminal justice agency.

148.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Attorney General lacks authority to impose the immigration-related conditions on FY 2018 Byrne JAG funds and, in doing so, has acted contrary to law in violation of the APA. Plaintiffs also are entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

## COUNT VIII
### Arbitrary and Capricious Agency Action
### (FY 2018 Conditions)

149.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

150.    Even if DOJ had a constitutional or statutory basis to impose the FY 2018 immigration-related conditions, which it does not, DOJ's decision to impose the conditions on recipients of Byrne JAG funds is arbitrary and capricious.

151.    DOJ never has previously determined that 8 U.S.C. §§ 1226, 1231, 1324, 1357, 1366, and 1644 are "applicable Federal laws" for the purposes of the Byrne JAG program.

152.    DOJ has never before imposed anything akin to the questionnaire component on Byrne JAG grantees, essentially requiring a legal opinion on a matter of federal statutory interpretation in order to receive FY 2018 funding.

153.    Despite DOJ's shift in policy, it has provided virtually no explanation for its actions. It released no reports, studies, or analysis in connection with its June 28, 2018 announcement of the FY 2018 immigration-related grant conditions, nor has it attempted to justify its aggressive and shifting interpretations of Section 1373.

154.    In addition, DOJ "relied on factors which Congress has not intended to consider," *State Farm*, 463 U.S. at 43, by, for example, evaluating grant applicants on the basis of their compliance with the immigration-related conditions rather than on their compliance with expressly enumerated statutory application requirements. *See* 34 U.S.C. § 10153(a)(1)-(6).

155.    DOJ also "entirely failed to consider an important aspect of the problem" by failing to recognize how Section 1373 interferes with local policies that promote public health and safety. *See Philadelphia*, 280 F. Supp. 3d at 625.

156.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the immigration-related conditions on FY 2018 Byrne JAG funds violate the APA. Plaintiffs also are entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

## COUNT IX
### Tenth Amendment: Commandeering
### (FY 2018 Conditions)

157.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

158.     Because Section 1644 is virtually identical to Section 1373, it violates the Tenth Amendment for the same or similar reasons.

159.     Because Sections 1373 and 1644 violate the Tenth Amendment, DOJ cannot require jurisdictions to comply with those statutes as a condition of receiving Byrne JAG funds. *See S. Dakota*, 483 U.S. at 207-8.

160.     Likewise, the notice and access conditions impermissibly commandeer states and local governments and cannot be validly imposed on Byrne JAG funding recipients.

161.     Additionally, the gag-order condition impermissibly commandeers state and local governments by further dictating their practices and procedures and treating them as enforcement arms of the federal government. Although ambiguous, the gag-order condition, by regulating public disclosure by *public* entities, appears so far-reaching as to instruct state and local governments how to govern in myriad and complex ways.

162.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the FY 2018 immigration-related conditions violate the Tenth Amendment. Plaintiffs also are entitled to a permanent injunction preventing the Attorney General from putting that condition into effect.

## COUNT X
### Violation of Spending Clause
### (FY 2018 Conditions)

163.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

164.     Even if Congress had delegated its authority to impose conditions on Byrne JAG funding, which it did not, all of the FY 2018 immigration-related conditions violate the Spending Clause because they are not reasonably related to the federal interest in the Byrne JAG program. *See S. Dakota v. Dole*, 483 U.S. at 207.

165.     The FY 2018 immigration-related conditions relate to *civil* immigration enforcement and do not reasonably relate to the Byrne JAG program, which is intended to provide funding to states and local governments for *criminal* justice purposes. The conditions actively undermine Congress's goals of disbursing funds across the country, targeting funds to combat violent crime, and respecting local judgment in settling law enforcement strategy.

166.     Furthermore, the FY 2018 immigration-related conditions violate the Spending Clause because of their ambiguity, leaving states and local governments unable to ascertain what is expected of them. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

167.     Additionally, the Spending Clause prohibits the federal government from imposing spending conditions to "induce the States to engage in activities that would themselves be unconstitutional." *S. Dakota v. Dole*, 483 U.S. at 210. The FY 2018 immigration-related conditions impermissibly induce Byrne JAG recipients to engage in unconstitutional activity, such as detaining individuals without probable cause in violation of the Fourth Amendment.

168.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the FY 2018 immigration-related conditions violate the Spending Clause. Plaintiffs also are entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

a) Declare that the immigration-related conditions for the FY 2017 and FY 2018 Byrne JAG programs are unlawful;

b) Preliminarily and permanently enjoin Defendants from imposing the immigration-related conditions on the FY 2017 and FY 2018 Byrne JAG funds; and from imposing immigration-related conditions on future Byrne JAG funds;

c) Issue a writ of mandamus compelling Defendants to immediately send FY 2017 and FY 2018 Byrne JAG award letters without the immigration-related conditions;

d) Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

e) Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, as permitted by federal law, including the APA and 28 U.S.C. § 2412; and

f) Grant other such relief as this Court may deem proper.


**PLAINTIFFS DEMAND A TRIAL BY JURY**

Respectfully submitted,

**CITY OF PROVIDENCE**
By its Attorney,

JEFFREY DANA
CITY SOLICITOR

/s/Jeffrey Dana (#5580)
jdana@providenceri.gov

/s/Megan Maciasz DiSanto (#7991)
Senior Assistant City Solicitor
mdisanto@providenceri.gov

/s/Etie-Lee Z. Schaub (#8783)
Associate City Solicitor
eschaub@providenceri.gov

City of Providence Solicitor's Office
444 Westminster Street, Suite 220
Providence, RI 02903
(401) 680-5333 / (401) 680-5520 (Fax)

**CITY OF CENTRAL FALLS**
By its Attorney,

MATTHEW JERZYK
CITY SOLICITOR

/s/Matthew Jerzyk (#7945)
mjerzyk@centralfallsri.us

/s/Robert Weber (#8828)
Assistant City Solicitor
rweber@centralfallsri.us

/s/Nicholas Hemond (#8782)
Assistant City Solicitor
nhemond@darroweverett.com

City of Central Falls
580 Broad St.
Central Falls, RI 02863
401-616-2435 / 401-727-7422 (Fax)

## **CERTIFICATION OF SERVICE**

I hereby certify that I have filed the within with the United States District Court on this 9th day of November 2018, that a copy is available for viewing and downloading via the ECF system, and that I have caused a copy to be sent to:

Zachary A. Cunha (#7855)
Assistant United States Attorney
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Zachary.Cunha@usdoj.gov

/s/ Megan Maciasz DiSanto