UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| CITY OF PROVIDENCE and CITY OF CENTRAL FALLS, <br><br> Plaintiffs, <br><br> v. <br><br> WILLIAM P. BARR,[1] in his Official capacity as Attorney General of the United States, and the UNITED STATES DEPARTMENT OF JUSTICE, <br><br> Defendants. | Civil Action No. 18-CV-437-JJM-LDA |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR, IN THE
<u>ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

---

[1] In accordance with Federal Rule of Civil Procedure 25(d), Attorney General William P. Barr is automatically substituted as a defendant in place of former Acting Attorney General Matthew G. Whitaker.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

STAUTORY AND ADMINISTRATIVE BACKGROUND ..............................................4

   I.     The Immigration and Nationality Act. ..................................................................4

   II.    DOJ's Office of Justice Programs and the Byrne JAG Program. ...........................6

   III.   Conditions on Byrne JAG Awards ..........................................................................7

ARGUMENT ....................................................................................................................10

   I.     Standards of Review ..............................................................................................10

        A.     Standard for a Motion To Dismiss for Failure To State a Claim under Federal Rule of Civil Procedure 12(b)(6). ..............................................10

        B.     Standard for a Motion for Summary Judgment under Federal Rule of Civil Procedure 56. ......................................................................................11

   II.    The challenged immigration-related Byrne JAG conditions do not violate the Separation of Powers. .....................................................................................12

        A.     The immigration conditions are authorized by the Byrne JAG statute. .........12

        B.     The immigration conditions are authorized by 34 U.S.C. § 10102(a)(6). .......14

        C.     The immigration conditions are authorized by 34 U.S.C. § 10153. ................16

        D.     The immigration conditions do not violate 34 U.S.C. § 10228(a). ................19

   III.   The immigration conditions are not arbitrary and capricious. .................................21

   IV.   The immigration conditions do not violate the Spending Clause. ..........................26

        A.     The Notice, Access, and Section 1373 Conditions are related to the purposes of the Byrne JAG Program. ............................................................27

        B.     The challenged immigration conditions are clear and unambiguous. ............29

   V.    Section 1373 is consistent with the Tenth Amendment and principles of federalism. ............................................................................................................31

        A.     Section 1373 is constitutional under *Murphy v. NCAA*. ...............................31

        B.     Section 1373 constitutionally regulates the sharing of immigration information. .........37

C.      Section 1373 encompasses, at minimum, the contact information and release status of aliens. ...................................................................................................................39

VI.     Plaintiffs are not entitled to declaratory, injunctive, or other relief. ........................................43

A.      Plaintiffs are not entitled to a declaratory judgment. .........................................................43

B.      Plaintiffs have failed to show that they are entitled to mandamus relief. .......................43

C.      The balance of the equities and the public interest weigh against injunctive relief. .......44

D.      If the Court grants an injunction, it should be limited to the current parties. ...............45

CONCLUSION ...............................................................................................................................48

# TABLE OF AUTHORITIES

## **CASES**

*Acosta v. Idaho Falls Sch. Dist. No. 91,*
   291 F. Supp. 3d 1162, 1168 (D. Idaho 2017) ................................................................44

*Alliance for Open Society Intern., Inc. v. U.S. Agency for Intern. Development,*
   651 F.3d 218 (2d Cir. 2011) ..........................................................................................27

*Ameron, Inc. v. U.S. Army Corps of Eng'rs,*
   809 F.2d 979 (3d Cir. 1986) ..........................................................................................12

*Arizona v. United States,*
   567 U.S. 387 (2012) .................................................................................................*passim*

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
   548 U.S. 291 (2006) .......................................................................................................29

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .......................................................................................................10

*Barbour v. Wash. Metro. Area Transit Auth.,*
   374 F.3d 1161 (D.C. Cir. 2004) .....................................................................................27

*Bell v. Reno,*
   218 F.3d 86 (2d Cir. 2000) ............................................................................................13

*Bell Atlantic v. Twombly,*
   550 U.S. 544 (2007) .......................................................................................................10

*Bennett Enters., Inc. v. Domino's Pizza, Inc.,*
   45 F.3d 493 (D.C. Cir. 1995) .........................................................................................18

*Benning v. Georgia,*
   391 F.3d 1299 (11th Cir. 2004) .....................................................................................31

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) .......................................................................................................46

*California ex rel. Becerra v. Sessions,*
   284 F. Supp. 3d 1015 (N.D. Cal. 2018) .........................................................................34

*Celotex Corp. v. Catrett,*
   477 U.S. 317, 323 (1986) ...............................................................................................11

*Ctr. for Arms Control & Non-Proliferation v. Pray,*
    531 F.3d 836 (D.C. Cir. 2008) ...........................................................................43

*Charles v. Verhagen,*
    348 F.3d 601 (7th Cir. 2003) .............................................................................31

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ..........................................................................................21

*City of Chicago v. Sessions,*
    888 F.3d 272, 298 (7th Cir. 2018) ....................................................................47

*City of New York v. United States,*
    179 F.3d 29 (2d Cir. 1999) ....................................................................31, 34, 36

*Clinton v. City of N.Y.,*
    524 U.S. 417 (1998) ..........................................................................................12

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ..........................................................................................45

*Dean v. United States,*
    556 U.S. 568 (2009) ..........................................................................................40

*DeNovellis v. Shalala,*
    124 F.3d 298 (1st Cir. 1997) .............................................................................11

*Dep't of Treasury v. Fed. Labor Relations Auth.,*
    494 U.S. 922 (1990) ..........................................................................................18

*DKT Mem'l Fund Ltd. v. AID,*
    887 F.2d 275 (D.C. Cir. 1989) ................................................................3, 12, 24

*Duvall v. Att'y Gen. of the U.S.,*
    436 F.3d 382 (3d Cir. 2006) .............................................................................28

*Eastman Kodak Co. v. Image Tech Servs., Inc.,*
    504 U.S. 451 (1992) ..........................................................................................11

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ...................................................................................24, 26

*Freilich v. Bd. of Dirs. of Upper Chesapeake Health, Inc.,*
    142 F. Supp. 2d 679 (D. Md. 2001) .................................................................35

*Freilich v. Upper Chesapeake Health, Inc.,*
    313 F.3d 205 (4th Cir. 2002) ............................................................................35

*Fullilove v. Klutznick,*
    448 U.S. 448 (1980) ................................................................................................44

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) ..........................................................................................45

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ................................................................................................34

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ..................................................................................................37

*Inland Empire-Immigrant Youth Collective v. Nielsen,*
    No. EDCV172048PSGSHKX, 2018 WL 1061408, at *21 (C.D. Cal. Feb. 26, 2018) ...................44

*In re Special April 1977 Grand Jury (Scott),*
    581 F.2d 589 (7th Cir. 1978) ..................................................................................39

*In re Tax Liabilities of Does,*
    No. 2:10-MC-00130-MCE-EFB, 2011 WL 6302284 (E.D. Cal. Dec. 15, 2011) ...........................39

*J&G Sales Ltd. v. Truscott,*
    473 F.3d 1043 (9th Cir. 2007) ................................................................................21

*Jimenez v. Peninsular & Oriental Steam Nav. Co.,*
    974 F.2d 221 (1st Cir.1992) ....................................................................................11

*Johnson v. Consumerinfo.com, Inc.,*
    745 F.3d 1019 (9th Cir. 2014) ................................................................................13

*Koslow v. Pennsylvania,*
    302 F.3d 161 (3d Cir. 2002) ..................................................................................27

*L.A. Haven Hospice, Inc. v. Sebelius,*
    638 F.3d 644 (9th Cir. 2011) ..................................................................................46

*Lamar, Archer & Cofrin, LLP v. Appling,*
    138 S. Ct. 1752 (2018) ..........................................................................................40

*Leocal v. Ashcroft,*
    543 U.S. 1 (2004) ....................................................................................................40

*Lewis v. Casey,*
    518 U.S. 343 (1996) ................................................................................................45

*Madison v. Virginia,*
    474 F.3d 118 (4th Cir. 2006) ..................................................................................29

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ...................................................................................46

*Mayweathers v. Newland,*
    314 F.3d 1062 (9th Cir. 2002) ............................................................. 3, 27

*McKenzie v. City of Chicago,*
    118 F.3d 552 (7th Cir. 1997) ......................................................................46

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29 (1983) ......................................................................................21

*Mulvihill v. Top-Flite Golf Co.,*
    335 F.3d 15 (1st Cir. 2003) ........................................................................11

*Murphy v. National Collegiate Athletic Association,*
    138 S. Ct. 1461 (2018) ........................................................................*passim*

*Nat'l Fed'n of Indep. Bus. v. Sebelius ("NFIB"),*
    567 U.S. 519 (2012) ............................................................................. 32, 34

*New York v. United States,*
    505 U.S. 144 (1992) ............................................................................. 27, 29

*Niken v. Holder,*
    556 U.S. 418 (2009) ...................................................................................44

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) .....................................................................................43

*Ocasio-Hernandez v. Fortuno-Burset,*
    640 F.3d 1 (1st Cir. 2011) .........................................................................10

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.,*
    265 F.3d 1028 (9th Cir. 2001) ...................................................................21

*Padilla v. Kentucky,*
    559 U.S. 356 (2010) ...................................................................................28

*Printz v. United States,*
    521 U.S. 898 (1997) ........................................................................35, 37, 38

*Providence Yakima Med. Ctr. v. Sebelius,*
    611 F.3d 1181 (9th Cir. 2010) ...................................................................21

*Reno v. Condon,*
    528 U.S. 141 (2000) ........................................................................34, 35, 38

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997) ..............................................................................39

*Rodriguez-Ortiz v. Margo Caribe, Inc.,*
    490 F.3d 92, 96 (1st Cir. 2007) ...........................................................10

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ..............................................................4, 27, 29, 30

*Sepulvida-Villarini v. Dep't. of Educ. of P.R.,*
    628 F.3d 25 (1st Cir. 2010) ..................................................................10

*Sesay v. Attorney Gen. of U.S.,*
    787 F.3d 215 (3d Cir. 2015) .................................................................43

*Takahashi v. Fish & Game Comm'n,*
    334 U.S. 410 (1948) ..............................................................................37

*Town of Chester v. Laroe Estates, Inc.,*
    137 S. Ct. 1645 (2017)..........................................................................45

*Trans-Spec Truck Service, Inc. v. Caterpillar, Inc.,*
    524 F.3d 315 (1st Cir. 2008) ................................................................11

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018)..........................................................................46

*U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth.,*
    844 F.2d 1087 (4th Cir. 1988)..............................................................18

*United States v. E. Baton Rouge Parish Sch. Bd.,*
    594 F.2d 56 (5th Cir. 1979)..................................................................44

*United States v. Mendoza,*
    464 U.S. 154 (1984) ..............................................................................47

*United States v. Odneal,*
    565 F.2d 598 (9th Cir. 1977) ................................................................18

*Util. Air Regulatory Grp. v. EPA,*
    134 S. Ct. 2427 (2014)..........................................................................39

*Va. Soc'y for Human Life, Inc. v. FEC,*
    263 F.3d 379 (4th Cir. 2001) ................................................................46

*Vigeant v. United States,*
    462 F. Supp.2d 221 (D.R.I. 2006) ........................................................11

*Winter v. Natural Res. Def. Council,*
   555 U.S. 7 (2008) ..................................................................................................44

*Zepeda v. INS,*
   753 F.2d 719 (9th Cir. 1983) ...............................................................................46

## **STATUTES**

5 U.S.C. § 553(a)(2) ..................................................................................................22

8 U.S.C. § 1101(a)(17) .......................................................................................... 40, 41

8 U.S.C. § 1182 ..........................................................................................................39

8 U.S.C. § 1226 ....................................................................................................*passim*

8 U.S.C. § 1227 ....................................................................................................*passim*

8 U.S.C. § 1228 ..................................................................................................... 5, 36

8 U.S.C. § 1229b .......................................................................................................41

8 U.S.C. § 1231(a) ...............................................................................................*passim*

8 U.S.C. § 1231(i) ................................................................................................ 26, 44

8 U.S.C. § 1305 .........................................................................................................41

8 U.S.C. § 1357 ....................................................................................................*passim*

8 U.S.C. § 1366 ...........................................................................................................3

8 U.S.C. § 1373 ....................................................................................................*passim*

25 U.S.C. § 1644(b) ..................................................................................................14

28 U.S.C. § 510 .........................................................................................................13

34 U.S.C. § 10102 ...............................................................................................*passim*

34 U.S.C. § 10110(2) .................................................................................................15

34 U.S.C. § 10122(c)(2)(F) ........................................................................................20

34 U.S.C. § 10141(b) .................................................................................................15

34 U.S.C. § 10152(a)(1) .......................................................................................*passim*

34 U.S.C. § 10152(e) ............................................................................................. 9, 20

34 U.S.C. § 10153.................................................................................................*passim*

34 U.S.C. § 10156 .......................................................................................................6

34 U.S.C. § 10202 .......................................................................................................8

34 U.S.C. § 10228.....................................................................................................19

34 U.S.C. § 10251(a)(1) ...................................................................................... 6, 21

34 U.S.C. § 10151 ............................................................................................... 6, 15

42 U.S.C. § 1395l(t)(2)(E) ........................................................................................ 14

42 U.S.C. § 3712(a)(6) ........................................................................................ 7, 13

42 U.S.C. § 5779(a) ........................................................................................... 35, 38

42 U.S.C. § 713(a)(1)(C)(i) ..................................................................................... 14

Pub. L. No. 90-351 ........................................................................... 6, 7, 19, 22

Pub. L. No. 96-157 ...................................................................................................19

Pub. L. No. 109-162 ........................................................................................ 6, 7, 13

Pub. L. No. 115-31 ........................................................................................................6

## **REGUATIONS**

8 C.F.R. § 214.1 .........................................................................................................41

8 C.F.R. § 287.5(a) ...................................................................................................25

28 C.F.R. § 66.2...........................................................................................................16

## **LAW REVIEW ARTICLES**

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction,*
   131 Harv. L. Rev. 417, 428-37 (2017)………………...………………………………46

## INTRODUCTION

This case asks whether the Federal Government—when it provides federal grants to state and local law enforcement—can impose conditions to ensure that the recipients are not frustrating the Federal Government's own law enforcement priorities and prerogatives by restricting access to information needed to locate and remove aliens who have committed crimes.  Plaintiffs challenge the authority of the U.S. Department of Justice ("DOJ" or "Department") to condition certain federal law enforcement grants on providing modest information sharing-related cooperation with respect to individuals whom state or local law enforcement agencies have already taken into criminal custody for public safety reasons, effectively arguing that they should be permitted to reap the benefit of federal grant funds while ignoring the modest and lawful conditions that accompany them.  This memorandum explains why the plaintiffs are wrong.  As such, the plaintiffs' motion for partial summary judgment (ECF No. 20) should be denied, and the defendants' motion to dismiss Counts I through V of the Amended Complaint, or alternatively, for partial summary judgment on those counts, should be granted. [2]

The Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program") provides federal funds for state and local law enforcement.  In furtherance of the Immigration and Nationality Act ("INA") and the statutes governing the Byrne JAG Program, DOJ requires Byrne JAG grantees to give federal immigration authorities access to state and local correctional facilities under the "program or activity" funded under the award to meet with aliens and to notify federal

---

[2] By agreement of the parties and the Court's endorsement of that agreement by order of November 30, 2018 (ECF No. 19), the parties are addressing the Fiscal Year 2017 Byrne JAG conditions challenged in Counts I through V of the Amended Complaint in the current round of briefing, while the Fiscal Year 2018 Byrne JAG conditions challenged in Counts VI through X of the Amended Complaint will be addressed in a separate round of briefing.  *See id.*  As such, the Defendants reserve their right to challenge the FY 2018 counts of the Amended Complaint under Fed. R. Civ. P. 12 and 56 at that later time.

authorities "as early as practicable" before the scheduled release of an alien from custody.  DOJ also requires grant recipients to comply with 8 U.S.C. § 1373(a), which specifically bars state and local governments from prohibiting or restricting the exchange of "information regarding the . . . citizenship or immigration status" of any individual with federal immigration authorities.

The call for intergovernmental law enforcement cooperation embodied in these three conditions follows from recognition that "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona v. United States*, 567 U.S. 387, 411 (2012).  For aliens who commit crimes and end up in state or local criminal custody, both the need for, and the expectation of, cooperation is particularly evident.  In deference to a state or local jurisdiction's significant interest in punishing individuals who violate state or local law, the INA usually permits these aliens to serve their entire sentence before being subject to federal detention for possible removal from the country.  Except in limited circumstances, the Department of Homeland Security "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment," and the alien's removal period "begins on . . .  the date the alien is released from [state or local criminal] detention."  8 U.S.C. § 1231(a)(1)(B)(iii), (a)(4)(A); *see id.* § 1226(c)(1) (requiring that federal immigration authorities take custody of a criminal alien "when the alien is released" from criminal custody); § 1231(a)(1)(A) (for an alien incarcerated by a State or local government, a 90-day "removal period" during which the federal government "shall" detain and then "shall" remove an alien from the U.S. "begins" no later than "the date the alien is released from . . . confinement"); § 1231(i) (expressly authorizing the federal government to make payments to a "State or a political subdivision of the State . . . with respect to the incarceration of [an] undocumented criminal alien").  But while delaying removal of these individuals allows state and local jurisdictions to ensure that their own criminal justice interests are served, it was certainly not Congress's intent that, by respecting the initial need for local punishment for local crimes, criminal

aliens would evade federal immigration authorities.  *See id.* at § 1226(c)(1) (the federal government "shall take into custody" certain "criminal aliens" "when the alien is released"); § 1231(a)(2) (mandating detention during 90-day removal period for all aliens against whom a final order of removal has been entered); § 1231(a)(1)(B)(iii) (providing that "[i]f the alien is detained or confined (except under an immigration process)," the 90-day period presumptively runs from the date on which "the alien is released from detention or confinement") ; *see also id.* § 1366 (requiring an annual DOJ report to Congress on "the number of illegal alien [felons] in Federal and State prisons" and programs underway "to ensure the prompt removal" from the U.S. of removable "criminal aliens"). Thus, these provisions and others contemplate that federal immigration officials will have access to information regarding the whereabouts, custody, and release status of aliens in state and criminal custody, so that the equally important federal interest in enforcement of the immigration laws can be meaningfully satisfied once state or local criminal custody ends.

The plaintiffs allege that DOJ lacks authority to impose these grant conditions and that they violate the Spending Clause.  All of these claims are without merit.  In the very same enactment that created the current Byrne JAG Program in 2006, Congress explicitly delegated to the Assistant Attorney General ("AAG") for DOJ's Office of Justice Programs ("OJP") the authority to "plac[e] special conditions on all grants," and to "determin[e] priority purposes for formula grants."  34 U.S.C. § 10102(a)(6).  This express delegation conveys ample authority to impose the challenged conditions, which do not, accordingly, violate the constitutional separation of powers.  *See DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 280-81 (D.C. Cir. 1989) (upholding statutory delegation to the Executive to impose terms and conditions on federal spending programs).

In the context of the plaintiffs' Spending Clause claim, the challenged conditions bear much more than "some relationship" to the purposes of the Byrne JAG Program, and thus meet the relatedness element of the Spending Clause.  *See Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th

Cir. 2002).  OJP and the grant programs it administers are designed to strengthen law enforcement and to "maintain liaison" among the various branches of government "in matters relating to criminal justice."  34 U.S.C. § 10102(a)(2).  The challenged conditions emanate from "the Department of Justice's top priority of reducing violent crime" and further the "long-established cooperative principles among law enforcement agencies."  *See* Administrative Record ("AR") at AR-00992 (DOJ Press Release No. 17-826 (July 25, 2017)).[3]  The conditions are also unambiguous.  *See South Dakota v. Dole*, 483 U.S. 203, 210 (1987).

For these reasons and for those explained below, the Court should grant defendants' motion to dismiss Counts I through V of the plaintiffs' Amended Complaint, or alternatively, to grant partial summary judgment to the defendants, and at the same time, deny the plaintiffs' motion for partial summary judgment, on those same counts.

<u>STAUTORY AND ADMINISTRATIVE BACKGROUND</u>

**I.      The Immigration and Nationality Act.**

Enforcement of the immigration laws, including and especially the investigation and apprehension of criminal aliens, is quintessentially a law enforcement function.  Through the INA, 8 U.S.C. § 1101 *et seq.*, Congress granted the Executive Branch significant authority to control the entry, movement, and other conduct of foreign nationals in the United States.  These responsibilities are assigned to law enforcement agencies, as the INA authorizes the Department of Homeland Security ("DHS"), DOJ, and other Executive agencies to administer and enforce the immigration laws.  The INA permits the Executive Branch to exercise considerable discretion to direct enforcement pursuant to federal policy objectives.  *See Arizona*, 567 U.S. at 396-97.

---

[3] The Administrative Record regarding the FY 2017 Conditions was filed on November 30, 2018 as ECF No. 18.

Yet, effective immigration enforcement is also a cooperative endeavor, and the INA *also* repeatedly contemplates cooperation among state and local officers and federal officials on immigration enforcement.  *See, e.g.*, 8 U.S.C. § 1357(g) (authorizing formal cooperative agreements under which trained and qualified state and local officers may perform specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens); *id.* § 1324(c) (authorizing state and local officers to make arrests for violations of the INA's prohibition against smuggling, transporting, or harboring aliens); *id.* § 1252c (authorizing state and local officers to arrest certain felons who have unlawfully returned to the United States).  Under authorities such as these, "state officers may perform the functions of an immigration officer."  *Arizona*, 567 U.S. at 408.  And – of particular relevance to this suit – pursuant to 8 U.S.C. § 1373, "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  *Id.* § 1373(a).[4]

The INA further provides that certain classes of aliens shall be removed from the United States upon order of the Attorney General or Secretary of Homeland Security.  *See, e.g., id.* §§ 1227(a), 1228.  In furtherance of that statutory objective, the INA requires federal authorities to take custody of certain criminal aliens pending removal proceedings "when the alien is released" from state or local custody.  *Id.* § 1226(c)(1).  Thus, the release of an alien who has been convicted of certain criminal offenses from state custody is a triggering event for one of the Federal Government's core

---

[4] Additionally, 8 U.S.C. § 1373(b) provides that "[n]otwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual: (1) Sending such information to, or requesting or receiving such information from, [federal immigration authorities]. (2) Maintaining such information. (3) Exchanging such information with any other Federal, State, or local government entity."

law enforcement responsibilities: the removal of criminal aliens under the INA.  Finally, carrying out the Federal Government's responsibility to remove criminal aliens "promptly" after their release from criminal custody requires that federal immigration authorities be able to interview aliens *while in state or local custody* to determine whether they should be removed upon the conclusion of that custody.

## II.     DOJ's Office of Justice Programs and the Byrne JAG Program.

Title I of the Omnibus Crime Control and Safe Streets Act of 1968, which was enacted expressly to promote "the effectiveness . . . and coordination of law enforcement and criminal justice systems at all levels of government," Pub. L. No. 90-351, 82 Stat. 197, 197, established the Office of Justice Programs ("OJP"), headed by an Assistant Attorney General.  *See* Pub. L. No. 90-351, 82 Stat. 197 (1968), *codified as amended at* 34 U.S.C. § 10101 *et seq.*  The same title of the Omnibus Crime Control Act also established an early iteration of what became the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") Program.  *See generally* 34 U.S.C. §§ 10151-58.  Under this Program – which came into its modern form through the Violence against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006) (the "Reauthorization Act") – OJP is authorized to "make grants to States and units of local government . . . to provide additional personnel, equipment . . . and information systems for criminal justice, including for any one or more of [certain enumerated] programs."  34 U.S.C. § 10152(a)(1).  In the same chapter, "criminal justice" is defined broadly to include various activities of the police, the courts, and "related agencies."  *Id.* § 10251(a)(1).

The Byrne JAG Program provides "formula grants," that is, grants that – when awarded – follow a statutory formula based on population, the rate of violent crime, and other factors.  *Id.* §§ 10152(a)(1), 10156.  For Fiscal Year ("FY") 2017, Congress appropriated $396,000,000 for the Byrne JAG Program, with certain carve-outs from that amount obligated to specific initiatives.  *See*

-6-

Consolidated Appropriations Act, Pub. L. No. 115-31, Div. B, Title II, 131 Stat. 135, 203 (2017).  By

statute, in order to request a Byrne JAG grant, the chief executive officer of a State or unit of local

government must submit an application "in such form as the Attorney General may require," 34

U.S.C. § 10153(A); and the application must include, among other things, "[a] certification, made in a

form acceptable to the Attorney General . . . that . . . the applicant will comply with . . . all . . .

applicable Federal laws," *id.* § 10153(A)(5)(D), "[a]n assurance that, for each fiscal year covered by an

application, the applicant shall maintain and report such data, records, and information (programmatic

and financial) as the Attorney General may reasonably require," *id.* § 10153(A)(4), and "[a] certification,

made in a form acceptable to the Attorney General . . . that . . . there has been appropriate

coordination with affected agencies."  *Id.* § 10153(a)(5)(C).

      Before 2006, the statute provided, without elaboration, that the AAG for OJP had the power

to "exercise such other powers and functions as may be vested in the Assistant Attorney General

pursuant to this chapter or by delegation of the Attorney General."  42 U.S.C. § 3712(a)(6) (2000).

Of particular relevance to the cross-motions now before the Court, in the same Reauthorization Act

that gave the Byrne JAG Program into its modern form, Congress amended the statute again, to

allow the responsible AAG to: "'plac[e] special conditions on all grants, and determin[e] priority

purposes for formula grants.'"  Pub. L. No. 109-162, § 1152(b), 119 Stat. at 3113; *see* 34 U.S.C. §

10102(a)(6).

### III.    Conditions on Byrne JAG Awards.

      In furtherance of the express statutory objective of promoting "the effectiveness . . . and

coordination of law enforcement and criminal justice systems at all levels of government," Pub. L. No.

90-351, 82 Stat. at 197, OJP has historically included a variety of conditions, which have varied

according to national law enforcement necessities and DOJ priorities, in Byrne JAG award documents.

In 2017, OJP imposed at least 62 special conditions upon grant recipients.  *See, e.g.*, FY 17 Award

Grant to Plaintiff City of Central Falls, ECF No. 20-3, P051-P70 (setting forth 62 Special

Conditions); FY 17 Award Grant to Plaintiff City of Providence, ECF No. 20-3, P79-P98 (setting

forth 63 Special Conditions).  For example, OJP has imposed, without objection, conditions related

to: (1) information sharing and privacy protection, *see* ECF No. 20-3, P087, ¶ 28; (2) research using

human subjects, *see id.* at ¶ 31; and (3) training, *see id.* at P088, ¶ 34.  Other historical conditions

imposed by the Assistant Attorney General have been tailored to Executive Branch prerogatives and

policy determinations, some of which resulted in *subsequent* congressional codification.  One such

condition, which prohibited use of Byrne JAG funds to purchase military-style equipment for state

and local law enforcement purposes, related in part to an Executive Order issued by President

Obama in 2015.  *See id.* at P091, ¶ 45; Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015),

*rescinded by* Exec. Order No. 13,809, 82 Fed. Reg. 41,499 (Aug. 28, 2017).  Since 2012, other

conditions have required that recipients: (1) comply with specific national standards when

purchasing body armor and (2) institute a "mandatory wear" policy for any purchased armor.  *See*

ECF No. 20-3, P090, ¶¶ 40-41.  While those conditions have now been explicitly codified by

Congress, *see* 34 U.S.C. § 10202(c)(1)(B), (C), they originated as exercises of DOJ's general statutory

authority to impose special conditions on grant funds.  Indeed, the AAG has also imposed an

"American-made" requirement for body armor purchases, despite the fact that Congress did not

choose to codify this requirement when considering legislation last year.  ECF No. 20-3, P090, ¶ 41.

In FY 2016, under the Obama Administration, OJP included for the first time an explicit

recognition that Section 1373 was an applicable federal law under the Byrne JAG Program.  That

recognition followed a memorandum issued by the Department's Inspector General on May 31,

2016, expressing concern that several state and local governments receiving federal grants might not

be complying with Section 1373.  *See* AR-00366-00381 ("2016 OIG Report").

For the FY 2017 Byrne JAG cycle, OJP accordingly notified applicants that awards under the Program would include three conditions requiring modest cooperation with federal law enforcement in the immigration setting. Those conditions require grantees: (1) to have a policy of providing DHS with advance notice of the scheduled release date of certain individuals held in state or local correctional facilities (the "notice condition"); (2) to have a policy permitting federal agents to access state or local correctional facilities for certain immigration enforcement purposes (the "access condition"); and (3) to comply with Section 1373, which, as noted above, prohibits state and local government and law enforcement entities or officials from restricting certain communications with DHS (the "Section 1373 condition"). *See, e.g.,* ECF No. 20-3, P064-P068, ¶¶ 52-56 (City of Providence FY 2017 Award).

Under the "Rules of Construction" provided within those grant conditions, the award documents make clear that nothing in the notice or access conditions requires a grantee to detain "any individual in custody beyond the date and time the individual would have been released in the absence of this condition." *See id.* at P067, ¶ 55. The documents also make clear that these conditions impose no requirements in relation to any requests by federal immigration authorities to detain non-U.S. citizens, and that the notice condition requires "only as much advance notice as practicable" before the release of a non-U.S. citizen. *Id.* Finally, the conditions apply only to the "program or activity" to be funded under the award, and they allow awarded funds to be used for costs incurred in implementing the conditions, up to 10% of the total grant. *See id.* at P067, ¶ 55(3); 34 U.S.C. § 10152(e).

# ARGUMENT

## I.     Standards of Review

### A.   Standard for a Motion To Dismiss for Failure To State a Claim under Federal Rule of Civil Procedure 12(b)(6).

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal where the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). On a Rule 12(b)(6) motion, the court must accept the factual allegations of the non-moving party as true and draw all reasonable inferences in his favor. *Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 96 (1st Cir. 2007). In applying this standard, a complaint that does not allege a plausible legal and factual basis for the relief requested is subject to dismissal under the rule. *See Bell Atlantic v. Twombly*, 550 U.S. 544, 561-562 (2007). Specifically, to survive dismissal, a well-pleaded complaint requires more than conclusory allegations or the mere *possibility* that the pleader is entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 668 (2009); *Twombly*, 550 U.S. at 561-562. Instead, to be viable, a claim must be "factually plausible," meaning that the alleged facts permit the court to draw a reasonable inference that the purported defendant is liable for the alleged conduct. Only factual allegations, and not legal conclusions, are afforded a presumption of veracity. *Iqbal* 556 U.S. at 1949-1950. A mere recitation of the elements of a cause of action is not sufficient to state a plausible claim, *id.,* and as such "a plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (internal citations omitted). "The make-or-break standard  . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief." *Id.* (quoting *Sepulvida-Villarini v. Dep't. of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010)).

In deciding a motion to dismiss under Rule 12(b)(6), the court may consider the challenged pleading, together with any documents incorporated by reference in that pleading, and matters

subject to judicial notice.  This category of documents may be considered without converting the motion to one for summary judgment, and includes documents annexed to the complaint, as well as documents referenced in, or integral to, the pleading.  *Trans-Spec Truck Service, Inc. v. Caterpillar, Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) (internal citations omitted).

**B.  Standard for a Motion for Summary Judgment under Federal Rule of Civil Procedure 56.**

Under Rule 56 summary judgment is warranted when, viewing the evidence in the light most favorable to the non-movant, the Court determines there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); *Eastman Kodak Co. v. Image Tech Servs., Inc.*, 504 U.S. 451, 457 (1992); *Mulvihill v. Top-Flite Golf Co.,* 335 F.3d 15, 19 (1st Cir. 2003) (quoting Fed. R. Civ. P. 56).

In this context, the moving party bears "initial responsibility of informing the district court of the basis for [his] motion, and identifying those portions of [the record] which [he] believes demonstrate the absence of a genuine issue of material fact." *Vigeant v. United States,* 462 F. Supp.2d 221, 226 (D.R.I. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has done so, the burden shifts to the party opposing judgment "to demonstrate that a trialworthy issue exists." *Vigeant*, 462 F. Supp. 2d at 226 (quoting *Mulvihill*, 335 F.3d at 19. The party opposing judgment cannot meet his burden by merely alleging that a fact is in dispute or by simply denying the absence of disputed facts." *Vigeant,* 462 F. Supp. 2d at 226 (citing *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997).  Absent a genuine dispute of material fact, questions of law are appropriate for resolution on summary judgment.  *Jimenez v. Peninsular & Oriental Steam Nav. Co.,* 974 F.2d 221, 223 (1st Cir.1992).

## II.   The challenged immigration-related Byrne JAG conditions do not violate the Separation of Powers.

### A.   The immigration conditions are authorized by the Byrne JAG statute.

Counts I and II of the Amended Complaint allege that all three immigration conditions violate the Constitution's separation of powers and are *ultra vires*, and accordingly Plaintiffs claim that they are entitled to summary judgment preventing imposition of the conditions.  *See* Am. Compl. ¶¶ 92-110; Mem. of Law in Supp. of Pls.' Mot. for Partial Summ. J. ("Pls.' Mem."), ECF No. 20-1, at 37-39. Plaintiffs' claims rest on the flawed premise that Congress has not authorized DOJ to impose these conditions on the receipt of Byrne JAG funds; as shown below, however, Congress has done precisely that.

As a preliminary matter, the plaintiffs do not dispute that Congress may, consistent with the separation of powers, properly delegate to the Executive Branch the authority to attach conditions to agency spending. *See, e.g.*, *Clinton v. City of N.Y.*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money.") (Breyer, J. dissenting) (citing examples dating back to the founding of the Republic); *DKT Mem'l Fund Ltd.*, 887 F.2d 275 at 280-81 (upholding conditions on spending imposed by President where statute authorized President to set certain "terms and conditions as he may determine"); *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979, 983 (3d Cir. 1986) ("Congress appropriates funds for a wide variety of purposes and delegates to executive branch officials the authority to make certain decisions regarding how those funds are to be spent.").  Accordingly, the plaintiffs' emphasis on the fact that Congress did not itself *directly* impose any immigration enforcement conditions on the receipt of Byrne JAG funds (*see* Pls.' Mem. at 37-38), is wholly beside the point.  Rather, the sole relevant question is whether Congress has *delegated* sufficient authority to DOJ to impose these conditions, in order to promote inter-governmental law enforcement cooperation.

An examination of the relevant statutory framework for the Byrne JAG program makes clear that Congress did delegate such authority, in no uncertain terms.  As Plaintiffs note, *id.* at 6, the contemporary version of the Byrne JAG Program was created in 2006, when the Reauthorization Act merged two earlier programs. Pub. L. No. 109-162, 119 Stat. 2960.  Plaintiffs fail to mention, however, that prior to the 2006 amendments, the relevant statute provided only that the AAG for OJP was authorized to "exercise such other powers and functions as may be vested in the [AAG] pursuant to this chapter or by delegation of the [AG]."  *See* 42 U.S.C. § 3712(a)(6) (West 2005).  In § 1152(b) of the Reauthorization Act, Congress expressly amended this provision by inserting, "'including placing special conditions on all grants, and determining priority purposes for formula grants'" before the period at the end.  Pub. L. No. 109-162, § 1152(b), 119 Stat. at 3113; *see* 34 U.S.C. § 10102(a)(6).  And confirming this amendment's plain text, a report accompanying the Act explained that the amendment would "allow[] the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants."  H.R. Rep. No. 109-233, at 101 (2005).

This context confirms that Congress intended the "special conditions" and "priority purposes" language to confer distinctive and meaningful power on the AAG to impose grant conditions. The plaintiffs have not explained why Congress would have added that language, if not to confer the authority described, particularly since another law *already* authorized the Attorney General to delegate the performance of his functions.  *See* 28 U.S.C. § 510.  Thus, Plaintiffs' reading of the statute gives no practical effect to *either* the "special condition" *or* the "priority purpose" powers—and directly contravenes the "well-known canon of statutory construction that, in general, a statute should not be construed so as to render a word or clause inoperative" *Bell v. Reno*, 218 F.3d 86, 91 (2d Cir. 2000); *see also, e.g., Johnson v. Consumerinfo.com, Inc.*, 745 F.3d 1019, 1022 (9th Cir. 2014) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and

substantial effect.") (citation omitted).

**B.  The immigration conditions are authorized by 34 U.S.C. § 10102(a)(6).**

Further, in keeping with the canon against surplusage, the language of Section 10102(a)(6) should be read to convey *independent* authority for the AAG to "determin[e] priority purposes for formula grants."  Congress's express formulation here plainly indicates an intention to allow the AAG to exercise a degree of discretion over *formula* grants in particular.[5]  This discretion must, if this language is to be afforded any meaningful legal effect, encompass at least the minimal authority to: (1) articulate broad priorities for a given Fiscal Year's grant program; (2) include, on program application forms, inquiries regarding the designated priority purpose; and (3) impose eligibility conditions reflecting the priority purpose.  In other words, under a plain reading of the statute, the authority to "determine priority purposes" necessarily includes the authority to *prioritize* federal grant monies for those state and local jurisdictions that assist in furthering relevant federal *purposes*. Further, because states and localities can decline to participate in the Byrne JAG Program —and thus, effectively annul any conditions attached to the grants—were this authority invoked to impose unreasonable conditions, any arguable risk of overreach that might otherwise inhere in this authority has a built-in structural check.

Plaintiffs argue that 34 U.S.C. § 10102(a)(6) does not authorize the immigrations conditions. *See* Pls.' Mem. at 27-31.  This argument misunderstands the structure of the Byrne JAG statute.

---

[5] Similar delegations of discretionary authority over the terms and conditions of federal grants are commonplace. *See, e.g.,* 42 U.S.C. § 713(a)(1)(C)(i) (providing for U.S. Department of Health & Human Services ("HHS") grants for personal responsibility education, to be paid upon satisfaction of certain statutory requirements *and* "such additional requirements as the [HHS] Secretary may specify"); *id.* § 1395l(t)(2)(E) (providing that HHS Secretary may make certain adjustments to Medicare spending as well as "other adjustments as determined to be necessary to ensure equitable payments"); 25 U.S.C. § 1644(b) (authorizing Secretary of Interior to "place conditions as deemed necessary to effect the purpose of this section in any grant or contract which the Secretary makes with any Indian tribe or tribal organization pursuant to this section.").

Essentially, the argument contends that because Section 10102(a)—which sets forth the general duties and authorities of the AAG for OJP—is codified in Subchapter 1 ("Office of Justice Programs"), while the Byrne JAG Program itself is codified in Subchapter 5 ("Bureau of Justice Assistance Grant Programs") of the same chapter of Title 34 of the U.S. Code, Section 10102(a)(6) lies outside the Byrne JAG authorizing statute.  According to the plaintiffs, the structure of these respective codifications compels the conclusion that Section 10101(a)(6) merely exemplifies the type of other powers that the AAG may possess by delegation elsewhere.  *See id.* at 23-25.  But this argument fundamentally misunderstands the codification of the Byrne JAG Program under OJP's Bureau of Justice Assistance Grant Programs. *See* 34 U.S.C. §§ 10151-58. The Director of the Bureau of Justice Assistance ("BJA") "report[s] to the [AG] *through the [AAG]*" for OJP.  34 U.S.C. § 10141(b) (emphasis added); *see* OJP, *About Us*, https://ojp.gov/about/about.htm (OJP organizational chart) (last visited Sept. 12, 2018).  Thus, BJA *is part of OJP*, not an independent entity—and the authority conferred on the OJP AAG by Section 10102(a)(6) necessarily reaches all programs under his supervision, including (but not limited to) the Byrne JAG Program.[6]

The immigration conditions at issue here—which merely promote inter-governmental law enforcement cooperation with respect to criminal aliens, so that grantee policies do not impair important federal policies—come comfortably within the fonts of delegated power in Section 10102(a)(6).  Pursuant to this authority, the AAG may condition the award of formula grants, like the Byrne JAG Program, on state and local cooperation with federal authorities in achieving federal law enforcement priorities, including the removal of criminal aliens.

---

[6] Further, it is wholly unremarkable that Congress would choose to delegate such substantive authority to the AAG, under the supervision of the Attorney General.  The former is expressly charged with "*maintain[ing] liaison* with … State governments in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and the latter, of course, is the nation's chief law enforcement officer, with express "*final authority* over all … grants" executed by OJP and its component offices, *id.* § 10110(2) (both emphases added).  Both, moreover, are Senate-confirmed positions.

Plaintiffs also point to a now-rescinded regulation, 28 C.F.R. § 66.12 (rescinded Dec. 19, 2014), to argue that this former regulation somehow constrains the "special conditions" authority conferred by Section 10102(a)(6). *See* Pls.' Mem. at 30 n. 43 .   Plaintiffs identify no authority for the novel argument that a former regulation can somehow constrain the meaning of a current law, but even apart from this fact, their theory suffers from several fundamental defects.  Most significantly, if Congress had intended to cabin the term "special conditions" in the manner Plaintiffs propose, it could easily have said so. But not only is the statute utterly devoid of any language referencing, incorporating, or otherwise limiting its application to the former regulation, it expressly authorizes the imposition of special conditions" on not just "some" or "certain" grants, or in certain circumstances, but rather "*on all grants*." 34 U.S.C. § 10102(a)(6) (emphasis added).  Simply put, the capacious phrasing of the statute Congress actually enacted—which, as noted above, is reaffirmed in the relevant legislative history, H.R. Rep. No. 109-233, at 101—is not compatible with the straight-jacketed interpretation advanced by the plaintiffs.

### C.  The immigration conditions are authorized by 34 U.S.C. § 10153.

Independent of the authority conferred in Section 10102(a)(6), a separate source of authority further supports the challenged conditions.  The Byrne JAG Program provides that the "Attorney General may . . . make grants to States and units of local government" for law enforcement and related purposes.  34 U.S.C. § 10152(a)(1).  Among other requirements set out specifically in the Byrne JAG statute, applicants must certify that they "will comply with all provisions of this part and all other applicable Federal laws," *id.* § 10153(A)(5)(D), and agree to undertake various activities to advance law-enforcement goals.  For example, applicants must provide an assurance that they will "maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," and that "there has been appropriate coordination with affected agencies."  *Id.* § 10153(A)(4), (5)(C).

-16-

The propriety of the notice and access special conditions is underscored by the provisions in the Byrne JAG statute that authorize the Attorney General to "reasonably require" "programmatic" information about the funded program, 34 U.S.C. § 10153(A)(4), and to demand "appropriate coordination" with affected agencies, *id.* § 10153(A)(5)(C). Notice of an alien's release from local custody constitutes reasonable information about the law-enforcement and corrections programs funded by the grants. And access to an alien in local custody constitutes appropriate coordination with federal immigration authorities affected by those programs' custody over the alien.

Further, section 10153 provides additional statutory authority for the challenged conditions. Underscoring the Byrne JAG Program's emphasis on intergovernmental cooperation so that grantee policies do not impair federal policies, the Department has statutory authority to ensure that Byrne JAG grantees "comply with . . . all other applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D). Section 1373 is, of course, a federal law.

While Plaintiffs argue otherwise (*see* Pls.' Mem. at 31-34)), here again, their strained reading of Section 10153(A)(5)(D) is inconsistent with the plain text of the statute. The relevant statutory language provides that a Byrne JAG applicant "shall submit an application . . . in such form as the Attorney General may require," to "include . . . [a] certification, made in a form acceptable to the Attorney General . . . that . . . the applicant will comply with all provisions of [34 U.S.C., chapter 101, part A,] and all other applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D). Congress's decision to empower the Attorney General to determine the form of Byrne JAG applications renders the most natural reading of this provision as a delegation to the Attorney General to determine whether a particular federal law constitutes an "applicable Federal law[]." *Id.* If Congress had intended to limit the term "applicable Federal laws" to include only statutes of the kind that the Plaintiffs suggest, it could have done so expressly. Instead, Congress granted the Department broad

power to condition Byrne JAG grants, if it gives notice, as it did here with respect to Section 1373, that it has determined that a particular federal law is "applicable."

In contrast to the Plaintiffs' narrow construction, courts have repeatedly broadly interpreted the term "applicable laws." *See, e.g., Dep't of Treasury v. Fed. Labor Relations Auth.*, 494 U.S. 922, 930 (1990) (interpreting statutory term "applicable laws" as "laws outside the Act"); *see also Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995) (noting that "all applicable laws" is "not reasonably or fairly susceptible to an interpretation that does not encompass compliance with state and federal tax laws"); *U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth.*, 844 F.2d 1087, 1094-95 (4th Cir. 1988) (finding statutory requirement that Executive Branch managers follow "applicable laws" to exclude federal agency circulars but to reach laws made by Congress); *United States v. Odneal*, 565 F.2d 598, 600 (9th Cir. 1977) (statutory reference to "all applicable federal laws" granted "very broad statutory authority").

Instead of "applicable Federal laws" being cabined artificially to those laws that "apply to federal grants," Pls.' Mem. at 31, a natural and coherent reading is that "applicable Federal laws" refers simply to the corpus of federal laws that actually do apply, independently, to Byrne JAG grantees. (8 U.S.C. § 1373 is, of course, one such law.) Here, it is important to bear in mind the context of the Byrne JAG Program, where all grantees are state and local jurisdictions rather than private individuals or entities. The limitation in Section 10153(A)(5)(D) to "applicable Federal laws" accordingly restricts the Department from requiring certification of compliance with, for example, federal tax laws that by their terms apply to private individuals rather than to the state and local jurisdictions that the Byrne JAG Program contemplates as grantees. It is entirely sensible for Congress to have used the word "applicable" in Section 10153(A)(5)(D) with this meaning tailored to the class of potential grantees, and there is nothing implausible about Congress expecting a

recipient of federal funds to certify its compliance with a federal law where the recipient is—independent of receiving those federal funds—already obligated to comply with that federal law.

### D.  The immigration conditions do not violate 34 U.S.C. § 10228(a).

In Count IV of the Amended Complaint, the plaintiffs claim the immigration conditions are invalid because they impermissibly exercise direction, supervision, or control over the plaintiffs' police forces.  *See* Am. Compl., ¶ 125.  The plaintiffs then advance this argument in support of their motion for partial summary judgment by arguing that the conditions violate 34 U.S.C. § 10228 through the improper commandeering of state or local police forces.  *See* Pls. Mem. at 34-37.  This claim fails as a matter of law.

Byrne JAG grantees voluntarily consent to the immigration conditions in return for receiving federal dollars.  Bryne JAG is a *voluntary* program.  If grantees are unhappy with the conditions, they are free to decline the award and thus never have any obligation to comply with its conditions. Apart from this, requiring modest cooperation with federal law enforcement in exchange for federal law enforcement funds does not exercise "direction, supervision, or control."  Indeed, an earlier version of 34 U.S.C. § 10228 (which similarly prohibited the United States "to exercise any direction, supervision, or control over any police force or any other law enforcement agency of any State or any political subdivision thereof") was enacted in the same 1968 Omnibus Crime Control Act whose express statutory object was to promote "the effectiveness . . . and *coordination of law enforcement and criminal justice systems at all levels of government*."  Pub. L. No. 90-351, 82 Stat. at 197, 249 (emphasis added).  Moreover, concurrent with the enactment of 34 U.S.C. § 10228, Congress created the National Institute of Justice (a component of OJP), *see* An Act to Restructure the Federal Law Enforcement Assistance Administration, Pub. L. No. 96-157, §§ 202, 815, 93 Stat. 1167, 1172, 1206 (1979), which has as one of its express statutory purposes "to develop programs and projects . . . to

improve and expand cooperation among the Federal Government, States, and units of local

government . . . ."  34 U.S.C. § 10122(c)(2)(F).

The Byrne JAG program imposes at least 62 "special conditions" on grant recipients.  *See, e.g.*, FY 17 Award Grant to Plaintiff City of Central Falls, ECF No. 20-3, P051-P70 (setting forth 62 Special Conditions); FY 17 Award Grant to Plaintiff City of Providence, ECF No. 20-3, P79-P98 (setting forth 63 Special Conditions).  Yet, in this lawsuit, Plaintiffs only challenge three (3) of those conditions.  As described above, the program imposes conditions on grantees relating to information sharing, privacy protection, various types of training, human-subject research, restrictions regarding the purchase of military-style equipment, conditions regarding the quality and use of body armor, and a myriad of other topics.  Plaintiffs evidently have no objection to the remaining conditions and will comply with their obligation to supervise any subgrantees' compliance with those remaining conditions, apparently without concern that state and local functions are commandeered by these additional provisions.

Moreover, since compliance with the three immigration conditions is an "authorized and priority purpose" of the Byrne JAG award, any "reasonable" and "necessary" costs incurred by a grantee to implement or supervise those conditions can be paid for out of the awarded Byrne JAG funds (to the extent such costs are not reimbursed under any other federal program and up to 10% of the total award).  *See, e.g.*, ECF No. 20-3, P093-P096, ¶¶ 53(4), 55(3), 56(3) (provisions of FY 17 Award Grant to the City of Providence); 34 U.S.C § 10152(e).  In other words, the three immigration conditions at issue impose no unfunded mandates on grant recipients, and the notion that awardees are saddled with significant, unreimbursed costs to comply with these three immigration conditions is simply wrong.

### III.     The immigration conditions are not arbitrary and capricious.

Count III in the Amended Complaint alleges that the immigration conditions are arbitrary or capricious in violation of the APA. *See* Am. Compl., ¶¶ 111-120.  The plaintiffs then make the same argument in support of partial summary judgment. *See* Pls.' Mem. at 50-53.

As an initial matter, if the conditions are statutorily authorized and comport with the Spending Clause, it is unclear how "arbitrary or capricious" scrutiny could otherwise limit DOJ's broad discretion.  In any event, when a court reviews an agency's action under the "arbitrary or capricious" standard, it is "required to be 'highly deferential,'" and to "presum[e] the agency action to be valid" as long as it is supported by a rational basis.  *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010) (quoting *J&G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1051 (9th Cir. 2007)). This standard of review is "narrow," and does not authorize a district court "to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  An agency action should be overturned only when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983)).

The challenged conditions easily satisfy this deferential standard. The Byrne JAG Program's authorizing statute specifies that Byrne JAG funds are designed to provide resources for, *inter alia*, "criminal justice," 34 U.S.C. § 10152(a)(1), defined broadly as "activities pertaining to *crime prevention, control, or reduction*, or the enforcement of the criminal law, including, but not limited to, police efforts to prevent, control, or reduce crime or to *apprehend criminals*, . . . activities of courts having criminal jurisdiction, and *related agencies*," *id.* § 10251(a)(1) (emphases added).  Such purposes are rationally

-21-

advanced by facilitating federal access to aliens who have violated, or are suspected of violating, state or local criminal laws—if for no other reason than that once removed, an alien who has committed a removable criminal offense is undeniably no longer present in this country with the potential to re-offend. *See* 8 U.S.C. § 1227(a)(2) (providing that a criminal conviction for any of a wide array of criminal offenses renders an alien removable).

Further, the challenged conditions are consonant with the Byrne JAG Program's purposes of ensuring that grantees "report such data . . . and information (programmatic and financial) as the Attorney General may reasonably require" and undertake "appropriate coordination with affected agencies." 34 U.S.C. § 10153(a)(4), (5). Moreover, the challenged conditions promote "the effectiveness . . . and coordination of law enforcement and criminal justice systems at all levels of government," Pub. L. No. 90-351, 82 Stat. at 197, and rationally promote interests in "maintain[ing] liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and comport with the inter-governmental cooperation that Congress contemplates in immigration enforcement. Indeed, the imposition of the challenged conditions is understandable as a result of a pair of investigations conducted the Department's Office of Inspector General ("OIG").

In 2007, the OIG conducted a congressionally-mandated audit concerning the cooperation of State Criminal Alien Assistance Program ("SCAAP") recipient jurisdictions in the removal of criminal aliens from the United States. *See* AR-00001-00109 (Cooperation of SCAAP Recipients in the Removal of Criminal Aliens from the United States ("2007 OIG Audit")).[7] In conducting this audit, the OIG "interviewed ICE officials to obtain their views, distributed a questionnaire to 164

---

[7] The APA expressly exempts from its "notice and comment" rulemaking requirements any agency matter "relating to … grants." 5 U.S.C. § 553(a)(2). Further, because this case implicates only three straightforward and discrete grant conditions, it is unsurprising that the relevant Administrative Record is not voluminous. Nonetheless, as set forth above, together with the relevant legal framework supplied by the Byrne JAG authorizing statute and the INA, the AR amply supports the challenged agency action.

SCAAP recipients, and conducted independent testing in 7 jurisdictions that received SCAAP

funding" under 8 U.S.C. § 1231(i).  *Id.* at AR-00005.  Relevant to compliance with 8 U.S.C. § 1373,

the audit reported that, as of that time, "[t]he 99 jurisdictions that responded to the questionnaire

stated almost unanimously that there was no legislation or policy impeding the ability of local

officers and agencies to communicate with ICE on immigration-enforcement matters."  *Id.* at AR-

00011.  The 2007 OIG Audit observed broadly that "many state, county, and local law enforcement

agencies are unwilling to initiate immigration enforcement but have policies that suggest they are

willing to cooperate with ICE when they arrest individuals on state or local charges and learn that

those individuals may be criminal aliens."  *Id.* at AR-00040-41.

Nine years later, the OIG issued a report in response to a request by OJP to examine

allegations of potential violations of Section 1373 by grant recipients.  *See* 2016 OIG Report at AR-

00366.  This 2016 review found deteriorating local cooperation with "efforts to remove

undocumented criminal aliens from the United States."  *Id.* at AR-00366-67 n.1.  The 2016 OIG

Report advised that "the information we have learned . . . during our recent work  . . . differs

significantly from what OIG personnel found nearly 10 years ago" when federal immigration

authorities had "commented favorably to the OIG with respect to cooperation and information flow

they received from the seven selected jurisdictions, except for [one jurisdiction]" that were

examined.  *Id.*  The 2016 OIG Report found that "each of the 10 jurisdictions" surveyed "had laws

or policies directly related to how those jurisdictions could respond to ICE detainers, and each

limited in some way the authority of the jurisdiction to take action with regard to ICE detainers."  *Id.*

at AR-00369.  Examining various jurisdictions' policies, the OIG stated that, "based on our

discussions with ICE officials about the impact these laws and policies were having on their ability

to interact with local officials, as well as the information we have reviewed to date, we believe these

policies and others like them may be causing local officials to believe and apply the policies in a

manner that prohibits or restricts cooperation with ICE in all respects," which "would be inconsistent with and prohibited by Section 1373." *Id.* at AR-00373. The OIG Report expressly recommended that DOJ "[r]equire grant applicants to provide certifications specifying the applicants' compliance with Section 1373, along with documentation sufficient to support the certification." *Id.* at AR-00374.

In the FY 2016 grant cycle, under the Obama Administration, DOJ introduced a requirement to certify compliance with Section 1373. *See* AR-00384 (July 7, 2016 OJP Memorandum stating determination that Section 1373 is an applicable federal law for Byrne JAG Program). For the FY 2017 cycle, DOJ maintained the Section 1373 condition, added the notice and access conditions, and publicly offered a sound explanation for all three conditions. DOJ's July 25, 2017 "Backgrounder on Grant Requirements" states that the conditions have a "goal of increasing information sharing between federal, state, and local law enforcement" so that "federal immigration authorities have the information they need to enforce the law and keep our communities safe." AR-00993. The Backgrounder notes that some jurisdictions have "refus[ed] to cooperate with federal immigration authorities in information sharing about illegal aliens who commit crimes," and states that the conditions will "prevent the counterproductive use of federal funds for policies that frustrate federal immigration enforcement." *Id.* The three conditions are "common-sense measures," *id.*, and "even in the absence of evidence, the agency's predictive judgment (which merits deference) makes entire sense" as "an exercise in logic rather than clairvoyance." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 521 (2009).

Immigration enforcement—particularly against aliens who have committed crimes—undoubtedly relates to criminal justice. Numerous federal statutes expressly tie these two subjects together—most centrally through the statutory determination that conviction of any of a wide array of criminal offenses renders an alien removable from this country, *see* 8 U.S.C. § 1227(a)(2), thus

-24-

eliminating their potential to re-offend.  *See* 2007 OIG Audit at AR-00014 (observing, in analyzing

the recidivism of criminal aliens released from state or local custody, that if the examined "data is

indicative," then "the rate at which released criminal aliens are rearrested is extremely high").

Accordingly, a July 25, 2017 press release by the Attorney General, accompanying the Backgrounder,

stated opposition to policies that "protect illegal aliens who have committed crimes," and an intent

to encourage jurisdictions "to change their policies and partner with federal law enforcement to

remove criminals."  AR-00992 (DOJ Press Release No. 17-826).

　　　　Relatedly, as explained above, the INA mandates that aliens who have committed certain

criminal offenses be taken into federal custody pending removal proceedings, but only when the

alien is released from state custody.  *See* 8 U.S.C. § 1226(c)(1).  Thus, the release of an alien who has

been convicted of certain criminal offenses from state custody constitutes a triggering event for one

of the Federal Government's core responsibilities under the INA—*i.e.*, the removal of criminal

aliens.  The notice and access conditions plainly facilitate the fulfillment of this statutory

responsibility—the former by allowing federal immigration authorities to interview aliens *during* their

state custody to determine whether they should be removed upon the conclusion of that custody,[8]

and the latter by greatly reducing the resources and risk involved in ICE taking qualifying criminal

aliens into custody. *See* Decl. of Caridad Cephas-Kimbrough, U.S. Immigration and Customs

Enforcement ("Cephas-Kimbrough Dec."), ¶ 8 (contrasting situations in which ICE officers are

able to take qualifying criminal aliens into federal custody in "controlled, law enforcement setting,

where they have been searched for weapons and contraband" with efforts to detain aliens "at-large

in the community," where "other people may be present, the surroundings are not secure, and

---

[8] See 8 U.S.C. § 1357(a), under which certain federal immigration officers and employees "have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States," and 8 C.F.R. § 287.5(a), under which that power may be exercised "anywhere in or outside the United States."

individuals may be armed or ready to flee").  Such lack of local or state law enforcement cooperation "heighten[s] the risk that is already inherent in at-large operations" for ICE agents.  *Id.*  And, as Deputy Assistant Director Cephas-Kimbrough confirms, "[P]rior to these limitations on cooperation, state and local officers would accompany ICE officers to residences in order to provide a uniformed presence and serve as a deterrent to resistance to ICE's enforcement efforts, as well as allowing for the arrest of individuals who illegally interfered with such efforts."  *Id.*  Given that the INA expressly contemplates local law enforcement activity with respect to immigration law enforcement, it is perfectly rational for DOJ to condition grant funding to promote these purposes.

For these reasons, the conditions rationally promote interests in "maintain[ing] liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and comport with the inter-governmental cooperation that Congress contemplates in immigration enforcement.  *See, e.g.*, 8 U.S.C. §§ 1226(d), 1231(i), 1357(g), 1373; *Arizona*, 567 U.S. at 411-12 ("Consultation between federal and state officials is an important feature of the immigration system" and Congress "has encouraged the sharing of information about possible immigration violations." (citation omitted)).  Because "the agency's reasons for" imposing the challenged conditions "were entirely rational," the plaintiffs' claims fails. *Fox TV*, 556 U.S. at 517.

## IV.     The immigration conditions do not violate the Spending Clause.

Count V of the Amended Complaint alleges that the notice, access, and Section 1373 conditions in the Byrne JAG Program violate the Spending Clause.  *See* Am. Compl. ¶¶ 129-135.  *See also* Pls.' Mem. at 45-49.  More specifically, this claim alleges that all three conditions are insufficiently related to the statutory purposes of the Byrne JAG Program and are impermissibly ambiguous.  *See id.*  Both contentions are wrong, and defendants are entitled to either a dismissal of, or summary judgment on, this count.

A.   **The Notice, Access, and Section 1373 Conditions are related to the purposes of the Byrne JAG Program.**

First, any "relatedness" inquiry required by the Spending Clause does not pose a difficult hurdle, despite the plaintiffs' argument.  *See* Pls.' Mem. at 49-50.  To the contrary, this is a "low-threshold" inquiry that "is a far cry from . . . an exacting standard for relatedness." *Mayweathers*, 314 F.3d at 1067.  "Congess's power under the Spending Clause is broad" and it is "well settled that Congress is entitled to further policy goals indirectly through its spending power that it might not be able to achieve by direct regulation." *Alliance for Open Society Intern., Inc. v. U.S. Agency for Intern. Development*, 651 F.3d 218, 230 (2d Cir. 2011).  Thus, in *Dole*, the Supreme Court upheld conditioning the receipt of federal highway funds on the loosely-related requirement that a State adopt a minimum drinking age.  *See* 483 U.S. at 208-09; *see also New York v. United States*, 505 U.S. 144, 167 (1992) (stating that only "some relationship" is necessary between spending conditions and "the purpose of the federal spending."); *Koslow v. Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002) (explaining that there need only be a "discernible relationship" between a condition imposed pursuant to the Spending Clause and the "federal interest in a program it funds").  As the D.C. Circuit has observed, the Supreme Court has never "overturned Spending Clause legislation on relatedness grounds." *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004).

The grant conditions at issue here easily satisfy this "low-threshold" relatedness inquiry. *Mayweathers*, 314 F.3d at 1067.  The Byrne JAG Program's organic statute specifies that program funds are designed to provide resources "for criminal justice," to support programs including law enforcement, prosecution, crime prevention, and corrections.  34 U.S.C. § 10152(a)(1).  These goals are also reflected in the responsibilities of the AAG, which involve "disseminat[ing] information" and "*maintain[ing] liaison with* . . . State governments in matters relating to criminal justice." 34 U.S.C. § 10102(a)(1), (2) (emphasis added).  The conditions also comport with the Byrne JAG purposes of ensuring that grantees undertake "appropriate coordination with affected agencies," *id.*

-27-

§ 10153(A)(5)(C), and "report such data . . . and information (programmatic and financial) as the Attorney General may reasonably require," *id.* § 10153(A)(4).

Further, as noted above, immigration enforcement, which the conditions promote, undoubtedly intersects with the Byrne JAG Program's criminal justice purposes, including the removal of previously-convicted offenders.   *See* 8 U.S.C. § 1227(a)(2); *supra* at 25.  Indeed, "[a] primary goal of several recent overhauls of the INA has been to ensure and expedite the removal of aliens convicted of serious crimes."  *Duvall v. Att'y Gen. of the U.S.*, 436 F.3d 382, 391 (3d Cir. 2006); *see Padilla v. Kentucky*, 559 U.S. 356, 360 (2010) (observing that "deportation or removal . . . is now virtually inevitable for a vast number of noncitizens convicted of crimes") (citation omitted).  Once removed, a criminal alien who has committed a removable offense—for example, an aggravated felony, domestic violence, child abuse, or certain firearm offenses—is no longer present in this country with the potential to re-offend.

As explained above, *see supra* at Background § 1, the INA repeatedly contemplates cooperation among state and local officers and federal officials on immigration enforcement, particularly with respect to criminal aliens.  Furthermore, given that the INA contemplates the federal detention of certain aliens upon their release from state or local custody, *see* 8 U.S.C. § 1226(c), the conditions can be understood as seeking to ensure that a state or local grantee's law enforcement activities do not impair the law enforcement activities of the federal government with respect to the same population—namely, aliens who have committed crimes.  Congress has mandated that aliens who have committed certain criminal offenses be taken into federal custody pending removal proceedings "when the alien is released" from state custody.  *Id.* § 1226(c)(1).  With respect to incarcerated aliens subject to a final removal order, the INA establishes a "removal period" of 90 days that begins with the date of the alien's release.  8 U.S.C. § 1231(a)(1)(A), (B).  It is important to this cooperative law enforcement framework that states and localities respond to

requests for release date information, give federal agents access to detainees in their custody, and avoid restricting communication of information regarding immigration status to DHS.

### B.   The challenged immigration conditions are clear and unambiguous.

Another limitation on the spending power is that when the federal government "desires to condition the States' receipt of federal funds, it must do so unambiguously . . . , enable[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (citation omitted).  Despite the plaintiffs' argument to the contrary (*see* Pls.' Mem. at 46-49), the challenged immigration conditions satisfy this requirement.

It is well-established that the Spending Clause authority is "broad," and empowers Congress to "set the terms on which it disburses federal money to the States[.]"  *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *see also*, *e.g.*, *Dole*, 483 U.S. at 206 (noting that Congress has "repeatedly employed the [spending] power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.") (citations omitted). While it is beyond cavil that the Spending Clause confers "broad" authority, that authority is nonetheless subject to certain discrete limitations, including that any terms attached to the receipt of federal funds must be "unambiguous[]," and thus enable the potential recipient to "exercise [its] choice" to participate (or not) in the program "knowingly, cognizant of the consequences of [its] participation."  *Dole*, 483 U.S. at 203 (citations omitted); *see also*, *e.g.*, *Madison v. Virginia*, 474 F.3d 118, 124 (4th Cir. 2006) (the Spending Clause is a "'permissible method of encouraging a State to conform to federal policy choices,' because 'the ultimate decision' of whether to conform is retained by the States – wh[ich] can always decline the federal grant.") (quoting *New York*, 505 U.S. at 168)).  Contrary to Plaintiffs' assertions, the conditions easily satisfy the clear-notice requirement.

These conditions clearly state what conduct is required, so that grantees can "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (citation omitted).  They require grantees (1) to give "agents of the United States acting under color of federal law" access to correctional facilities "to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States," (2) to notify DHS, upon "formal written request" and "as early as practicable," before "the scheduled release date and time for a particular alien in such facility," and (3) "[o]ngoing compliance 8 U.S.C. 1373."  ECF No. 20-3, P096, ¶ 56 (FY 17 Grant Award to City of Providence).  The award documents also specify that nothing in these conditions requires a grantee to detain "any individual in custody beyond the date and time the individual would have been released in the absence of this condition;" that the conditions impose no requirements regarding any requests by federal immigration authorities to detain aliens; and that the notice condition requires "only as much advance notice as practicable."  *Id.* at P095, ¶ 55(4)(B).  Moreover, to the extent any uncertainty might remain, the FY 2017 Byrne JAG award letter invited any prospective grantee with a question about any requirement of the solicitation to contact OJP's Response Center (customer service center) by telephone or email.  *See* ECF No. 20-3, P074.  A prospective grantee could also contact the appropriate "Grant Manager"—that is, a specific, named OJP employee assigned to work with jurisdictions within a specified geographical area.  *Id.*; BJA Programs Office Contact Information, *available at* https://www.bja.gov/About/Contacts/ ProgramsOffice.html (last visited Sept. 13, 2018).[9]

---

[9] The BJA is the component of OJP that administers the Byrne JAG Program.

Further, any arguable marginal uncertainty regarding the outer boundaries of the grant conditions would not render these conditions unconstitutionally ambiguous.  Indeed, "the exact nature of [grant] conditions may be largely indeterminate, provided that the existence of the conditions is clear, such that States have notice that compliance with the conditions is required." *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (citation omitted); *see, e.g.*, *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) ("Once Congress clearly signals its intent to attach federal conditions to Spending Clause legislation, it need not specifically identify and proscribe in advance every conceivable state action that would be improper.") (citation omitted).  Moreover, Plaintiffs do not complain about the clarity of any other Byrne JAG conditions, such as those requiring compliance with restrictions on lobbying under 18 U.S.C. § 1913 and 31 U.S.C. § 1352.  *See* ECF No. 20-3, P083, ¶ 19, compliance with "federal appropriations statutes" generally, *id.* at P084, ¶ 20; reporting of evidence of violations of the False Claims Act, *id.* at ¶ 21; and compliance with prohibitions on reprisal under 41 U.S.C. § 4712, *id.* at P086, ¶ 23.  The problem in this case is not that DOJ has failed to provide Plaintiffs with notice of the modest immigration conditions attached to Byrne JAG grants, thus allowing Plaintiffs to knowingly refuse them.  Instead it is that, having received clear notice, Plaintiffs seek to take the money while blithely ignoring the conditions on which it is offered.  Neither the Spending Clause nor its interpreting law, however, give Plaintiffs this option to have it both ways.

## V.     Section 1373 is consistent with the Tenth Amendment and principles of federalism.

### A.  Section 1373 is constitutional under *Murphy v. NCAA.*

The plaintiffs argue that the Supreme Court's recent decision in *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), effectively renders Section 1373 as unconstitutional, and abrogates the court decisions affirming the constitutionality of that section, such as *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999).  *See* Pls.' Mem. at 39-45.  These arguments fail as a matter

of law.

As a threshold—but dispositive—matter, both the Tenth Amendment generally, and the *Murphy* decision specifically, are wholly inapposite here, where Plaintiffs are challenging conditions on a *voluntary federal grant*. It is well-established that "a perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants." *Dole*, 483 U.S. at 210. Indeed, the statute addressed in *Murphy*—the Professional and Amateur Sports Protection Act of 1992 ("PASPA")—had nothing to do with the sharing of information for immigration enforcement purposes. Rather, it required states to themselves regulate sports betting in the manner Congress wished. *See Murphy*, 138 S. Ct. at 1478. PASPA could not be "understood as a regulation of private actors," but instead prohibited state authorization of sports gambling. *Id.* at 1481. And Section 1373 is just one small piece of that broader immigration regulatory scheme under the INA, which is distinguishable from PASPA. In other words, gambling regulation falls within the traditional police powers of a state, which is a far cry from immigration enforcement—a plenary power of Congress.

Instead, the only pertinent constitutional question presented is whether the grant conditions are a valid exercise of the Spending Clause power.[10] In that context, the federal government "may offer funds to the States, and may condition those offers on compliance with specified conditions. These offers may well induce the States to adopt policies that the Federal Government itself could not impose." *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 537 (2012) (citation omitted). Because a state may "adopt the simple expedient of not yielding to what she urges is federal coercion," *Dole*, 483 U.S. at 210, by declining to participate in the Byrne JAG Program, the Spending Clause, not the Tenth Amendment, provides the proper rubric for analyzing Plaintiffs'

---

[10] Defendants demonstrate that the challenged immigration conditions do not violate the Spending Clause above, Argument § IV.

claims—and the commandeering theory has no purchase here.

Two specific examples from *Murphy* illustrate this well.  First, the *Murphy* Court discussed the Airline Deregulation Act of 1978 as an example of permissible federal preemption of state statutes.  *See Murphy*, 138 S. Ct. at 1480.  That Act lifted prior federal regulations of airlines, but Congress wanted to ensure that the States would not undue federal deregulation with regulation of their own.  *See id.*  Therefore, the Act provided that "'no State or political subdivision thereof . . . shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any [covered] air carrier.'"  *Id.* (*quoting* 49 U.S.C. App. § 1305(a)(1) (1988)).  The Supreme Court then explained why this statute did not impermissibly regulate the States:

> This language might appear to operate directly on the States, but it is a mistake to be confused by the way in which a preemption provision is phrased.  As we recently explained, we do not require Congress to employ a particular linguistic formulation when preempting state law.  And if we look beyond the phrasing employed in the Airline Deregulation Act's preemption provision, it is clear that this provision operates just like any other federal law with preemptive effect.  It confers on private entities (*i.e.,* covered carriers) a federal right to engage in certain conduct subject only to certain (federal) constraints.

*Murphy*, 138 S. Ct. at 1480 (internal citation and quotation marks omitted).  In a second example, the *Murphy* Court cited favorably *Arizona v. United States*, 567 U.S. 387 (2012), for "how this works":

> Noting that federal statutes "provide a full set of standards governing alien registration," we concluded that these laws "reflect[ ] a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards."  What this means is that the federal registration provisions not only impose federal registration obligations on aliens but also confer a federal right to be free from any other registration requirements.

*See Murphy*, 138 S. Ct. at 1481 (*quoting Arizona*, 567 U.S. at 401) (internal citation omitted).

The Supreme Court's reasoning in *Murphy* is analogous to the Section 1373 context.

Congress has plenary power to regulate immigration.  In the exercise of this power, Section 1373 confers upon entities or individuals a federal right to engage in certain conduct (the voluntary

transmission of information to federal immigration authorities) subject only to certain federal constraints.  *See* 8 U.S.C. § 1373(a).  Just like the Airline Deregulation Act, it would be a mistake to view Section 1373 as operating directly on the States.

To the extent, however, that the plaintiffs could proceed with an attack on Section 1373 as an independent statutory mandate, that attack fails on its own merits.  As an initial point, "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."  *Arizona*, 567 U.S. at 394 (citation omitted).  "As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States" and "may legislate in areas traditionally regulated by the States."  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  And courts "begin with the time-honored presumption that [a statute] is a constitutional exercise of legislative power."  *Reno v. Condon*, 528 U.S. 141, 148 (2000) (citation omitted).

Merely protecting the transmission of information to federal authorities does not "compel the State[] to enact or administer a federal regulatory program" or to "act on the Federal Government's behalf."  *NFIB*, 567 U.S. at 575, 620; *cf. California ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1035 (N.D. Cal. 2018) (noting that "[n]o cited authority holds that the scope of state sovereignty includes the power to forbid state or local employees from voluntarily complying with a federal program"); *City of New York*, 179 F.3d at 34-35 (rejecting a Tenth Amendment facial challenge to Section 1373 of the kind the plaintiffs raise here, and noting that the Tenth Amendment does not give States and their subdivisions "an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs," particularly in the information sharing context).

Second, the Supreme Court has explained elsewhere that its precedents on "commandeering" do not apply in the same way when access to information is at issue—a principle that *Murphy* does not in any way undermine.  Simply put, the Constitution does not prohibit federal

enactments that "do[] not require the States in their sovereign capacity to regulate their own citizens," but instead "regulate[] the States as the owners of data bases." *Reno*, 528 U.S. at 151; *see also, e.g., Printz v. United States*, 521 U.S. 898, 918 (1997) (recognizing that statutes "which require only the provision of information to the Federal Government[] do not involve . . . the forced participation of the States' executive in the actual administration of a federal program."); *id.* at 936 (noting that the commandeering principle is not properly understood as reaching "purely ministerial reporting requirements," such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department of Justice.") (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a)); *see also, e.g., Freilich v. Bd. of Dirs. of Upper Chesapeake Health, Inc.*, 142 F. Supp. 2d 679, 697 (D. Md. 2001) ("This Court has found no case" holding that a statutory command to report information for a federal data bank "commandeers the state."), *aff'd sub nom. Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205 (4th Cir. 2002).

The distinction drawn by this line of cases reflects the sound principle that an information-access requirement like Section 1373 does not "regulate the States' sovereign authority to regulate their own citizens," *Murphy*, 138 S. Ct. at 1479 (citation omitted), but rather ensures federal access to information regarding regulated individuals that is needed *for the federal government to regulate* those individuals.[11]  As explained above, the INA provides that a federal immigration officer "shall have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1).  The INA also provides that certain classes of aliens, including certain criminal aliens, shall be removed from the United States upon the

---

[11] In this respect, it also bears emphasizing that *Murphy* did not call into question any aspect of *Arizona*—and indeed, cited the decision favorably with respect to the settled understanding that the federal government's broad immigration authority permits Congress to "foreclose any state regulation in the area," 138 S. Ct. at 1481 (quoting *Arizona*, 567 U.S. at 401).  *Murphy* thus supports defendants' argument that States may not employ conflicting practices that interfere with the federal immigration scheme.

order of the Attorney General or the Secretary of Homeland Security, *see, e.g., id.* at §§ 1227(a), 1228. Simply put, federal officials cannot carry out these fundamental statutory duties, without knowing where those persons are located.  Indeed, the legislative history of Section 1373 indicates that the statute was intended to counteract passive resistance to sharing information.  *See, e.g.,* S. Rep. No. 104-249, at 19-20 (1996) (noting that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, *the Federal regulation of* immigration and the achieving of the purposes and objectives of the [INA]") (emphasis added).  Thus, because Section 1373 merely secures information needed to carry out the federal removal scheme—in which the federal government takes full responsibility for regulation of and enforcement against individuals—it does not present any legitimate concern regarding a deflection of political responsibility.  On the other hand, Section 1373 *does* ensure that the Federal Government can carry out its statutory responsibilities to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" and to remove the alien "upon the order of the Attorney General" after completion of criminal sentences.  8 U.S.C. §§ 1227(a), 1228, 1357(a)(1).  Thus, both the purpose and the effect of Section 1373 and the challenged grant conditions are to ensure that the federal government has the information it needs to "regulate individuals, not States."  *Murphy*, 138 S. Ct. at 1476 (citation omitted).

And because *Murphy* does not abrogate Section 1373, this Court is free to look to *City of New York*, 179 F.3d 29, where the Second Circuit affirmed the constitutionality of Section 1373, despite Plaintiffs' argument to the contrary.  There, the Second Circuit rejected New York City's challenge to the statute and held that "states do not retain under the Tenth Amendment an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs."  *Id.* at 35.  The Second Circuit concluded that "Congress [through Section 1373] has not compelled state and local governments to enact or administer any federal regulatory program.  Nor has it

affirmatively conscripted states, localities, or their employees into the federal government's service." *Id.* at 35 (*citing Printz v. United States*, 521 U.S. 898, 918 (1997)).  Instead, the Second Circuit found that the Federal Government's plenary power to regulate immigration permitted it to impose the requirements of Section 1373.  *See id.* at 34 (". . . Congress has plenary power to legislate on the subject of aliens."), consistent with a long-line of Supreme Court opinions holding that the "'Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, [and] the period they may remain.'"  *Id.* (*quoting Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948)).  Or, in other words, "'the regulation of aliens is so intimately blended and intertwined with responsibilities of the national government' that federal policy in this area always takes precedence over state policy."  *Id.* at 34 (*quoting Hines v. Davidowitz*, 312 U.S. 52, 66 (1941)).  The Unites States respectfully submits that *City of New York*'s holding that Section 1373 is a valid and constitutional exercise of Congress's plenary power to regulate immigration remains correct, and that Plaintiff's Tenth Amendment arguments in this case fail for this reason as well.

### B. Section 1373 constitutionally regulates the sharing of immigration information.

The plaintiffs content that "Section 1373 impermissibly directs the functioning of local government in contravention of Tenth Amendment principles in a number of ways." Pls.' Mem. at 41.  Plaintiffs fail to acknowledge, however, that their own policies intrude upon an area of traditional—and constitutional—*federal* control: the treatment and conduct of aliens in the United States.  When a local government exercises its authority in relation to aliens, the matter necessarily and fundamentally involves the Federal Government.  For example, although the INA allows state and local governments to punish criminal conduct by aliens before imposing immigration-related consequences under the INA, the treatment of foreign nationals in the United States is quintessentially a federal concern—so much that Congress could have preempted criminal punishment in favor of immigration consequences.  *See Arizona*, 567 U.S. at 394.

Federal statutes relating to immigration—including the gathering of information protected by Section 1373—are exclusively concerned with regulating private actors, namely aliens whose presence in the United States violates federal law.  The information that is subject to Section 1373 is according information *about* private actors that is needed for federal immigration authorities to perform their regulatory function *against* such private actors.  And, contrary to the plaintiffs' assertions, the fact that this information is in the hands of a state or local government does not immunize it, under the Tenth Amendment, from access by the Federal Government when necessary for federal enforcement or regulation.

As the Supreme Court has recognized, and as discussed above (*supra* at 35) the Constitution does not prohibit federal enactments that merely "regulate[] the States as the owners of data bases." *Reno*, 528 U.S. at 151. Thus, *Reno* held that a provision that "restricts the States' ability to disclose a driver's personal information without the driver's consent," *id.* at 144, was consistent with the Tenth Amendment even if the regulation would "require time and effort on the part of state employees," or the State had acquired the relevant information in its capacity as a regulator of drivers.  *Id.* at 150. Similarly, the Court in *Printz*, 521 U.S. at 918, recognized that statutes "which require only the provision of information to the Federal Government[] do not involve . . . the forced participation of the States' executive in the actual administration of a federal program." *Id.* at 918.[12] Accordingly, the Court's key Tenth Amendment cases reflect the different considerations that apply when the Federal Government needs access to information to perform its functions.

Indeed, it would be an extraordinary departure from historical practice to immunize states from their responsibility to provide information relevant to the federal regulation of individuals.

---

[12] Justice O'Connor further explained that Tenth Amendment jurisprudence is not properly read to invalidate information sharing requirements, such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department of Justice." *Printz*, 521 U.S. at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a)).

Congress frequently calls on States to share relevant information, and these enactments are constitutionally well supported.  It makes sense that access to information works differently: for example, it is not controversial that courts have the authority to obtain information relevant to the controversies before them, that this authority may extend to state officials, and that this is not treated as a regulation of those officials.  *See* Judiciary Act of 1789, §§ 13, 15, 1 Stat. 73, 80-82 (providing that "all . . . said courts . . . shall have the power . . . to require the parties to produce books or writings in their possession or power"); *cf. In re Special April 1977 Grand Jury (Scott)*, 581 F.2d 589, 592 (7th Cir. 1978) ("Nothing in the United States Constitution immunizes any exclusive domain of the state . . . from the reach of a federal grand jury.").  This is also true with respect to administrative processes that require information in state hands.  *See In re Tax Liabilities of Does*, No. 2:10-MC-00130-MCE-EFB, 2011 WL 6302284, at *4 (E.D. Cal. Dec. 15, 2011) ("If the Tenth Amendment cannot bar a grand jury subpoena, it cannot bar an IRS summons").  While these cases involving subpoena authority raise additional and different issues, there is one common and essential takeaway: obtaining information relevant to a regulatory function is not the same as regulating the party with that information, just as a court subpoena for information would never be thought of as regulation of the State *qua* State.  Here, Section 1373 protects access to information that is essential to the regulation of aliens and to initiating the removal process.  *See* 8 U.S.C. §§ 1182, 1226, 1227, 1231, 1357.

### C.  Section 1373 encompasses, at minimum, the contact information and release status of aliens.

As the Supreme Court has recognized, "reasonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the *broader context of the statute as a whole.*'"  *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014) (*quoting Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)) (emphasis added).  When coupled with its placement within the wider framework of federal immigration law, the text of Section 1373 reflects Congress's intent that the

provision reach the types of information critical in applying the "immigration laws," including the "removal of aliens."  8 U.S.C. § 1101(a)(17).

First, Section 1373 forbids a state or local government from prohibiting the exchange of "information *regarding*" an individual's immigration status, not merely the individual's immigration status, and courts "must give effect to every word of a statute wherever possible."  *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004).  The Supreme Court recently provided guidance on the meaning of "regarding" and similar words in *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752 (2018).  There, the Court noted that "respecting" in statutory language is materially equivalent to "concerning" and "regarding," and that use of "respecting" (and similar words) "generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject."  *Id.* at 1759-60.  Faced with deciding whether a given piece of information constituted a "statement respecting [a] debtor's financial condition" under the Bankruptcy Code, the Court fashioned a standard—holding that a piece of information falls within that category "if it has a direct relation to or impact on the debtor's overall financial status"—but did not delineate all types of information that might be included.  *Id.* at 1761.

Thus, Congress's use of "information regarding" in Section 1373(a) was clearly intended to broaden the scope of the information covered.  Later in Section 1373, Congress used narrower language, referring to "[immigration] status information."  8 U.S.C. § 1373(c); *see Dean v. United States*, 556 U.S. 568, 573 (2009) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citations omitted).  As the Supreme Court explained in *Lamar*, the use of "regarding" in Section 1373(a) "has a broadening effect."  A contrary reading would render the statute largely meaningless, as DHS is already aware of an individual's legal right to be present in the United States.

The text and relevant interpretive principles thus make clear that Section 1373(a) and Section 1373(b) cover more than an alien's immigration status.  To give Congress's choice of the phrase "information regarding" its intended meaning, it must encompass information relevant to determining one's compliance with the INA, which naturally includes information relevant to ascertaining removability. Under the structure of the INA, information relevant to removability includes the date on which an alien will be released from state or local custody, as release is generally necessary before DHS may remove an alien.  "Information regarding" immigration status also includes one's address, both home and work, which is crucial to many determinations under the INA, including whether the alien has accrued the necessary continuous presence to be eligible for relief from removal, 8 U.S.C. § 1229b(a)(1), (a)(2), (b)(1)(A); whether the alien has kept DHS informed of any change of address as required by 8 U.S.C. § 1305; and whether an alien admitted in a particular nonimmigrant status (*e.g.*, B-1 business visitor) has remained in the United States beyond their authorized period of admission, evidenced an intent not to abandon his or her foreign residence, or otherwise violated the terms and conditions of such admission (e.g., engaged in unauthorized employment), *see* 8 U.S.C. § 1227(a)(1)(C), 8 C.F.R. § 214.1.

Further, "the broader context" of the INA "as a whole" confirms the importance of Section 1373 to the overall immigration system enacted by Congress.  In the INA, Congress instructed DHS to enforce the "immigration laws," that is, the "laws, conventions, and treaties of the United States relating to the immigration, exclusion, . . . or removal of aliens." 8 U.S.C. § 1101(a)(17).  Further, in deference to a state or local jurisdiction's significant interest in punishing its criminals, the INA generally permits aliens convicted under state or local law to serve their entire sentence before being subject to federal detention for possible removal from the country.  Except in limited circumstances, DHS "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment," and the alien's removal period "begins on . . .  the date the alien is released from

-41-

[state or local criminal] detention." 8 U.S.C. § 1231(a)(1)(B)(iii), (a)(4); *see id.* § 1226(c)(1) (requiring

that federal immigration authorities take custody of a criminal alien "when the alien is released" from

criminal custody).  But in delaying removal of these individuals until state and local jurisdictions'

criminal justice interests are served, it was certainly not Congress's intent that these criminal aliens

would evade federal immigration authorities. *See id.* (requiring detention of "criminal aliens" pending

removal proceedings).  Thus, to position DHS to carry out its significant duties related to the removal

of criminal aliens, Congress enacted Section 1373 to ensure the sharing of immigration-related

information between all levels of government and DHS.

The legislative history accompanying Section 1373 also confirms that the provision should

not be narrowly construed.  The House Conference Report states that Section 1373 was intended to

enable state and local officials to "communicate with the INS *regarding the presence, whereabouts, and

activities of illegal aliens.*"  H. R. Conf. Rep. 104-725, at 383 (July 30, 1996) (emphasis added).  The

Senate Report states in more general terms that that "[t]he acquisition, maintenance, and exchange

of immigration-related information by State and local agencies is consistent with, and potentially of

considerable assistance to, the Federal regulation of immigration and the achieving of the purposes

and objectives of the Immigration and Nationality Act."  S. Rep. No. 104–249, at 19-20 (2d Sess.

1996). If, as the House Report indicates, Section 1373 encompasses the "whereabouts" of illegal

aliens, it should be understood to include requests to acknowledge or report the presence of

incarcerated illegal aliens, plans to release those aliens into the general population, and the

individual's address following release.

VI.   **Plaintiffs are not entitled to declaratory, injunctive, or other relief.**

   A.   **Plaintiffs are not entitled to a declaratory judgment.**

In the Amended Complaint, the plaintiffs seek a declaratory judgment.  Am. Compl., p. 44.  Here, the plaintiffs essentially rely upon an all-or-nothing argument that Section 1373 is unconstitutional on its face.  The plaintiffs do not contend that their policies comply with even a narrow reading of Section 1373 or that their internal policies permit a bare-minimum of information to flow to the Federal Government under Section 1373.  In sum, the plaintiffs flatly refuse to comply with Section 1373.

To award the plaintiffs declaratory relief, this Court would accordingly need to hold Section 1373 unconstitutional on its face.  This is sufficient enough to deny the City's request for a declaration, since, as shown above, Section 1373 is, and has previously been held to be, facially constitutional.  *Cf. Ctr. for Arms Control & Non-Proliferation v. Pray*, 531 F.3d 836, 842 (D.C. Cir. 2008) ("We need not now fix the outer boundaries of [a particular] exemption [under the Federal Advisory Committee Act] because the Commission on the Intelligence Capabilities so clearly lies at its center[.]"); *Sesay v. Attorney Gen. of U.S.*, 787 F.3d 215, 221-22 (3d Cir. 2015) ("We need not define the outer boundaries of materiality today, however, because we conclude that Sesay's actions exceeded [the minimal] threshold.").

   B.   **Plaintiffs have failed to show that they are entitled to mandamus relief.**

Plaintiffs seek a writ of mandamus to compel the defendants to disburse the Bryne JAG grants without the challenged conditions.  *See* Pls.' Mem. at 60-63.  Plaintiffs have not shown, however, that DOJ has failed to take a legally *required* action, and thus is not entitled to a writ of mandamus compelling DOJ to act on its application.  *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004). The Byrne JAG statute provides that the Attorney General "may" make grants from appropriated funds to carry out the purposes of the program, 34 U.S.C. § 10152(a)(1), and

does not set any deadline for the Department to issue decisions on Byrne JAG applications.  Thus, because there is no non-discretionary action at issue, mandamus relief is unwarranted.

### C. The balance of the equities and the public interest weigh against injunctive relief.

A party seeking an injunction must "establish . . . that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).  These factors merge in a suit against the Federal Government.  *Niken v. Holder*, 556 U.S. 418, 435 (2009).  Here, the public interest weighs heavily against the plaintiffs' attempt to enjoin statutorily authorized Executive Branch policies that are designed to promote the enforcement of federal immigration law in jurisdictions that receive federal law enforcement funds.  Courts have routinely held that "the United States has an interest in enforcing federal law."  *Acosta v. Idaho Falls Sch. Dist. No. 91*, 291 F. Supp. 3d 1162, 1168 (D. Idaho 2017) (*quoting United States v. E. Baton Rouge Parish Sch. Bd.*, 594 F.2d 56, 58 (5th Cir. 1979)).  Plaintiffs' requested relief threatens, in particular, the "strong interest . . . in the effective and efficient enforcement of the nation's immigration laws," *Inland Empire-Immigrant Youth Collective v. Nielsen*, No. EDCV172048PSGSHKX, 2018 WL 1061408, at *21 (C.D. Cal. Feb. 26, 2018), as well as the Federal Government's interest in seeing that federal funds are used "to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980).

The challenged notice and access conditions promote these interests by promoting operational efficiency by conserving the resources needed by DHS to execute its mission; supporting the federal ability to remove criminal aliens from the country; and helping reduce federal expenditures on the State Criminal Alien Assistance Program, *see* 8 U.S.C. § 1231(i), under which the Federal Government compensates states and localities for their incarceration of certain criminal aliens.  At bottom, encouraging cooperation among local governments and federal immigration

-44-

authorities promotes the public interest in executing federal laws that require removal of criminal aliens. These concrete interests tip the equities in this case sharply toward denying an injunction.

### D.  If the Court grants an injunction, it should be limited to the current parties.

Plaintiffs seek a permanent, nation-wide injunction that would prohibit Federal Government's use of the challenged conditions in every FY 17 Byrne JAG grant, regardless of location or if the grantee objects to those conditions. Pls.' Mem. at 58-60. For all of the reasons set forth above, Plaintiffs are not entitled to *any* relief. If the Court were to enter an injunction, however, it should be limited to the plaintiffs rather than extending to any other jurisdictions throughout the country. Such an injunction would violate the requirements of Article III and long-standing requirements of equity.

To establish Article III standing, a plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006). "[S]tanding is not dispensed in gross," and the plaintiffs must establish standing "separately for each form of relief sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).

The Supreme Court recently reaffirmed these principles in *Gill v. Whitford*, 138 S. Ct. 1916 (2018), concluding that a set of voters had not demonstrated standing to challenge alleged statewide partisan gerrymandering of Wisconsin legislative districts. The plaintiffs alleged that voters who shared their political views were disadvantaged by the way district lines were drawn statewide, and that they were therefore entitled to challenge the entire state map. *Id.* at 1924-25. But the Court concluded that a "plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury in fact,'" and that a voter's "harm [from] the dilution of [his] vote[] . . . is district specific" because it "results from the boundaries of the particular district in which he resides." *Id.* at 1930 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Accordingly, the Court held that "the remedy that is

proper and sufficient lies in the revision of the boundaries of the individual's own district," not the broader remedy of "restructuring all of the State's legislative districts."  *Id.* at 1930-31; *accord id.* at 1933 ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it.").  *See also Zepeda v. INS*, 753 F.2d 719, 730 n.1 (9th Cir. 1983) (recognizing the "elementary principle" that in the absence of class certification, plaintiffs are "not entitled to relief for people whom they do not represent" because any individual plaintiff "could merely file an individual suit as a pseudo-private attorney general and enjoin the government in all cases"); *McKenzie v. City of Chicago*, 118 F.3d 552, 555 & n.* (7th Cir. 1997).

Even apart from Article III's requirements, fundamental principles of equity support the same rule.  The Supreme Court has cautioned that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court."  *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)) (vacating the entry of a nationwide injunction insofar as it applied to parties other than the plaintiff, and specifically rejecting the argument that the district court's holding that a challenged federal policy was "facially invalid" sufficed to justify this remedy); *see Madsen* v. *Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV. 417, 428-37 (2017) (explaining the lack of historical basis for nationwide injunctions).

Moreover, nationwide injunctions "take a toll on the federal court system – preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch."  *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see L.A. Haven Hosp.*, 638 F.3d at 664-65 (noting tendency of nationwide injunctions to "thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue") (quoting, *inter alia*, *Va. Soc'y for*

*Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001)).  They also create an inequitable "one-way-ratchet" under which any prevailing plaintiff obtains relief on behalf of all others, but a victory by the government would not preclude other potential plaintiffs from "run[ning] off to the 93 other districts for more bites at the apple." *City of Chicago v. Sessions*, 888 F.3d 272, 298 (7th Cir. 2018) (Manion, J., dissenting in part), *vacated* No. 17-2991, 2018 WL 4268814 (Aug. 10, 2018); *cf. United States v. Mendoza*, 464 U.S. 154, 158-62 (1984) (holding that non-parties to an adverse decision against the federal government may not invoke the decision to preclude the government from continuing to defend the issue in subsequent litigation).

There are multiple cases across the country challenging the same Byrne JAG grant conditions at issue here.  Each court should adjudicate the claims of the plaintiffs before it, and the plaintiffs in others cases should not benefit if this Court were to rule against the defendants here as to certain issues—just as those plaintiffs will not be bound by any aspect of the Court's decision if defendants prevail in full or in part in this action.  Conversely, the Plaintiffs do not have standing to seek an injunction broader than necessary to remedy their own asserted injuries.  And issuing such an injunction would harm the development of legal precedent in this area.  The plaintiffs simply cannot plausibly assert that an injunction extending to any other jurisdictions is necessary to remedy their own claimed harms.

## **CONCLUSION**

For the reasons set forth above, the Court should deny Plaintiffs' motion for partial

summary judgment and grant in the defendants' motion to dismiss the plaintiffs' claims challenging

the FY 2017 immigration conditions, or alternatively, grant defendants' motion for partial summary

judgment on those same claims.

Dated:  March 2, 2019

Respectfully submitted,

AARON L. WEISMAN
United States Attorney

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. TYLER
Assistant Director

 /s/ *Daniel D. Mauler*
DANIEL D. MAULER
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
(202) 616-0773
(202) 616-8470 (fax)
dan.mauler@usdoj.gov

 /s/ *Zachary A. Cunha*
ZACHARY A. CUNHA (Bar No. 7855)
Assistant United States Attorney
50 Kennedy Plaza, 8th Floor
Providence, RI 02906
(401) 709-5000
 Zachary.Cunha@usdoj.gov

## <u>CERTFICATE OF SERVICE</u>

I hereby certify that, on March 2, 2019, I caused the foregoing document to be filed by means of this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rules of Civil Procedure 5(b)(2)(E) and 5(b)(3) and Local Rules Gen 304 and 305.

Dated: March 2, 2019                    By:      */s/ Zachary A. Cunha*
                                                 Zachary A. Cunha
                                                 Assistant United States Attorney