UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| CITY OF PROVIDENCE and CITY OF CENTRAL FALLS,<br><br>                              Plaintiffs,<br><br>         v.<br><br>WILLIAM P. BARR, in his Official capacity as Attorney General of the United States, and the UNITED STATES DEPARTMENT OF JUSTICE,<br><br>                              Defendants. | Civil Action No.<br>18-CV-437-JJM-LDA |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT AND
MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS,
OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

STATUTORY AND ADMINISTRATIVE BACKGROUND ............................................... 3

  I.     The Immigration and Nationality Act ..................................................................... 3

  II.    DOJ Office of Justice Programs and the Byrne JAG Program ............................... 5

ARGUMENT ...................................................................................................................... 10

  I.     Standards of Review ............................................................................................. 10

      A.    Standard for a Motion To Dismiss for Failure To State a Claim under
            Federal Rule of Civil Procedure 12(b)(6) ................................................... 10

      B.    Standard for a Motion for Summary Judgment under Federal Rule of
            Civil Procedure 56 ...................................................................................... 11

  II.    The Challenged Conditions are Permissible. ........................................................ 12

      A.    The Challenged Conditions are Authorized by Statute and Do Not Violate the
            Separation of Powers. ................................................................................. 12

      B.    The Challenged Conditions are Consistent with the Spending Clause. ........................ 18

          1.    The Conditions are Related to the Purposes of Byrne JAG. ......................... 18

          2.    These Conditions are Unambiguous. ................................................. 21

      C.    Plaintiffs' APA Claim Must Be Dismissed. ................................................. 22

      D.    Plaintiffs' Tenth Amendment Claim Must Be Dismissed. ................................. 24

          1.    The Challenged Conditions Do Not Violate the Tenth Amendment
              or Anti-Commandeering Principles. ........................................................ 24

          2.    The Constitutionality of Sections 1373 and 1644 Need Not be
              Decided by this Court ................................................................. 26

          3.    Sections 1373 and 1644 Validly Guard Against Frustration of the
              Federal Immigration Statutory Design. ................................................. 27

          4.    The Sections are Constitutional under *Murphy v. NCAA* and other
              Controlling Precedent. ............................................................... 28

  III.   Any Injunction Should Be Limited to the Parties. ............................................... 31

CONCLUSION ................................................................................................................. 31

# TABLE OF AUTHORITIES

## CASES

*Arizona v. United States*,
   567 U.S. 387 (2012)............................................................................................ 4, 24, 28

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................ 10, 11

*Barbour v. Wash. Metro. Area Transit Auth.*,
   374 F.3d 1161 (D.C. Cir. 2004) ................................................................................... 18

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................ 10, 11

*Bogues v. United States*,
   703 F. Supp. 2d 318 (S.D.N.Y. 2010).......................................................................... 14

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ........................................................................................ 31

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)....................................................................................................... 12

*Charles v. Verhagen*,
   348 F.3d 601 (7th Cir. 2003) ........................................................................................ 22

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971)....................................................................................................... 23

*City & Cty. of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ...................................................................................... 31

*City of Chicago v. Sessions*,
   No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018)........................................... 31

*City of Los Angeles v. Barr*,
   --- F.3d ----, 2019 WL 3049129 (9th Cir. 2019).......................................................... 19

*Clinton v. City of N.Y.*,
   524 U.S. 417 (1998)....................................................................................................... 12

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
   527 U.S. 666 (1999)....................................................................................................... 18

*DeNovellis v. Shalala*,
  124 F.3d 298 (1st Cir. 1997) ................................................................. 12

*DKT Mem'l Fund Ltd. v. AID*,
  887 F.2d 275 (D.C. Cir. 1989) .............................................................. 13

*Duvall v. Atty. Gen. of U.S.*,
  436 F.3d 382 (3d Cir. 2006) ................................................................. 19

*Eastman Kodak Co. v. Image Tech Servs., Inc.*,
  504 U.S. 451 (1992) .............................................................................. 11

*Ely v. Velde*,
  451 F.2d 1130 (4th Cir. 1971) ............................................................. 17

*Eringer v. Principality of Monaco*,
  No. CV 10-1803 GAF (EX), 2011 WL 13134271 (C.D. Cal. Aug. 23, 2011),
   *aff'd*, 533 F. App'x 703 (9th Cir. 2013) ............................................. 13

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) .............................................................................. 23

*Hodel v. Virginia Surface Mining & Reclamation Ass'n*,
  452 U.S. 264 (1981) .......................................................................... 28, 29

*Jimenez v. Peninsular & Oriental Steam Nav. Co.*,
  974 F.2d 221 (1st Cir. 1992) ............................................................... 12

*Koslow v. Pennsylvania*,
  302 F.3d 161 (3d Cir. 2002) ................................................................. 20

*Mayweathers v. Newland*,
  314 F.3d 1062 (9th Cir. 2002) ......................................................... 18, 22

*Mulvihill v. Top-Flite Golf Co.*,
  335 F.3d 15 (1st Cir. 2003) ............................................................. 11, 12

*Murphy v. National Collegiate Athletic Ass'n*,
  138 S. Ct. 1461 (2018) ............................................................... 27, 28, 29

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) .......................................................................... 18, 25

*New York v. United States*,
  505 U.S. 144 (1992) ....................................................................... 18, 27, 30

*Ocasio-Hernandez v. Fortuno-Burset*,
  640 F.3d 1 (1st Cir. 2011) ................................................................ 11

*Padilla v. Kentucky*,
  559 U.S. 356 (2010) ........................................................................ 19

*Printz v. United States*,
  521 U.S. 898 (1997) ................................................................... 27, 30

*Reno v. Condon*,
  528 U.S. 141 (2000) ................................................................... 25, 30

*Rodriguez-Ortiz v. Margo Caribe, Inc.*,
  490 F.3d 92 (1st Cir. 2007) .............................................................. 10

*Sepulveda-Villarini v. Dep't. of Educ. of P.R.*,
  628 F.3d 25 (1st Cir. 2010) .............................................................. 11

*Sierra Club v. EPA*,
  774 F.3d 383 (7th Cir. 2014) ............................................................ 22

*South Dakota v. Dole*,
  483 U.S. 203 (1987) .............................................................. 18, 21, 25

*Trans-Spec Truck Service, Inc. v. Caterpillar, Inc.*,
  524 F.3d 315 (1st Cir. 2008) ............................................................ 11

*United States v. House of Representatives of the United States*,
  556 F. Supp. 150 (D.D.C. 1983) ....................................................... 26

*United States v. Rumely*,
  345 U.S. 41 (1953) .......................................................................... 26

*United States v. Salerno*,
  481 U.S. 739 (1987) ........................................................................ 26

*Vigeant v. United States*,
  462 F. Supp. 2d 221 (D.R.I. 2006) .................................................... 12

## STATUTES

5 U.S.C. § 552 ............................................................................. 13, 23

5 U.S.C. § 901 .................................................................................. 16

8 U.S.C. § 1101 *et seq.* ...................................................................... 3

8 U.S.C. § 1226 .................................................................................. 8, 19, 24, 27

8 U.S.C. § 1227 .......................................................................................... 4, 19

8 U.S.C. § 1228 ............................................................................................... 19

8 U.S.C. § 1231 ...................................................................................... 8, 19, 27

8 U.S.C. § 1252c .............................................................................................. 5

8 U.S.C. § 1306 ................................................................................................ 4

8 U.S.C. § 1324 ...................................................................................... *passim*

8 U.S.C. § 1357 ....................................................................................... 5, 8, 24

8 U.S.C. § 1366 ................................................................................................ 4

8 U.S.C. § 1373 ...................................................................................... *passim*

8 U.S.C. § 1378 ............................................................................................... 19

8 U.S.C. § 1644 ................................................................................. 1, 8, 9, 25

8 U.S.C. ch. 12 ............................................................................................... 21

18 U.S.C. ch. 49 ............................................................................................. 21

18 U.S.C. § 1071 ........................................................................................ 7, 21

18 U.S.C. § 1072 ............................................................................................ 21

26 U.S.C. § 5853 ............................................................................................ 14

34 U.S.C. § 10102 .................................................................................. *passim*

34 U.S.C. § 10141 .......................................................................................... 16

34 U.S.C. § 10152 ...................................................................................... 6, 18

34 U.S.C. § 10153 ...................................................................................... 6, 14

34 U.S.C. § 10154 .......................................................................................... 14

34 U.S.C. § 10155 .......................................................................................... 16

34 U.S.C. § 10156 ........................................................................................................ 6

34 U.S.C. § 10202 ........................................................................................................ 7

34 U.S.C. § 10221 ...................................................................................................... 16

34 U.S.C. § 10251 ................................................................................................... 6, 18

34 U.S.C. § 10228 ................................................................................................. 16, 17

42 U.S.C. § 3712 (2005) ............................................................................................ 15

42 U.S.C. § 5779 ........................................................................................................ 30

49 U.S.C. app. § 1305 (1988) .................................................................................... 29

Pub. L. No. 90-351, 82 Stat. 197 (1968) ..................................................................... 2

Pub. L. No. 109-162, 119 Stat. 2960 (2005) ............................................................. 15

**RULES**

Fed. R. Civ. P. 12 ................................................................................................. 10, 11

Fed. R. Civ. P. 56 ................................................................................................. 10, 11

**REGULATIONS**

8 C.F.R. § 287.5 ........................................................................................................... 8

27 C.F.R. § 479.90 ..................................................................................................... 15

**OTHER AUTHORITIES**

Carl Campanile and Emily Saul,
    *Illegal immigrant charged with biting off ICE officer's fingertip*, New York Post (Mar. 15, 2019) ........................................................................................................ 20

Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015) ....................................... 6

Exec. Order No. 13,809, 82 Fed. Reg. 41,499 (Aug. 28, 2017) .................................. 6

H.R. Rep. No. 104-725 (1996) ................................................................................... 28

H.R. Rep. No. 109-233 (2005) ................................................................................... 15

https://nypost.com/2019/03/15/illegal-immigrant-charged-with-biting-off-ice-officers-fingertip/
................................................................................................................ 21

https://ojp.gov/funding/Explore/pdf/FY18JAG_STATE_13731644_Rev0816.pdf ...................... 9

*ICE arrests more than 20 released in New York after detainers ignored* (Mar. 5, 2019),
https://www.ice.gov/news/releases/ice-arrests-more-20-released-new-york-after-detainers-
ignored .............................................................................................................................. 21

Liaison, Merriam-Webster's Collegiate Dictionary (10th ed. 1998)........................................... 13

**INTRODUCTION**

In this case, the plaintiffs challenge certain requirements in the Fiscal Year ("FY") 2018 Edward Byrne Memorial Justice Assistance Grant Programs ("Byrne JAG Program"). In five counts in their Amended Complaint, plaintiffs challenge these requirements under the Spending Clause, the Administrative Procedure Act ("APA"), the Tenth Amendment, the constitutional separation of powers, and as ultra vires; plaintiffs also request a writ of mandamus and a nation-wide injunction against the Department.

The Amended Complaint should be dismissed in its entirety for failure to state a claim, or in the alternative, the defendants should be granted summary judgment on all claims. Among other claims, plaintiffs challenge the FY 2018 versions of the notice, access, and Section 1373 conditions that are similar to what this Court considered in the context of the FY 2017 Byrne JAG program earlier in this litigation. There, this Court entered a permanent injunction precluding defendants from enforcing the FY 2017 notice, access, and compliance conditions as to any FY 2017 Byrne JAG grant issued to any grantee in the State of Rhode Island. *See* Partial Judgment of Injunction and Writ of Mandamus, June 27, 2019 (ECF No. 35). Defendants respectfully disagree with the Court's previous ruling, move for dismissal of plaintiffs' challenge to the somewhat-similar FY 2018 conditions, and reiterate, incorporate, and preserve for further review the arguments made therein regarding the conditions.[1] Defendants, however, will not repeat their previous arguments regarding those conditions. Similarly, defendants will not repeat at length arguments regarding the constitutionality of 8 U.S.C. § 1373, which apply equally to 8 U.S.C. § 1644.

---

[1] *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment and in Support of Defendants' Motion to Dismiss, or, in the Alternative, Motion for Partial Summary Judgment (ECF No. 23-1); Defendants' Reply in Further Support of their Motion to Dismiss, or, in the Alternative, for Partial Summary Judgment (ECF No. 28).

Plaintiffs, however, now challenge two new Byrne JAG requirements not previously considered by this Court.  Beginning in FY 2018, the Office of Justice Programs ("OJP" or "Office") is requiring that the "programs or activities" receiving federal financial assistance under the Byrne JAG program refrain from publicly disclosing sensitive law enforcement information—communicated or made available *by the federal government*—for the purpose of frustrating law enforcement operations, in addition to reporting whether recipients are subject to laws that affect communication with federal immigration agencies.  Additionally, OJP requires that a grantee report whether a funded program or activity is subject to laws, policies, or practices that govern how employees may communicate with federal immigration authorities.  That the Department of Justice ("Department" or "DOJ") would include such conditions is unsurprising.  When Congress enacted the statute under which OJP (the Department's primary grant-making component) and the Byrne JAG program (the Department's primary law enforcement grant program) both are authorized, it made specific findings that "law enforcement efforts must be better coordinated, intensified, and made more effective at all levels of government," and declared that the overarching purpose of the statute is to "[t]o assist State and local governments in reducing the incidence of crime [and] to increase the effectiveness, fairness, and coordination of law enforcement and criminal justice systems at all levels of government."  Pub. L. No. 90-351, 82 Stat. 197 (1968).

Consistent with that congressional action, the purpose of these conditions is obvious:  If law enforcement partners at various levels of government are going to work together to address public safety, they must be free to share information without fear that it will be misappropriated and misused.  That plaintiffs are now seeking to vindicate a contrary position is remarkable.  OJP's authority to include these conditions is clear:  The Office is authorized to "maintain liaison with . . . State governments in matters relating to criminal justice."  34 U.S.C. § 10102 (a)(2).  The need for these conditions is even clearer given that an elected local official in another State recently made

public an impending federal law enforcement operation, intentionally frustrating the enforcement of federal law and putting officers' lives at risk. *See* Administrative Record at AR01038-39[2] (social media postings of the mayor of Oakland, California). Moreover, these conditions apply to federal law enforcement information regarding both illegal aliens and "fugitive[s] from justice" under the federal criminal laws, further illustrating the conditions' relationship to the purposes of the Byrne JAG Program.

The plaintiffs' claims should be dismissed with prejudice. As shown below, the challenged conditions are statutorily-authorized and do not violate the separation of powers. The conditions do not violate the Spending Clause because they are sufficiently related to the statutory purpose of Byrne JAG and are not ambiguous. The conditions are reasonable and satisfy the Administrative Procedure Act ("APA"). Finally, the plaintiffs' Tenth Amendment challenge and constitutional arguments about Sections 1373 and 1644 need not be addressed by this Court. But to the extent this Court does address those arguments, the challenge conditions satisfy scrutiny and the Sections 1373 and 1644 pass constitutional muster. Accordingly, the Amended Complaint should be dismissed.

## STATUTORY AND ADMINISTRATIVE BACKGROUND

### I.  The Immigration and Nationality Act

Enforcement of the immigration laws, including and especially the investigation and apprehension of criminal aliens, is quintessentially a law enforcement function. Through the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, Congress granted the Executive Branch significant authority to control the entry, movement, and other conduct of foreign nationals in the United States. These responsibilities are assigned to law enforcement agencies, as the INA

---

[2] The Administrative Record regarding the FY 2018 conditions was filed on May 30, 2019, in this matter as ECF No. 29.

authorizes the Department of Homeland Security ("DHS"), the Department of Justice, and other Executive agencies to administer and enforce the immigration laws.  The INA gives the Executive Branch considerable authority and discretion to conduct and direct immigration enforcement pursuant to federal policy objectives.  *See Arizona v. United States*, 567 U.S. 387, 396-97 (2012).

Several outcomes and federal agency responsibilities under the INA turn on the existence and timing of local or state criminal proceedings against aliens.  For example, the INA provides that aliens who have committed certain classes of crimes shall be removed from the United States upon order of the Attorney General or the Secretary of Homeland Security.  *See, e.g.*, 8 U.S.C. § 1227 (a)(2).  The Attorney General must report to the House and Senate judiciary committees on "the number of illegal aliens convicted of felonies in any Federal or State court [during the preceding year]" and "the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies"—"stating the number incarcerated for each type of offense."  *Id.* § 1366 (1), (2).

The connection between immigration law and criminal law is also reflected in the fact that the INA contains a number of criminal provisions related to immigration.  For example, the statute imposes criminal penalties on an alien for failing to register with federal authorities and for failing to notify federal authorities of a change of address.  *Id.* §§ 1306 (a), (b).  More seriously, the INA imposes criminal penalties on any person who conceals, harbors, or shields an alien from detention "in any place, including any building or any means of transportation," "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law."  *Id.* § 1324 (a)(1)(A)(iii).  It also imposes penalties for "engag[ing] in any conspiracy to commit any of the preceding acts" and for "aid[ing] or abet[ting] the commission of any of [those] acts."  *Id.* § 1324(a)(1)(A)(v).

The INA repeatedly contemplates coordination between federal officials and state and local officials on immigration enforcement.  For example, state and local officers are authorized to make arrests for violation of the INA's prohibitions against smuggling, transporting, or harboring aliens, *id.* § 1324(c), and to arrest certain felons who have unlawfully returned to the United States, *id.* § 1252c; *see also id.* § 1357 (g) (authorizing formal cooperative agreements under which trained and qualified state and local officers may perform specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens).  Consistent with this coordination and with the importance of state and local criminal proceedings under the INA, certain provisions of federal immigration law protect the transfer of information regarding aliens between and among federal officials and state and local government entities.  Section 1373 of Title 8 provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." Section 1644 of Title 8 contains substantially the same proscription.  Section 1373 also states that no person or agency may prohibit or restrict a federal, state, or local government entity from "[m]aintaining such information" or from "[e]xchanging such information with any other Federal, State, or local government entity."  The INA requires federal immigration authorities to "cooperate with the States" to ensure that state and local officials have information to assist them in making arrests under the INA.  *Id.* § 1252c (b).

## II.  DOJ Office of Justice Programs and the Byrne JAG Program

As described in prior filings before this Court, the Assistant Attorney General ("AAG") for OJP possesses "[s]pecific, general and delegated powers," including the power to "maintain liaison with . . . State governments in matters relating to criminal justice."  34 U.S.C. § 10102 (a)(2).  The statute also authorizes the AAG to "exercise such other powers and functions as may be vested in

[him] pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." *Id.* § 10102 (a)(6).

The predecessor to the Byrne JAG Program was created in the same statute that created OJP. Under this program, OJP is authorized to "make grants to States and units of local government . . . to provide additional personnel, equipment . . . and information systems for criminal justice, including for any one or more of [certain enumerated] programs," and "for any purpose for which a grant was authorized to be used" under the Byrne JAG Program's predecessor programs. *Id.* § 10152 (a). "[C]riminal justice" is defined broadly to include various activities of the police, the courts, and "related agencies." *Id.* § 10251 (a)(1).

The Byrne JAG Program provides "formula grants"—that is, grants that, when awarded, must follow a statutory formula based on population, the rate of violent crime, and other factors. *Id.* § 10156. By statute, to request a Byrne JAG grant, the chief executive officer of a State or unit of local government must submit an application "in such form as the Attorney General may require," *id.* § 10153 (a), and it must include, among other things, "[a] certification, made in a form acceptable to the Attorney General . . . that . . . the applicant will comply with . . . all . . . applicable Federal laws," *id.* § 10153(a)(5)(D).

OJP has historically included a variety of conditions in Byrne JAG awards. For example, the Office has imposed, without objection, conditions related to information-sharing and privacy protection, *see* AR00451, ¶ 26 (FY 2016 Byrne JAG award to New York City), research using human subjects, *see id.* ¶ 29, and training, *see id.* ¶¶ 32-33. Other historical conditions imposed by the Assistant Attorney General have been inspired by Executive Branch prerogatives, and in some instances resulted in *subsequent* congressional codification. One such condition, which prohibited use of Byrne JAG funds to purchase military style equipment, related in part to an Executive Order issued by President Obama in 2015. *See id.* AR00454, ¶ 46; Exec. Order No. 13,688, 80 Fed. Reg.

3451 (Jan. 16, 2015), *rescinded by* Exec. Order No. 13,809, 82 Fed. Reg. 41,499 (Aug. 28, 2017).  Since 2012, other conditions have required that recipients: (a) comply with specific national standards when purchasing body armor and (b) institute a "mandatory wear" policy for all officers (even those *not* using body armor purchased using JAG funds) if any body armor is purchased using JAG funds. AR00453, ¶¶ 38-39.

While the mandatory wear condition has now been codified by Congress, *see* 34 U.S.C. §§ 10202 (c)(1)(B), (C), it originated as an exercise of DOJ's authority to impose special conditions. And the AAG has imposed an "American-made" requirement for body armor purchases, which Congress did not choose to codify last year.  *See* AR00453, ¶ 38.  In recent years, the number of conditions attached to Byrne JAG Grants has typically numbered in the several dozen.  *See* AR00444-00455 (New York City FY 2016 award, containing 53 conditions).  And as discussed further below, immigration-related requirements date back to at least 2016, under the prior Administration.

In the Fiscal Year 2017 Byrne JAG grant cycle, OJP imposed the notice, access, and Section 1373 certification conditions.  The Court is already familiar with these conditions.  *See* Defendants' Memorandum of in Opposition to Plaintiffs' Motion for Partial Summary Judgment and in Support of Defendants' Motion to Dismiss, or, In the Alternative, Motion for Partial Summary Judgment (ECF No. 23-1), at 7-9.

For the current Byrne JAG grant cycle, Fiscal Year 2018, OJP notified potential applicants that awards under the Program would include certain conditions requiring modest cooperation with federal law enforcement responsibilities in the immigration setting.  As now issued to most 2018 applicants, those conditions require the following of Byrne JAG recipients (within the "program or activity" funded by the award):

- Consistent with the objectives of federal law enforcement statutes—including 8 U.S.C. § 1324 (a), the smuggling/harboring statute referred to above, and 18 U.S.C. § 1071—not to publicly disclose any sensitive federal law enforcement information in an attempt to harbor or shield from detection either a "fugitive from justice" under the federal criminal laws or an alien who "has come to, entered, or remains in the United States" in violation of federal immigration law, regardless of whether the disclosure would violate 8 U.S.C. § 1324 (a) (the "public-disclosure condition"), Central Falls FY 18 Award[3], ¶ 44; Providence FY 18 Award, ¶ 44.[4]

- Consistent with federal law enforcement statutes and regulations—including 8 U.S.C. § 1357 (a)(1), the INA interrogation statute referred to above, and 8 C.F.R. § 287.5 (a)(1)—not to interfere with the exercise of that authority by impeding the access of immigration officials to any correctional facility to meet with an alien for such an interrogation (the "FY 2018 access condition"), Central Falls FY 18 Award, ¶ 45; Providence FY 18 Award, ¶ 45.

- Consistent with federal law enforcement statutes—including 8 U.S.C. §§ 1231(a) and 1226(c)(1), the statutes requiring federal immigration officials to take custody of a criminal alien "when the alien is released" from state or local custody—not to interfere with the removal process by failing to notify immigration officials "as early as practicable" regarding the scheduled release date and time of an alien in the grantee's custody when requested by immigration officials (the "FY 2018 notice condition"), Central Falls FY 18 Award, ¶ 46; Providence FY 18 Award, ¶ 46.

- With respect to the "program or activity" receiving federal financial assistance under the award, not to have in place an "information-communication restriction" (defined to incorporate certain terms used in 8 U.S.C. §§ 1373 and 1644), and not to obligate or draw down grant funds if such a restriction is in place (the "FY 2018 Section 1373/1644 compliance condition"), Central Falls FY 18 Award, ¶¶ 41-43; Providence FY 18 Award, ¶¶ 41-43.

- To provide certain information to OJP regarding 1) whether a grantee jurisdiction has laws, policies, or practices related to how employees may communicate with DHS or ICE, or 2) if the grantee is subject to laws from a superior political entity that address the same issue (the "information-reporting condition"), FY 2018 Byrne JAG Solicitation, at P108.[5]

Under the "Rules of Construction" within those grant conditions, the FY 2018 award documents make clear that nothing in the FY 2018 notice condition requires a Byrne JAG grantee to

---

[3] The FY 18 Byrne JAG award to the City of Central Falls is at Pls.' Index of Exhibits to Motion for Partial Summary Judgment (ECF No. 34-3), at P143-168.

[4] The FY 18 Byrne JAG award to the City of Providence is at Pls.' Index of Exhibits to Motion for Partial Summary Judgment (ECF No. 34-3), at P114-P142.

[5] The FY 2018 Byrne JAG Solicitation is at Pls.' Index of Exhibits to Motion for Partial Summary Judgment (ECF No. 34-3), at P057-P113

detain "any individual in custody beyond the date and time the individual otherwise would have been released."  Central Falls FY 18 Award, ¶ 46(4)(B); Providence FY 18 Award, ¶ 46(4)(B).  The documents also make clear that this condition imposes no requirements in relation to any requests from federal immigration authorities to detain non-citizens, and that the condition requires "only as much advance notice as practicable" before the release of an alien.  *Id.*  Further, the award documents define "impeding" access to a correctional facility, for purposes of the interrogation condition, as taking any action or following any law or policy that "is designed to prevent or to significantly delay or complicate" such access or that "has the effect of preventing or of significantly delaying or complicating" such access.  Central Falls FY 18 Award, ¶ 45(4)(A)(3); Providence FY 18 Award, ¶ 45(4)(A)(3).

In order to assess each applicant's ability to fulfill the FY 2018 access and notice conditions, OJP required each applicant to submit a certification from its chief legal officer that—

> neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any prohibition or any restriction that would apply to the 'program or activity' to be funded in whole or in part under the FY 2018 OJP Program . . . , and that deals with either— (1) a government entity or -official sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. §§ 1373(a) & 1644; or (2) a government entity or -agency sending to, requesting or receiving from, maintaining, or exchanging information of the types (and with respect to the entities) described in 8 U.S.C. § 1373(b).

*See* https://ojp.gov/funding/Explore/pdf/FY18JAG_STATE_13731644_Rev0816.pdf (indicating the form and text of the certification); FY 2018 Byrne JAG Solicitation at 1, 41, 45.  Additionally, each applicant's chief executive was required to certify that he had "no reason to believe th[e foregoing] certification to be false or otherwise incorrect" (collectively, these requirements are the "FY 2018 certification requirement").  *See id.*

The Complaint purports to challenge five conditions:  the FY 2018 access condition, the FY 2018 Section 1373 / 1644 compliance condition, the FY 2018 notice condition, the information-

reporting condition, and the public-disclosure condition.  *See* Am. Compl. ¶¶ 64-69.  Additionally, the plaintiffs challenge certifications that relate to the conditions.  *See id.* at ¶ 70.

## ARGUMENT

Defendants moves for dismissal of the Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Alternatively, defendants move for summary judgment on all of plaintiffs' claims.  *See* Fed. R. Civ. P. 56.

On the merits, defendants recognize that this Court has already ruled against the challenged FY 2017 conditions.  *See* Memorandum and Order, June 10, 2019 (ECF No. 30).  In at least some respects, those FY 2017 conditions are similar to the FY 2018 access, notice, and Section 1373/1644 compliance conditions also being challenged here.  Defendants respectfully disagree with those rulings, but does not now repeat in full the arguments in defense of those FY 2017 and FY 2018 conditions, other than to incorporate herein the arguments made previously and to preserve them for further review.  *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment and in Support of Defendants' Motion to Dismiss, or, in the Alternative, Motion for Partial Summary Judgment (ECF No. 23-1); Defendants' Reply in Further Support of their Motion to Dismiss, or in the Alternative, for Partial Summary Judgment (ECF No. 28).

I.    **Standards of Review**

   A.  **Standard for a Motion To Dismiss for Failure To State a Claim under Federal Rule of Civil Procedure 12(b)(6).**

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal where the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). On a Rule 12(b)(6) motion, the court must accept the factual allegations of the non-moving party as true and draw all reasonable inferences in his favor.  *Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 96 (1st Cir. 2007).  In applying this standard, a complaint that does not allege a plausible legal and factual basis for the relief requested is subject to dismissal under the rule. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

561-562 (2007).  Specifically, to survive dismissal, a well-pleaded complaint requires more than conclusory allegations or the mere *possibility* that the pleader is entitled to relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 668 (2009); *Twombly*, 550 U.S. at 561-562.  Instead, to be viable, a claim must be "factually plausible," meaning that the alleged facts permit the court to draw a reasonable inference that the purported defendant is liable for the alleged conduct. Only factual allegations, and not legal conclusions, are afforded a presumption of veracity.  *Iqbal*, 556 U.S. at 677-79.  A mere recitation of the elements of a cause of action is not sufficient to state a plausible claim, *id.,* and as such "a plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action."  *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (internal citations omitted).  "The make-or-break standard  . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief."  *Id.* (quoting *Sepulveda-Villarini v. Dep't. of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010)).

In deciding a motion to dismiss under Rule 12(b)(6), the court may consider the challenged pleading, together with any documents incorporated by reference in that pleading, and matters subject to judicial notice.  This category of documents may be considered without converting the motion to one for summary judgment, and includes documents annexed to the complaint, as well as documents referenced in, or integral to, the pleading.  *Trans-Spec Truck Service, Inc. v. Caterpillar, Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) (internal citations omitted).

### B.  Standard for a Motion for Summary Judgment under Federal Rule of Civil Procedure 56.

Under Rule 56 summary judgment is warranted when, viewing the evidence in the light most favorable to the non-movant, the Court determines there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); *Eastman Kodak Co. v. Image Tech Servs., Inc.*, 504 U.S. 451, 457 (1992); *Mulvihill v. Top-Flite Golf Co.,* 335 F.3d 15, 19 (1st Cir. 2003) (quoting Fed. R. Civ. P. 56).

In this context, the moving party bears "initial responsibility of informing the district court of the basis for [his] motion, and identifying those portions of [the record] which [he] believes demonstrate the absence of a genuine issue of material fact." *Vigeant v. United States,* 462 F. Supp. 2d 221, 226 (D.R.I. 2006) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has done so, the burden shifts to the party opposing judgment "to demonstrate that a trialworthy issue exists." *Vigeant,* 462 F. Supp. 2d at 226 (quoting *Mulvihill,* 335 F.3d at 19. The party opposing judgment cannot meet his burden by merely alleging that a fact is in dispute or by simply denying the absence of disputed facts." *Vigeant,* 462 F. Supp. 2d at 226 (citing *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir. 1997). Absent a genuine dispute of material fact, questions of law are appropriate for resolution on summary judgment. *Jimenez v. Peninsular & Oriental Steam Nav. Co.,* 974 F.2d 221, 223 (1st Cir. 1992).

## II.     The Challenged Conditions are Permissible.

### A.  The Challenged Conditions are Authorized by Statute and Do Not Violate the Separation of Powers.

Count VII of the Amended Complaint asserts that the challenged FY 18 conditions are ultra vires. *See Am.* Compl., ¶¶ 143-148. Plaintiffs repeat this assertion in their opening brief to argue that the defendants lack statutory authority to impose the conditions. *See* Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment (FY 2018 Byrne JAG Program) (ECF No. 34-1) (hereinafter, "Pls.' Opening Brief"), at 21-35. As noted above, defendants reserve their arguments regarding the FY 2017 conditions and the FY 2018 conditions that are somewhat-similar to the FY 2017 conditions. With respect to the remaining conditions, an examination of the relevant statutes shows that the Assistant Attorney General for OJP possesses ample authority to impose these conditions.

As a preliminary matter, it is well-established that Congress may, consistent with the separation of powers, properly delegate to the Executive Branch the authority to impose requirements on recipients of agency spending.  *See, e.g., Clinton v. City of N.Y.*, 524 U.S. 417, 488 (1998) (Breyer, J., dissenting) ("Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money."); *DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275, 280-81 (D.C. Cir. 1989) (upholding conditions on spending where statute authorized President to set certain "terms and conditions as he may determine").

The content, history, and structure of the relevant statutes demonstrate that Congress delegated such authority.  Congress authorized the Assistant Attorney General for OJP to "maintain liaison with . . . State governments in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), to place "special conditions on all grants," and to determine "priority purposes for formula grants," *id.* § 10102(a)(6).  The authority to "maintain liaison" is alone sufficient for the public-disclosure condition.  Operational security—the confidentiality of law enforcement operations—is essential to law enforcement operations.[6]  Law enforcement officials at different levels of government must able to share information, without a concern that a public official at another level might publicize it.

A liaison is defined as "a close bond or connection" or "a person who establishes and maintains communication for mutual understanding and cooperation."  *See Liaison*, Merriam-Webster's Collegiate Dictionary (10th ed. 1998).  Thus, the AAG is responsible for maintaining "a close bond or connection" between federal and state criminal justice authorities and for facilitating "mutual understanding and cooperation" among such authorities.  This clearly encompasses, at minimum, protecting the confidentiality of federal law enforcement information provided to state and local agencies.  *Cf. Eringer v. Principality of Monaco*, No. CV 10-1803 GAF (EX), 2011 WL

---

[6] For example, the federal Freedom of Information Act protects the confidentiality of operational law enforcement information.  *See* 5 U.S.C. § 552(b)(7).

13134271, at *5 (C.D. Cal. Aug. 23, 2011) (stating that plaintiff's contract for "maintaining liaison" between the Principality and foreign intelligence agencies entailed "regularly shar[ing] sensitive intelligence information"), *aff'd*, 533 F. App'x 703 (9th Cir. 2013).  Maintaining liaison inherently includes maintaining integrity of communications channels.  And limiting what sensitive information can be shared is an indispensable part of requiring proper liaising between state and federal authorities.  The challenged conditions thus enable federal, state, and local law enforcement officials to work together effectively and safely—to "maintain liaison."

The public-disclosure condition is also supported by 34 U.S.C. § 10153(a)(4), which requires a grant application to include "[a]n assurance that . . the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require."  Keeping law enforcement information secret is obviously a way to "maintain . . . data."  Similarly, safeguarding the confidentiality of such information is also a form of "coordination with affected agencies."  *Id.* § 10153(a)(5)(C).

The information-reporting and certification conditions are also justified by the express statutory requirement to submit a Byrne JAG application "in such form as the Attorney General may require," 34 U.S.C. § 10153(a).  This confirms OJP's authority to require applicants to include certain information about any laws or policies regarding communication with federal immigration authorities.  And the authority to dictate the "form" of an application necessarily encompasses the authority to "disapprove any application," 34 U.S.C. § 10154, that fails to comply with the required form. That authority necessarily encompasses requiring that certain information be included in an application rather than only setting forth its "structure."  *Cf. Bogues v. United States*, 703 F. Supp. 2d 318, 329 (S.D.N.Y. 2010) (authority to dictate "form" and "manner" of application encompasses authority to determine when a new application must be submitted to continue the status granted pursuant to earlier application).  After all, the purpose of an application form is to collect

information to determine whether to grant or deny the application; therefore, determining the "form" of an application necessarily includes deciding what information to seek.  Indeed, many federal regulations enacted pursuant to an agency's authority to determine the "form" of an application set forth the information required in the application.  *See, e.g.*, 26 U.S.C. § 5853(c) (authorizing Secretary of the Treasury to determine "form and manner" of application to exempt certain firearms transfers from tax); 27 C.F.R. § 479.90 (setting forth content of application for tax-exempt firearms transfer and procedure for claiming exemption).

Further, the challenged conditions also fall within the AAG's authority to place "special conditions on all grants" and to determine "priority purposes for formula grants," 34 U.S.C. § 10102(a)(6).  Congress created the current version of the Byrne JAG Program in 2006, when the Reauthorization Act merged two earlier programs.  Pub. L. No. 109-162, 119 Stat. 2960.  Before the 2006 amendments, the relevant statute provided only that the AAG for OJP was authorized to "exercise such other powers and functions as may be vested in the [AAG] pursuant to this chapter or by delegation of the [Attorney General]."  *See* 42 U.S.C. § 3712 (a)(6) (2005).  In the Reauthorization Act, Congress expressly amended this provision by inserting the words "including placing special conditions on all grants, and determining priority purposes for formula grants."  Pub. L. No. 109-162, § 1152(b), 119 Stat. 2960, 3113 (2005); *see* 34 U.S.C. § 10102 (a)(6).  And confirming this amendment's plain text, the House Judiciary Committee report accompanying the Act states unequivocally that the amendment would "allow[] the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants."  H.R. Rep. No. 109-233, at 101 (2005).[7]

_____

[7] The legislative history of Section 10102(a)(6) demonstrates that Congress intended in the 2006 amendment to expand the authority of the AAG, not merely to repeat that the Attorney General could delegate preexisting authority to the AAG.  The relevant section of the House Report

Moreover, the AAG's authority to place "special conditions on all grants" and to determine "priority purposes for formula grants" clearly applies to the Byrne JAG Program.  Section 10102(a) sets forth the general duties and authorities of the AAG for OJP, and the Bureau of Justice Assistance, which directly administers the Byrne JAG Program, is part of OJP.  By statute, the Director of the Bureau of Justice Assistance "report[s] to the Attorney General through the Assistant Attorney General [for OJP]."  34 U.S.C. § 10141(b).  Thus, the authority conferred on the AAG by Section 10102(a)(6) necessarily reaches all programs under his supervision, including the Byrne JAG Program.[8]

Further, the independent authority to "determin[e] priority purposes for formula grants" plainly reflects an intent to allow the AAG to exercise a degree of discretion over *formula* grants in particular.  Such discretion must, if this language is to be afforded any meaningful legal effect, encompass at least the minimal authority to (1) articulate broad priorities for a given Fiscal Year's grant program; (2) include, on program application forms, inquiries regarding the designated priority purpose; and (3) protect the confidentiality of related federal law enforcement information.  In other words, the authority to "determine priority purposes" necessarily includes the authority to *prioritize* federal grant monies for those state and local jurisdictions that assist in furthering relevant federal *purposes*.  Additionally, because States and localities would decline to participate in—and thus,

---

is titled: "Section 242.  Coordination Duties of Assistant Attorney General" and reads in full: "Subsection 242(a) amends the authorizing statute for OJP to include the Office of Victims of Crime within the list of OJP bureaus.  Subsection 242(b) allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants."  H.R. Rep. No. 109-233, at 101 (2005).  It is significant what is *not* included here.  There is *no* mention of "including" or the powers delegated by the Attorney General.  Thus, this demonstrates that Congress intended to expand the AAG's powers in the 2006 amendment.  The plaintiffs' argument to the contrary in their Opening Brief at pp. 27-29 is simply wrong.

[8] *See also, e.g.,* 34 U.S.C. § 10155; *id.* § 10221(a); *id.* § 10221(c); 5 U.S.C. § 901(a).

-16-

effectively annul—the Byrne JAG Program were this authority invoked to impose unreasonable conditions, any arguable risk of overreach has a built-in structural check.

Finally, plaintiffs' argument that the challenged conditions violate 34 U.S.C. § 10228(a), *see* Pls.' Opening Brief, at 30-33, is without merit.  Section 10228(a) prohibits the federal government from "exercis[ing] any direction, supervision or control over any police force or any other criminal justice agency" of any state or locality. 34 U.S.C. § 10228(a).  Plaintiffs offer no explanation as to how a condition (applicable only to the "program or activity" receiving federal financial assistance under the grant award) prohibiting disclosure of sensitive *federal* law enforcement information or providing certain information to OJP in the application process—the conditions this Court has not yet addressed—could plausibly be said to exercise "direction, supervision, or control" over a state or local criminal justice agency.  In any event, "[t]he dominant concern of Congress apparently was to guard against any tendency towards federalization of local police and law enforcement agencies." *Ely v. Velde*, 451 F.2d 1130, 1136 (4th Cir. 1971).  None of the challenged conditions does any such thing.  After all, the Byrne JAG grant program is voluntary.  Plaintiffs consent to the conditions that are attached to the Byrne JAG grants.  DOJ is not forcing conditions on state or local law enforcement agencies.  Plaintiffs are free to forgo Byrne JAG program funds if any particular condition proves undesirable or unpalatable, but they are not free to dictate the terms on which they may help themselves to federal funds, ignoring lawfully imposed conditions in the process.

At its core, plaintiffs' argument that "Congress has not delegated any authority to the Executive that would permit DOJ to impose the FY 2018 immigration-related conditions" (Pls.' Opening Brief, at 33) is, in reality, a challenge to DOJ imposing *any* conditions on the Byrne JAG grant.  Plaintiffs fail to offer any limiting principle why the challenged conditions should fall, but the other special conditions that have been imposed *every year* since 2006 can survive.  Plaintiffs'

argument cannot prevail in the face of the multiple statutes cited above or the lengthy history of the Byrne JAG program.

### B.  The Challenged Conditions are Consistent with the Spending Clause.

Plaintiffs argue that the challenged conditions violate the Spending Clause.  *See* Am. Compl. ¶¶ 66-69 (Count X); Pls.' Opening Brief, at 37-40.  Under its spending authority, Congress "may offer funds to the States, and may condition those offers on compliance with specified conditions." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012).  It is well-established that the Spending Clause confers broad authority, such that conditions imposed pursuant to this authority may permissibly require States to "tak[e] certain actions that Congress could not [otherwise] require them to take."  *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 (1999). Nevertheless, the spending authority is subject to certain discrete limitations, two of which are purportedly at issue here:  (1) "conditions on federal grants may be illegitimate if they are unrelated to the federal interest in particular national projects or programs"; and (2) conditions must be "unambiguous[]."  *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).  The challenged conditions easily satisfy both of these aspects of *Dole*.

### 1.      The Conditions are Related to the Purposes of Byrne JAG.

Initially, it is well-established that the "relatedness" aspect of *Dole* does not pose a difficult hurdle; to the contrary, the Supreme Court has held that only "some relationship" is needed between spending conditions and "the purpose of the federal spending."  *New York v. United States*, 505 U.S. 144, 167 (1992); *see Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (stating that this "low-threshold" inquiry "is a far cry from . . . an exacting standard for relatedness").  As the D.C. Circuit has observed, the Supreme Court has never "overturned Spending Clause legislation on relatedness grounds."  *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004).

The Byrne JAG Program promotes "criminal justice" by supporting programs such as law enforcement, prosecution, crime prevention, and corrections. 34 U.S.C. § 10152 (a)(1). The term "criminal justice" is defined broadly under the Byrne JAG statute to include various activities of the police, the courts, and "related agencies." *Id.* § 10251 (a)(1). Further, immigration enforcement, which the challenged conditions promote, undoubtedly intersects with the Byrne JAG Program's criminal justice purposes, at a minimum for the simple reason that a conviction for any of a wide variety of criminal offenses renders an alien removable from this country. *See* 8 U.S.C. § 1227(a)(2). Indeed, the term "criminal alien" appears multiple times in the INA, and "[a] primary goal of several recent overhauls of the INA has been to ensure and expedite the removal of aliens convicted of serious crimes." 8 U.S.C. §§ 1226 (c), 1228(a), 1231(a)(6), 1378; *Duvall v. Atty. Gen. of U.S.*, 436 F.3d 382, 391 (3d Cir. 2006); *see Padilla v. Kentucky*, 559 U.S. 356, 360 (2010) (observing that "deportation or removal is now virtually inevitable for a vast number of noncitizens convicted of crimes") (citation omitted). Once removed, a criminal alien who has committed a removable offense is no longer present in this country with the potential to re-offend.

Indeed, the Ninth Circuit recently concluded that DOJ's determination that illegal immigration enforcement is a public safety issue was reasonable. *See City of Los Angeles v. Barr*, --- F.3d ----, 2019 WL 3049129 (9th Cir. 2019). According to the Ninth Circuit:

> DOJ's understanding that illegal immigration presents a public safety issues has been acknowledged by the Supreme Court. While it is not a crime for a removable alien to remain present in the United States, the Court has recognized that in some jurisdictions, such as Arizona's most populous county, aliens who have entered the country illegally are reported to be responsible for a disproportionate share of serious crime. The Court has noted that accounts in the record suggest there is an epidemic of crime, safety risks, serious property damage, and environmental problems' associated with the influx of illegal migration across private land near the Mexican border. Congress has likewise expressed concern about increasing rates of criminal activity by aliens.

*Id.* at *9 (citations, quotation marks, and alterations omitted).  The Ninth Circuit squarely rejected Los Angeles's Spending Clause challenge to related conditions on grant programming, noting that "cooperation relating to enforcement of federal immigration law is in pursuit of the general welfare, meets the low bar of being germane to the federal interest in providing the funding to address crime and disorder problems and otherwise . . . enhance public safety."  *Id.* at *8 (quotation marks and citation omitted).  Thus, the challenged conditions ensure that any "program or activity" funded by the Byrne JAG Program does not thwart the federal government's exercise of its ability to remove aliens not lawfully present in the United States or removable due to a criminal conviction.  *See Koslow v. Pennsylvania*, 302 F.3d 161, 176 (3d Cir. 2002) (observing that the challenged condition "govern[ed] only a 'program or activity' receiving federal funds," and noting that this limitation aided in satisfying "the 'relatedness' requirement articulated in *Dole*").  Declining to fund jurisdictions that disclose federal law enforcement information in an attempt to hinder federal law enforcement operations is plainly related to the criminal-justice purposes of the Byrne JAG Program.  The relationship of the public-disclosure condition to the purposes of this program are even clearer given that the condition protects not only federal law enforcement information regarding illegal aliens, but also information regarding "fugitive[s] from justice" under the federal criminal laws.  *See, e.g.*, Central Falls FY18 Award, ¶ 44.  Similarly, the information-reporting condition allows the Department to learn about potential situations where a jurisdiction is subject to laws that are adverse to federal law enforcement goals.  And finally, the certification condition ensures that grantees will faithfully comply with their requirements under this voluntary grant program.

Recent events further illustrate the need for these conditions and its relationship to the purposes of the program.  Included in the Administrative Record are public Twitter and Facebook posts by the mayor of a California city informing residents of an impending operation by federal immigration authorities.  *See* AR01038-39.  In those communications, the executive of a U.S.

jurisdiction specifically made a "public disclosure [of] federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection . . . any alien who [had] come to, entered, or remain[ed] in the United States" in violation of law.  Beyond that specific example, it is simply common sense that a lack of cooperation endangers ICE agents and communities.[9] Federal law enforcement officials must be able to inform state and local officials of impending operations without fear of compromising those operations.  Such basic coordination is essential not only for the success of operations but also for the safety of law enforcement personnel and the public.

In sum, ensuring that jurisdictions receiving federal law enforcement funds do not hinder the enforcement of immigration law supports the purposes of the Byrne JAG Program.

## 2.    These Conditions are Unambiguous.

When the federal government "desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation."  *Dole*, 483 U.S. at 207 (citation omitted).  The conditions easily satisfy this aspect of *Dole*, especially in light of the accompanying "Rules of Construction."

The public-disclosure condition states very clearly that it prohibits the "public disclosure [of] federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection any fugitive from justice under 18 U.S.C. ch. 49, or any alien who has come to, entered, or remains in the United States in violation of 8 U.S.C. ch. 12—without regard to whether such disclosure would constitute (or could form a predicate for) a violation of 18 U.S.C. [§§] 1071 or

---

[9] In March, an ICE agent was injured apprehending a suspect in the Bronx who had been released from custody despite an ICE detainer.   Carl Campanile and Emily Saul, *Illegal immigrant charged with biting off ICE officer's fingertip*, New York Post (Mar. 15, 2019), https://nypost.com/2019/03/15/illegal-immigrant-charged-with-biting-off-ice-officers-fingertip/; *see also ICE arrests more than 20 released in New York after detainers ignored* (Mar. 5, 2019), https://www.ice.gov/news/releases/ice-arrests-more-20-released-new-york-after-detainers-ignored.

1072 or of 8 U.S.C. [§] 1324(a)."  Providence FY 18 Award ¶ 44.  The Rules of Construction define "alien," "law enforcement sensitive information," "federal law enforcement information," and "public disclosure" in detail.  *See id.*  This condition, as well as the information-reporting condition and the certification condition are set forth in the Byrne JAG award documents, as evidenced by plaintiffs' ease of quoting them.  *See* Am. Compl. ¶¶ 61-73.  There is simply nothing mysterious or unclear about what the conditions require.[10]

Further, any arguable marginal uncertainty regarding the outer boundaries of this condition would not render it unconstitutionally ambiguous.  Indeed, the "exact nature of [grant] conditions may be 'largely indeterminate,' provided that the existence of the conditions is clear, such that [grantees] have notice that compliance with the conditions is required."  *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (quoting *Mayweathers*, 314 F.3d at 1067).

### C.  Plaintiffs' APA Claim Must Be Dismissed.

Count VIII of the Amended Complaint alleges that the decision to impose the challenged conditions runs afoul of the APA because it was arbitrary and capricious.  *See* Am. Compl. ¶¶ 149-156; Pls.' Opening Brief, at 41-45.  This challenge also fails as a matter of law.  Initially, if these conditions are statutorily authorized and comport with the Constitution—which they do—it is

---

[10] In their Opening Brief, plaintiffs make the unsupported argument that the public-disclosure condition is "broad enough to cover a situation where the Cities learn from a federal crime statistics database that ICE raids in schools and courthouses are increasing nationally, and City officials publicly comment to note the change, criticize the policy, and warn City residents of possible ICE enforcement actions at those sensitive locations."  Pls.' Opening Brief, at 39.  This is an exaggeration and not a violation of the condition.  The public-disclosure condition prohibits the disclosure of "federal law enforcement information" that is communicated or made available by the federal government to a state or local government entity, such as "notice of planned, imminent, commencing, continuing, or impending federal law enforcement activity."  *See, e.g.*, Providence FY 18 Award, ¶ 44(4)(A)(2).  And it prohibits such disclosure only if it is "made … in a direct or indirect attempt to conceal, harbor, or shield from detection" an individual described under 18 U.S.C. ch. 49 or who is in the United States in violation of 8 U.S.C. ch. 12.  *Id.* at ¶ 44(4)(A)(2).

unclear how "arbitrary or capricious" scrutiny could otherwise limit the Department's broad discretion.

When a court reviews an agency's action under the "arbitrary or capricious" standard, it is required to be "highly deferential" and to "presum[e] that agency actions are valid as long as the decision is supported by a rational basis." *Sierra Club v. EPA*, 774 F.3d 383, 393 (7th Cir. 2014). This standard of review is "narrow," and does not authorize a district court "to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

Even assuming OJP's imposition of these conditions were subject to arbitrary-and-capricious review notwithstanding the absence of any statutory standards governing the choice of special conditions and priority purposes, it is reasonable on its face for OJP to condition federal law enforcement grant funding on the agreement by the grantee that the "program or activity" receiving assistance from that funding will not publicly disclose sensitive *federal* law enforcement information in an attempt to shield an alien or fugitive from detection.  Indeed, the public-disclosure condition protects some of the same information covered by the law enforcement exemption to the federal Freedom of Information Act, which exempts from disclosure, among other things, information compiled for law enforcement purposes whose disclosure "could reasonably be expected to interfere with enforcement proceedings" or to "endanger the life or physical safety of any individual."  5 U.S.C. § 552 (b)(7).  Similarly, the information-reporting condition allows the federal government to learn if immigration enforcement agents will operate in jurisdictions with laws or policies at odds with their mission.  In short, "even in the absence of evidence, the agency's predictive judgment (which merits deference) makes entire sense" as "an exercise in logic rather than clairvoyance." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 521 (2009).

Information subject to judicial notice further supports the rationality of the challenged conditions.  The Department of Justice under the prior Administration instituted a requirement for FY 2016 Byrne JAG grantees to certify compliance with 8 U.S.C. § 1373 in order to protect the exchange of information among federal, state, and local law enforcement.  *See, e.g.* AR 00382-91 (July 2016 letter from DOJ to Congress stating determination that Section 1373 was an "applicable federal law"); AR00395-97 (July 2016 communication from DOJ to JAG applicants describing Section 1373); AR00317 (FY 16 Byrne JAG Local Solicitation describing Section 1373); AR00346-47 (FY 16 Byrne JAG State Solicitation describing Section 1373).  For the FY 2017 grant cycle, the Department added conditions similar to the notice and access conditions described above.  The FY 2018 requirements responded to further developments, including, in relation to the public-disclosure condition, at least one instance in which an elected official in another State publicly disclosed an impending federal law enforcement operation designed to apprehend suspected illegal aliens.

Finally, as discussed above in relation to the Spending Clause, immigration enforcement undoubtedly relates to criminal justice.  The challenged conditions thus rationally promote interests in "maintain[ing] liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102 (a)(2), and comports with the intergovernmental cooperation that Congress plainly contemplates in immigration enforcement.  *See, e.g.*, 8 U.S.C. §§ 1226(d), 1357(g), 1373; *see also Arizona v. United States*, 567 U.S. 387, 411-12 (2012 ("Consultation between federal and state officials is an important feature of the immigration system" and Congress "has encouraged the sharing of information about possible immigration violations.").

### D.  Plaintiffs' Tenth Amendment Claim Must Be Dismissed.

#### 1.    The Challenged Conditions Do Not Violate the Tenth Amendment or Anti-Commandeering Principles.

In Count IX of the Amended Complaint, plaintiffs allege that Sections 1373 and 1644 violate the Tenth Amendment.  *See* Am. Compl., ¶ 159.  Additionally, plaintiffs alleged that the FY

2018 notice and access condition, along with the public disclosure condition, also violate the Tenth Amendment. *See id.* at ¶¶ 160-61. This Court was previously faced with a similar argument from the plaintiffs that the FY 2017 notice, access, and section 1373 conditions supposedly violated the Tenth Amendment. *See id.* at ¶¶ 126-27. In its earlier opinion on the FY 2017 conditions, the Court declined to reach this argument. *See* Memorandum and Order (ECF No. 30), at 3.

This case involves a grant that the plaintiffs are free to accept or reject, not any federal mandate that directly regulates the plaintiffs. The relevant question here is *not* whether the grant conditions, if they were federally-compelled obligations of the plaintiffs, would infringe the Tenth Amendment. A "perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants." *Dole*, 483 U.S. at 210. Instead, the only pertinent constitutional question presented is whether the grant conditions are a valid exercise of the Spending Clause power. In that context, the federal government "may offer funds to the States, and may condition those offers on compliance with specified conditions. These offers may well induce the States to adopt policies that the Federal Government itself could not impose." *NFIB*, 567 U.S. at 537. Because the plaintiffs may simply decline to participate in the Byrne JAG Program, the plaintiffs' Tenth Amendment claim has no purchase here.

As to the public-disclosure condition, the Tenth Amendment is simply inapposite where plaintiffs are challenging conditions on a voluntary federal grant. It is well-established that "a perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants." *Dole*, 483 U.S. at 210. In any event, the Complaint offers no support for plaintiffs' apparent claim that a prohibition on *disclosing* certain sensitive information somehow commandeers the plaintiffs, *see* Am. Compl. ¶ 161. Such a claim is meritless on its face. *See Reno v. Condon*, 528 U.S. 141, 149-51 (2000) (federal

statute restricting state's ability to disclose certain personal information did not violate the commandeering doctrine).

> ### 2.    The Constitutionality of Sections 1373 and 1644 Need Not be Decided by this Court.

To any extent that the plaintiffs nevertheless could proceed with its claim that 8 U.S.C. § 1373 or 8 U.S.C. § 1644, as independent statutory mandates, are "facially unconstitutional" under a commandeering theory, Am. Compl. ¶ 159[11], the plaintiffs cannot meet their burden to show that "no set of circumstances exists under which the [Sections] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

The FY 2018 Byrne JAG program seeks to encourage the free-flow of communication between federal authorities and state or local personnel regarding immigration issues.  To accomplish this, Special Conditions 41-43 incorporate by reference some of the substantive concepts found in Section 1373,[12] as independent conditions upon the grantee.  Significantly, this is *not* enforcement of Section 1373 as a stand-alone statute.  Nor are the defendants attempting to enforce Section 1373 against the plaintiffs in this litigation.  As such, the Court need not determine the constitutionality of Section 1373 as a stand-alone statute.  "Courts have a duty to avoid unnecessarily deciding constitutional issues."  *United States v. House of Representatives of the United States*, 556 F. Supp. 150, 152 (D.D.C. 1983) (citing *United States v. Rumely*, 345 U.S. 41, 45-46 (1953)). Rather, the Court should analyze only whether the relevant Special Conditions are appropriate under the Spending Clause analysis.  As demonstrated above, these Special Conditions are germane to the

---

[11] In their Opening Brief's section on the Tenth Amendment argument, plaintiffs appear to pull back from challenging the FY 18 Notice condition, FY 18 Access condition, public-disclosure condition, information-reporting condition, or the related certifications.  This section of their brief addresses only Sections 1373 and 1644.  *See* Pls.' Opening Brief, at 35-36.

[12] Sections 1373 and 1644 are substantively similar. For convenience, reference will be made only to Section 1373, but defendants' arguments supporting one section apply equally to the other.

federal interest in the Byrne JAG program and are sufficiently clear.  The Court's analysis should stop there.

> 3.   **Sections 1373 and 1644 Validly Guard Against Frustration of the Federal Immigration Statutory Design.**

In any event, § 1373 is entirely consistent with the Tenth Amendment.  As noted, the statute provides that "State" and "local government entit[ies] or official[s]" "may not prohibit, or in any way restrict," any government entity or official from sharing with federal immigration authorities "information regarding the citizenship or immigration status" of any individual. 8 U.S.C. § 1373(a); *see also id.* § 1373(b) (similar).  The statute does not require jurisdictions to regulate in a particular area, as in *New York v. United States*, 505 U.S. 144 (1992), and *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018).  Nor does it require jurisdictions to enforce a federal regulatory scheme, as in *Printz v. United States*, 521 U.S. 898 (1997).  Rather, § 1373 is a permissible information-sharing requirement that preempts State and local governments from hindering the federal government's enforcement of the immigration laws against individual aliens.

As applied here, § 1373 pertains to the effects of state and local criminal custody on the INA's regulatory scheme concerning the removal and detention of individual aliens.  The INA provides that DHS "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment." 8 U.S.C. § 1231(a)(4)(A).  But within 90 days of "the date the alien is released from detention or confinement," DHS "shall remove" an alien subject to a final order of removal. *Id.* § 1231(a)(1)(A), (B)(iii). During this removal period, DHS "shall detain" the alien, and, if the alien has a qualifying criminal history, "[u]nder no circumstance[s] shall DHS release the alien during the removal period. *Id.* § 1231(a)(2).  Similarly, when an alien is not yet subject to a final order of removal, DHS may execute a warrant to arrest and detain the alien under § 1226(a) when he is released from local criminal custody and, if the alien has a qualifying criminal history, DHS "shall" take the alien into custody "when the alien is released," *id.* § 1226(c).

In this context, a requirement that localities provide DHS with information regarding immigration status (such as an alien prisoner's release date, which is essential to determining when the alien can be removed)—or § 1373's narrower requirement that localities *may not restrict* their officers from sharing such information with DHS—merely prevents localities from using the criminal-law authority over aliens that Congress has allowed them to retain in a manner that frustrates the operation of the parallel federal regulatory scheme for potential removal or detention upon aliens' release from local custody.  Even if Congress had not enacted § 1373, that would follow from basic principles of obstacle preemption.  *See Arizona v. United States*, 567 U.S. 387, 399 (2012). Congress did not create a scheme in which the federal government shall take custody of aliens upon their release from state criminal custody without having any mechanism for ascertaining when the alien would be released.  The INA's allowance for state criminal custody to be completed before removal is premised on the assumption that the federal government will be able to learn such aliens' release dates and seamlessly take them into federal custody in a safe and orderly manner.

The legislative history of § 1373 confirms this understanding.  Congress first prohibited restrictions on the sharing of "information regarding" an alien's "immigration status" as a response, in part, to laws enacted by "[v]arious localities" that "prevent[ed] local officials from disclosing the immigration status of individuals to INS."  H.R. Rep. No. 104-725, at 391 (1996).  The House Conference Report explained that the statute was intended to "give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens."  *Id.* at 383; *see id.* (the provision "is designed to prevent any State or local" prohibition or restriction on "any communication between State and local officials and the INS").

### 4.    The Sections are Constitutional under *Murphy v. NCAA* and other Controlling Precedent.

*Murphy* expressly did not disturb the bedrock principle that state and local laws that obstruct federal laws "regulat[ing] private actors" are "preempt[ed]."  138 S. Ct. at 1479.  That principle could

not save the statute at issue in *Murphy*, which did not "impose any federal restrictions on private actors," but instead sought to prohibit States from authorizing sports gambling schemes. *Id.* at 1481. By contrast, where, as here, both sovereigns regulate private individuals, the issue is not whether the federal government has commandeered a State, but whether the State's scheme is preempted insofar as it poses an obstacle to the effectuation of the federal scheme. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289-90 (1981) (It "is incorrect" to "assume that the Tenth Amendment limits congressional power to pre-empt or displace state regulation of private activities affecting interstate commerce.").

Congress could have provided for immediate removal of aliens regardless of pending local criminal prosecutions. Allowing local criminal custody to continue while requiring that localities facilitate the effectuation of—or at least not interfere with—an orderly transfer to federal officers at the end of such custody does not in any sense "commandeer" the locality into enforcing federal law, but merely places conditions on the locality's exercise of its own regulatory authority. *See Hodel*, 452 U.S. at 290-91 ("We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role."). In sum, so long as Congress is expressly (or implicitly) preempting a locality from interfering with federal regulation of private parties, it is not impermissibly regulating the locality directly.

Plaintiffs misunderstand the relevant analysis when it alleges that Section 1373 forces the states to regulate in a certain way. As the Supreme Court admonished in *Murphy*, "it is a mistake to be confused by the way in which a preemption provision is phrased," because "language might appear to operate directly on the States"—even in a targeted way—but in substance merely prevent the States from obstructing federal regulation of private parties. 138 S. Ct. at 1480; *see id.* (discussing 49 U.S.C. app. § 1305(a)(1) (1988)). That is exactly what § 1373 does: it preempts States and localities from hindering the INA's regulation of aliens.

Plaintiffs effectively assert that they may use their regulatory authority over persons who are also subject to federal regulatory authority in a way that impedes the operation of federal law. But this gets the matter backwards. By affirmatively asserting criminal custody over aliens whom the federal government seeks to detain and remove, plaintiffs' scheme impairs the exercise of the parallel federal scheme unless plaintiffs terminate custody in a manner that does not hinder the federal government in assuming custody. It is precisely when two regulatory schemes collide in this fashion that the Supremacy Clause authorizes Congress to prohibit a locality from using its authority to create an obstacle to the functioning of the federal scheme.

The federal government is not requiring plaintiffs to enforce federal law by arresting particular individuals or extending their custody. *See Printz*, 521 U.S. at 926 (citing *New York*, 505 U.S. at 188). Instead, it is the federal government that seeks to assume custody, and only of those aliens whom plaintiffs have already decided, for their own reasons, to take into custody pursuant to state criminal law. The federal government bears sole responsibility for the actions it takes with respect to private persons pursuant to its regulatory authority.

Moreover, even if § 1373 could properly be analyzed apart from the INA's general regulatory scheme, a requirement to not interfere with a federal inquiry about an alien's release date or other information regarding immigration status would in no sense be "commandeering" local officials to execute federal law. In *Printz*, the Supreme Court held that local law-enforcement officers could not be required to perform background checks to validate the legality of gun sales under federal law. At the same time, it distinguished statutes that "require only the provision of information to the Federal Government," as they "do not involve . . . the forced participation of the States' executive in the actual administration of a federal program." *Printz*, 521 U.S. at 918. The Supreme Court's Tenth Amendment cases are not properly read to invalidate reporting requirements, such as the requirement for "state and local law enforcement agencies to report cases of missing children to the

Department of Justice." *Id.* at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a)); *see Reno v. Condon*, 528 U.S. 141, 151 (2000) (Constitution does not prohibit federal enactments that "do[] not require the States in their sovereign capacity to regulate their own citizens," but instead "regulate[] the States as the owners of data bases").

**III.     Any Injunction Should Be Limited to the Parties.**

The Amended Complaint should be dismissed insofar as it seeks an injunction on behalf of parties not before the Court. *See City of Chicago v. Sessions*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018) (vacating nationwide aspect of injunction); *accord California v. Azar*, 911 F.3d 558, 582-84 (9th Cir. 2018) (reversing nationwide preliminary injunction as abuse of discretion); *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1243-45 (9th Cir. 2018).

While the plaintiffs continue to seek a nationwide injunction (Pls.' Opening Brief, at 50-52), this Court declined to do so previously in the context of the FY 2017 conditions. *See* Partial Judgment of Injunction and Writ of Mandamus (ECF No. 35), at ¶ 1.  Without restating them here, the defendants rely upon and incorporate their previous arguments against granting injunctive relief to any non-parties in this case. *See* Motion to Dismiss, or, in the Alternative, Cross-Motion for Partial Summary Judgment on Behalf of Defendants (ECF No. 23), at 45-48.  The Court should again decline to issue a nationwide injunction.

<u>**CONCLUSION**</u>

For the reasons set forth above, the Court should deny Plaintiffs' motion for partial summary judgment and grant the Defendants' motion to dismiss the Plaintiffs' claims challenging the FY 2018 immigration conditions, or alternatively, grant Defendants' motion for partial summary judgment on those same claims.

Respectfully submitted,

AARON L. WEISMAN
United States Attorney

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. TYLER
Assistant Director

 /s/ Daniel D. Mauler
DANIEL D. MAULER
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
(202) 616-0773 / (202) 616-8470 (fax)
dan.mauler@usdoj.gov

 /s/ Zachary A. Cunha
ZACHARY A. CUNHA (Bar No. 7855)
Assistant United States Attorney
50 Kennedy Plaza, 8th Floor
Providence, RI 02906
(401) 709-5000  /  (401) 709-5001 (fax)
Zachary.Cunha@usdoj.gov

## CERTFICATE OF SERVICE

I hereby certify that, on August 12, 2019, I caused the foregoing document to be filed by means of this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rules of Civil Procedure 5(b)(2)(E) and 5(b)(3) and Local Rules Gen 304 and 305.

By:     /s/ Zachary A. Cunha
        Zachary A. Cunha
        Assistant United States Attorney